1   BLOOD HURST & O'REARDON, LLP
    TIMOTHY G. BLOOD (149343)
2   THOMAS J. O'REARDON II (247952)
    701 B Street, Suite 1700
3   San Diego, CA  92101
    Telephone: (619) 338-1100
4   Facsimile: (619) 338-1101
    tblood@bholaw.com
5   toreardon@bholaw.com

6   GRANT & EISENHOFER P.A.
    ADAM J. LEVITT*
7   EDMUND S. ARONOWITZ*
    30 North LaSalle Street, Suite 1200
8   Chicago, Illinois  60602
    Telephone:  (312) 214-0000
9   Facsimile:  (312) 214-0001
    alevitt@gelaw.com
10  earonowitz@gelaw.com

11  SIPRUT PC
    JOSEPH J. SIPRUT*
12  ALEKSANDRA M.S. VOLD*
    TYLER ZANDERS*
13  17 N. State Street, Suite 1600
    Chicago, Illinois  60602
14  Telephone:  (312) 236-0000
    Facsimile:  (312) 948-9212
15  jsiprut@siprut.com
    avold@siprut.com
16  tzanders@siprut.com

17  Attorneys for Plaintiff

18              UNITED STATES DISTRICT COURT

19   NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

20  VINCENT D. MULLINS, individually and    Case No. 13      1271    KAW
    on behalf of all others similarly situated,
21                                           CLASS ACTION COMPLAINT
            Plaintiff,
22                                           CLASS ACTION
        v.
23                                           JURY TRIAL DEMANDED
    PREMIER NUTRITION CORPORATION
24  f/k/a JOINT JUICE, INC.,

25          Defendant.

26

27

28

00057376                    CLASS ACTION COMPLAINT

Plaintiff Vincent D. Mullins ("Plaintiff" or "Mullins") brings this class action complaint against Defendant Premier Nutrition Corporation f/k/a Joint Juice, Inc. ("Joint Juice" or "Defendant"), on behalf of himself and all others similarly situated, and complains and alleges upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1.      This is a consumer protection class action brought pursuant to Fed. R. Civ. Proc. 23 arising out of Defendant's false advertising its "Joint Juice" products. Defendant claims Joint Juice provides significant health benefits for the joints of all consumers who drink its products. These claimed health benefits are the only reason a consumer would purchase Joint Juice. Defendant's advertising claims, however, are false, misleading, and reasonably likely to deceive the public.

2.      Defendant markets, sells, and distributes Joint Juice, a line of joint health dietary supplements.[1] Through an extensive, integrated, and widespread nationwide marketing campaign, Defendant promises that Joint Juice will support and nourish cartilage, lubricate joints, and improve joint comfort. Defendant asserts that the ingredient glucosamine hydrochloride will provide these significant health benefits.

3.      The same promise is made on all of the subject Joint Juice products and throughout the Joint Juice marketing materials. For example, the Joint Juice six-bottle packaging prominently states that the Product "helps keep cartilage lubricated and flexible," and that consumers should "drink daily for healthy, flexible joints."

4.      Throughout its advertising and marketing, Defendant communicated the same substantive message on all of the Products' packaging and labeling: that the Products will improve the health of joints and relieve joint pain. As a result, the joint health benefit message on the packaging of Defendant's Products will be collectively referred to as Defendant's "joint

---

[1]   The Joint Juice line consists of: (1) Joint Juice supplement drink; (2) Joint Juice On-The-Go Drink Mix; and (3) Joint Juice Easy Shot Supplement (collectively, "Joint Juice" or the "Products"). Plaintiff reserves the right to include other Products as a result of discovery.

1 health benefit representations."

2      5.     Defendant's advertising and marketing campaign is designed to induce

3 consumers to purchase Joint Juice because of their reliance upon the accuracy of the deceptive

4 health benefits message. As a result of its extensive marketing campaign (in 2009, Defendant

5 spent a reported $3.5 million advertising Joint Juice), and in just the past six years, Defendant

6 has sold over $100 million dollars of the Joint Juice products.

7      6.     Defendant, however, has sold products that do not perform as advertised. As a

8 result of the misleading messages conveyed by its marketing campaign, Defendant has caused

9 consumers to purchase products that do not perform as advertised.

10      7.     Plaintiff brings this action on behalf of himself and all other similarly situated

11 consumers to halt Defendant's dissemination of this false and misleading advertising message,

12 correct the false and misleading perception it has created in the minds of consumers, and to

13 obtain redress for those who have purchased Joint Juice.

14                              **JURISDICTION AND VENUE**

15      8.     The Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The

16 matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000

17 and is a class action in which there are in excess of 100 class members and some of the

18 members of the class are citizens of states different from Defendant.

19      9.     This Court has personal jurisdiction over Defendant because Defendant is

20 authorized to and does conduct business in California. Defendant has marketed, promoted,

21 distributed, and sold Joint Juice in California, and Defendant's primary place of business is in

22 California, rendering exercise of jurisdiction by California courts permissible.

23      10.     Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because

24 a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this

25 district. Venue is also proper under 18 U.S.C. §1965(a) because Defendant transacts

26 substantial business in this District and is a resident of this District.

27      11.     Intradistrict Assignment: Pursuant to Civil Local Rules 3-2(c)-(d), and 3-5(b),

28 Defendant is headquartered in San Francisco County, this action otherwise arises in San

BLOOD HURST & O'REARDON, LLP

00057376

2

CLASS ACTION COMPLAINT

1    Francisco County, and it is therefore appropriate to assign this action to the San Francisco

2    Division.

**PARTIES**

*Plaintiff*

12.    Vincent Mullins is a citizen of the State of Illinois.  At all times relevant to this action, he resided in Cook County, Illinois.  In December 2012, Plaintiff Mullins was exposed to and saw Defendant's representations by reading the label of a Joint Juice "Weekly Pack" of eight-ounce beverage bottles at a Walgreen's pharmacy in Libertyville, Illinois.  In reliance on the joint health benefit representations on the front of the label, Plaintiff purchased the Joint Juice product for approximately $7.  By purchasing the falsely advertised product, Plaintiff suffered injury-in-fact and lost money.

13.    The Product does not provide the promised benefits.  Had Plaintiff known the truth about Defendant's misrepresentations and omissions at the time of his purchase, Plaintiff would not have purchased the Product.

*Defendant*

14.    Premier Nutrition Corporation ("Premier") f/k/a Joint Juice, Inc. is a corporation organized and existing under the laws of the state of Delaware.  Premier's headquarters is at 188 Spear Street, Suite 600, San Francisco, California 94105.  Premier is a manufacturer of high-protein nutrition products, including ready-to-drink shakes, bars, powders and cookies.  Premier's primary brands are Premier Protein and Joint Juice.  Premier manufactures, advertises, markets, distributes, and/or sells the Joint Juice products to tens of thousands of consumers in Illinois, California, and throughout the United States.  The conduct at issue substantially emanates from California.  From its headquarters and offices in California, Defendant creates the false and deceptive advertising campaign at issue, and promotes, markets, distributes, and sells the Products to many thousands of consumers throughout the United States, including through its retail website.  Defendant's CEO, chief financial officer, chief operating officer, marketing employees, research and development, and customer service personnel are also located in California.  Defendant's retail distribution

*BLOOD HURST & O'REARDON, LLP*

3
CLASS ACTION COMPLAINT

vendor is located in California, and its outside advertising agency is located in San Francisco.

15.    Joint Juice, Inc. n/k/a Premier Nutrition Corporation was a San Francisco-based corporation organized and existing under the laws of the state of California.   Joint Juice, Inc. was headquartered at 120 Howard Street, Suite 600, San Francisco, California 94105.   Joint Juice, Inc. was a leading provider of ready-to-drink glucosamine supplements.   Up until becoming known as Premier in 2011 or 2012, and from its headquarters and offices in California, Joint Juice, Inc. manufactured, advertised, marketed, distributed, and/or sold the Joint Juice products to tens of thousands of consumers in Illinois, California and throughout the United States.   On October 12, 2011, Joint Juice Inc. announced the acquisition of Premier Nutrition.

16.    Upon information and belief, Joint Juice's employees with decision-making relevant to this litigation, including Joint Juice's executives and marketing employees, are located in California.   For example, Mr. Ritterbush, who works out of San Francisco, is the current CEO of Premier and former CEO of Joint Juice.   The outside advertising agency used by Joint Juice is also located in San Francisco.   Further, Joint Juice represents that the Products were created by its founder, Dr. Kevin Stone, at the Stone Clinic in San Francisco.

## FACTUAL ALLEGATIONS

### The Joint Juice Products

17.    Since 1999, on a nationwide basis, Defendant has distributed, marketed, and sold the Joint Juice Products.

18.    The Joint Juice Products are sold by a variety of third-party retailers, including Costco, Sam's Club, Walgreens, Wal-Mart, and Target.   Defendant also sells Joint Juice directly to consumers through its website.

19.    The Joint Juice Products are available in 1) drink mix packets, which retail for approximately $22 for a thirty-count box, 2) eight-ounce beverage bottles, which retail for approximately $30 for a thirty-pack, or approximately $6 for a six-pack, and 3) Easy Shot™ bottles, which retail for approximately $15 for a twenty-ounce bottle containing sixteen servings.

BLOOD HURST & O'REARDON, LLP

00057376

20.     According to Defendant, and as stated on the Products' packaging, the Joint Juice Products contain 1,500 mg per serving of glucosamine hydrochloride.

21.     Glucosamine hydrochloride is a combination of glucosamine (an amino sugar compound produced by the body, and which can be isolated from shellfish) where the glucosamine is combined with hydrochloric acid.

22.     Unlike the Products at issue, other glucosamine-infused products often contain glucosamine sulfate, which is a combination of glucosamine and sulfur molecules.

23.     Glucosamine is one the most abundant monosaccharides (sugars) in the body.

24.     From a scientific perspective, it is impossible to extrapolate and conclude that because a result was demonstrated with glucosamine sulfate, that same result would be shown with glucosamine hydrochloride.

25.     Glucosamine hydrochloride is less expensive than glucosamine sulfate.

26.     According to a 2006 study published by the New England Journal of Medicine (discussed below), at least 20 million Americans are affected by osteoarthritis – a number that is expected to double over the next two decades.

27.     According to the Mayo Clinic, the signs and symptoms of osteoarthritis include joint pain, joint tenderness, joint stiffness, and the inability to move your joint through its full range of motion.[2]

***Defendant's False and Deceptive Advertising for the Joint Juice Products***

28.     Since the Products' launch, Defendant, through its advertisements including on the Products' packaging and labeling, has consistently conveyed the message to consumers throughout the United States that Joint Juice helps to support and nourish cartilage, "lubricate" joints, and help with "joint comfort," simply by consuming the Products.

29.     Defendant claims that glucosamine hydrochloride is the Products' primary active ingredient, and that chondroitin sulfate is an active ingredient.

---

[2]     http://www.mayoclinic.com/health/osteoarthritis/DS00019/DSECTION=symptoms (last visited March 15, 2013).

BLOOD HURST & O'REARDON, LLP

00057376

30.     Specifically, Defendant states on the Products' packaging and in its marketing materials that Joint Juice helps: to support and nourish cartilage, "lubricate" joints, and improve joint comfort without any limitation on which joints, for adults of *all* ages and without any limitation on what stages of joint related ailments.

31.     In its marketing materials, including on its packaging and labeling, Defendant also represents that Joint Juice was "originally developed for pro athletes by orthopedic surgeon Kevin R. Stone, M.D. to keep joints healthy and flexible."

32.     Defendant's marketing representations repeat and reinforce the claims made on the packaging and labeling for the Products.   For example, on its website, Defendant represents that "[e]veryone has over 200 moving joints in his or her body, covered by articulate cartilage. . . . Glucosamine in Joint Juice stimulates production of lubricants your joints use to stay healthy and flexible."[3]

33.     Defendant's advertising deceptively reinforces the health benefits message through references to "expert stories," including from Dr. Kevin Stone, Joint Juice's founder and co-owner.   According to an article written by Dr. Stone and posted on Defendant's website, "[t]aking glucosamine and chondroitin together – in the liquid formula found only in Joint Juice® products – ensure that you get a full day's supply of glucosamine (1,500 mg) and chondroitin to maintain healthy and happy joints."

34.     Defendant's website also contains a prominent link to a "Joint Juice® joint health assessment."   This marketing gimmick further reinforces the false and misleading representation that Joint Juice will provide the significant, advertised health benefits.

35.     Likewise, in a 60-second television commercial, Joint Juice spokesman Joe Montana, who states that "my joints have gotten a little stiff lately and at first I thought I had to live with it because of pro football and just getting older," makes the false and deceptive representations that "the glucosamine and chondroitin lubricates and cushions the cartilage in my joints so I can move more easily . . . it works great for anyone who likes to keep moving!" Further adding unfounded credibility to the deceptive claim, the Joint Juice advertisement also

_____

[3]     JOINTJUICE, http://www.jointjuice.com/healthyjoints.asp (last visited March 4, 2013).

BLOOD HURST & O'REARDON, LLP

00057376

BLOOD HURST & O'REARDON, LLP

1   states that Joint Juice "was originally developed by an orthopedic surgeon for pro athletes."[4]

2   According to Defendant, "glucosamine and chondroitin have been proven to help maintain

3   joint function and mobility."[5]

4       36.    The Products' packaging appears as follows:

5          EasyShot™ (Front)                    EasyShot™ (Back)

 

---

25   [4]    "Extraordinary Joe", available at http://www.youtube.com/watch?v=9qOqK_GjoUM
     (last visited March 15, 2013); *see also* http://www.youtube.com/watch?v=EYN-hoTYELE (30
26   second version of the "Extraordinary Joe" television ad makes the same representations) (last
     visited March 15, 2013).
27   [5]    "Joe Montana Partners with Joint Juice, Inc. to Get American on a Health Joint
     Regimen," available at http://www.bevnet.com/news/2011/joe-montana-partners-with-joint-
28   juice-inc-to-get-americans-on-a-healthy-joint-regimen (last visited March 15, 2013).

00057376

Drink Mix Box (Front)

Drink Mix Box (Back)





Beverage Bottle Six-Pack (Back)



*Scientific Studies Confirm That Joint Juice Is Not Effective And Defendant's Health Benefits Message Is False And Deceptive*

37.    Despite Defendant's representations, glucosamine, alone or in combination with other ingredients including chondroitin sulfate, is *not* effective in providing the represented joint health benefits.

38.    For example, a 1999 study involving 100 subjects by Houpt *et al.*, entitled *Effect of glucosamine hydrochloride in the treatment of pain of osteoarthritis of the knee*, 26(11) J. Rheumatol. 2423-30 (1999), found that glucosamine hydrochloride performed no better than placebo at reducing pain at the conclusion of the eight week trial.

39.    Likewise, a 2004 study by McAlindon, *et al.*, entitled *Effectiveness of Glucosamine For Symptoms of Knee Osteoarthritis: Results From and Internet-Based Randomized Double-Blind Controlled Trial*, 117(9) Am. J. Med. 649-9 (Nov. 2004), concluded that "glucosamine was no more effective than placebo in treating symptoms of knee osteoarthritis" – in short, that glucosamine is ineffective. *Id.* at 646 ("we found no difference between the glucosamine and placebo groups in any of the outcome measures, at any of the assessment time points").

40.    Many studies have also confirmed there is a significant "placebo" effect with respect to consumption of products represented to be effective in providing joint health benefits such as Defendant's Products.

41.    Indeed, more than 30% of persons who took placebos in these studies believed that they were experiencing joint health benefits when all they were taking was a placebo.

42.    A 2004 study by Cibere, *et al.*, entitled *Randomized, Double-Blind, Placebo-Controlled Glucosamine Discontinuation Trial In Knee Osteoarthritis*, 51(5) Arthritis Care & Research 738-45 (Oct. 15, 2004), studied users of glucosamine who had claimed to have experienced at least moderate improvement after starting glucosamine. These patients were divided into two groups – one that continued using glucosamine and one that was given a placebo. For six months, the primary outcome observed was the proportion of disease flares in the glucosamine and placebo groups. A secondary outcome was the time to disease flare. The

9

00057376

BLOOD HURST & O'REARDON, LLP

study results reflected that there were no differences in either the primary or secondary outcomes for glucosamine and placebo.  The authors concluded that the study provided no evidence of symptomatic benefit from continued use of glucosamine – in other words, any prior perceived benefits were due to the placebo effect and *not* glucosamine.  *Id.* at 743 ("In this study, we found that knee OA disease flare occurred as frequently, as quickly, and as severely in patients who were randomized to continue receiving glucosamine compared with those who received placebo.  As a result, the efficacy of glucosamine as a symptom-modifying drug in knee OA is not supported by our study.").

43.     A large (1,583 subjects), 24-week, multi-center RCT study sponsored by the National Institute of Health ("NIH"), published in the New England Journal of Medicine (the "2006 GAIT Study"), concluded: "[t]he analysis of the primary outcome measure did not show that either [glucosamine or chondroitin], alone or in combination, was efficacious. . . ." Clegg, D., *et al.*, *Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee Osteoarthritis*, 354 New England J. of Med. 795, 806 (2006).

44.     The 2006 GAIT Study authors rigorously evaluated the effectiveness of glucosamine hydrochloride and chondroitin, alone and in combination, on osteoarthritis for six months.  According to the study's authors, "[t]he analysis of the primary outcome measure did not show that either supplement, alone or in combination, was efficacious. . . ." 2006 GAIT Study at 806.[6]

45.     Subsequent GAIT studies in 2008 and 2010 reported that glucosamine and chondroitin did not rebuild cartilage[7] and were otherwise ineffective – even in patients with moderate to severe knee pain for which the 2006 reported results were inconclusive.  *See* Sawitzke, A.D., *et al.*, *The Effect of Glucosamine and/or Chondroitin Sulfate on the*

---

[6]  The 2006 GAIT Study was funded by the National Center for Complementary & Alternative Medicine and the National Institute of Arthritis and Musculoskeletal and Skin Diseases, two components of NIH.

[7]  To similar effect, a study by Kwok, *et al.*, entitled *The Joints On Glucosamine (JOG) Study: A Randomized, Double-Blind, Placebo-Controlled Trial To Assess The Structural Benefit Of Glucosamine In Knee Osteoarthritic Based On 3T MRI*, 60 Arthritis Rheum 725 (2009) concluded that glucosamine was not effective in preventing the worsening of cartilage damage.

BLOOD HURST & O'REARDON, LLP

*Progression of Knee Osteoarthritis: A GAIT Report*, 58(10) J. Arthritis Rheum. 3183–91 (Oct. 2008); Sawitzke, A.D., *Clinical Efficacy And Safety Of Glucosamine, Chondroitin Sulphate, Their Combination, Celecoxib Or Placebo Taken To Treat Osteoarthritis Of The Knee: 2-Year Results From GAIT*, 69(8) Ann Rhem. Dis. 1459-64 (Aug. 2010).

46.     The GAIT studies are consistent with the reported results of prior and subsequent studies.  For example, the National Collaborating Centre for Chronic Conditions ("NCCCC") reported "the evidence to support the efficacy of glucosamine hydrochloride as a symptom modifier is poor" and the "evidence for efficacy of chondroitin was less convincing." NCCCC, Osteoarthritis National Clinical Guideline for Care and Management of Adults, Royal College of Physicians, London 2008.  Consistent with its lack of efficacy findings, the NCCCC Guideline did not recommend the use of glucosamine or chondroitin for treating osteoarthritis. *Id.* at 33.

47.     In a 2007 report, Vlad, *et al.* reviewed all studies involving glucosamine hydrochloride and concluded that "[g]lucosamine hydrochloride is not effective." *Glucosamine for Pain in Osteoarthritis*, 56:7 Arthritis Rheum. 2267-77 (2007); *see also id.* at 2275 ("we believe that there is sufficient information to conclude that glucosamine hydrochloride lacks efficacy for pain in OA").

48.     Even studies not concerning the type of glucosamine in the Joint Juice Products demonstrate that glucosamine does not provide the joint health benefits that Defendants represent.  For example, a study by Rozendaal, *et al.*, entitled *Effect of Glucosamine Sulfate on Hip Osteoarthritis*, 148 Ann. of Intern. Med. 268-77 (2008), assessing the effectiveness of glucosamine on the symptoms and structural progression of hip osteoarthritis during two years of treatment, concluded that glucosamine was no better than placebo in reducing symptoms and progression of hip osteoarthritis.

49.     In December 2008, the American Academy of Orthopaedic Surgeons published clinical practice guidelines for the "Treatment of Osteoarthritis of the Knee (Non-Arthroplasty)," and recommended that "glucosamine and sulfate or hydrochloride not be prescribed for patients with symptomatic OA of the knee."  Richmond *et al.*, *Treatment of*

11

BLOOD HURST & O'REARDON, LLP

00057376

*osteoarthritis of the knee (nonarthroplasty)*, J. Am. Acad. Orthop. Surg. Vol. 17 No. 9 591-600 (2009). This recommendation was based on a 2007 report from the Agency for Healthcare Research and Quality (AHRQ), which states that "the best available evidence found that glucosamine hydrochloride, chondroitin sulfate, or their combination did not have any clinical benefit in patients with primary OA of the knee." Samson, *et al.*, *Treatment of Primary and Secondary Osteoarthritis of the Knee*, Agency for Healthcare Research and Quality, 2007 Sep 1. Report No. 157.

50.     In 2009, a panel of scientists from the European Food Safety Authority ("EFSA") (a panel established by the European Union to provide independent scientific advice to improve food safety and consumer protection), reviewed nineteen studies submitted by an applicant, and concluded that "a cause and effect relationship has not been established between the consumption of glucosamine hydrochloride and a reduced rate of cartilage degeneration in individuals without osteoarthritis." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of a health claim related to glucosamine hydrochloride and reduced rate of cartilage degeneration and reduced risk of osteoarthritis*, EFSA Journal (2009), 7(10):1358.

51.     In a separate opinion from 2009, an EFSA panel examined the evidence for glucosamine (either hydrochloride or sulfate) alone or in combination with chondroitin sulfate and maintenance of joints. The claimed effect was "joint health," and the proposed claims included "helps to maintain healthy joint," "supports mobility," and "helps to keep joints supple and flexible." Based on its review of eleven human intervention studies, three meta-analyses, 21 reviews and background papers, two animal studies, one in vitro study, one short report, and one case report, the EFSA panel concluded that "a cause and effect relationship has not been established between the consumption of glucosamine (either as glucosamine hydrochloride or as glucosamine sulphate), either alone or in combination with chondroitin sulphate, and the maintenance of normal joints." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of health claims related to glucosamine*

*alone or in combination with chondroitin sulphate and maintenance of joints and reduction of inflammation*, EFSA Journal (2009), 7(9):1264.

52. A 2010 meta-analysis by Wandel, *et al.*, entitled *Effects of Glucosamine, Chondroitin, Or Placebo In Patients With Osteoarthritis Or Hip Or Knee: 'Network Meta-Analysis*, BMJ 341:c4675 (2010), examined prior studies involving glucosamine and chondroitin, alone or in combination, and whether they relieved the symptoms or progression of arthritis of the knee or hip. The study authors reported that glucosamine and chondroitin, alone or in combination, did not reduce joint pain or have an impact on the narrowing of joint space: "Our findings indicate that glucosamine, chondroitin, and their combination do not result in a relevant reduction of joint pain nor affect joint space narrowing compared with placebo." *Id.* at 8. The authors further concluded "[w]e believe it unlikely that future trials will show a clinically relevant benefit of any of the evaluated preparations." *Id.*

53. On July 7, 2010, Wilkens, *et al.*, reported that there was no difference between placebo and glucosamine for the treatment of low back pain and lumbar osteoarthritis and that neither glucosamine nor placebo were effective in reducing pain related disability. The researchers also concluded that, "Based on our results, it seems unwise to recommend glucosamine to all patients" with low back pain and lumbar osteoarthritis. Wilkens, *et al.*, *Effect of Glucosamine on Pain-Related Disability in Patients With Chronic Low Back Pain and Degenerative Lumbar Osteoarthritis*, 304(1) JAMA 45-52 (July 7, 2010).

54. In 2011, Miller and Clegg, after surveying the clinical study history of glucosamine and chondroitin, concluded that, "[t]he cost-effectiveness of these dietary supplements alone or in combination in the treatment of OA has not been demonstrated in North America." Miller, K. and Clegg, D., *Glucosamine and Chondroitin Sulfate*, Rheum. Dis. Clin. N. Am. 37 103-118 (2011).

55. In 2012, a report by Rovati, *et al.* entitled *Crystalline glucosamine sulfate in the management of knee osteoarthritis: efficacy, safety, and pharmacokinetic properties*, Ther Adv Muskoloskel Dis 4(3) 167-180, noted that glucosamine hydrochloride "ha[s] never been shown to be effective."

BLOOD HURST & O'REARDON, LLP

56.     In 2012, EFSA examined the evidence glucosamine sulphate or glucosamine hydrochloride, and a claimed effect of "contributes to the maintenance of normal joint cartilage." Based on its review of 61 references provided by Merck Consumer Healthcare, the EFSA panel concluded that "a cause and effect relationship has not been established between the consumption of glucosamine and maintenance of normal joint cartilage in individuals without osteoarthritis." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of a health claim related to glucosamine and maintenance of normal joint cartilage*, EFSA Journal 2012, 10(5): 2691.

**The Impact of Defendant's Wrongful Conduct**

57.     Despite clinical studies that show the ingredients in Defendant's Joint Juice products are ineffective, Defendant conveyed and continues to convey one uniform health benefits message:   Joint Juice supports and nourishes cartilage, "lubricates" joints, and improves joint comfort in all joints in the human body, for adults of all ages and for all manner and stages of joint-related ailments.

58.     As the inventor, manufacturer, and distributor of Joint Juice, Defendant possesses specialized knowledge regarding the content and effects of the ingredients contained in Joint Juice and Defendant is in a superior position to know whether its Products work as advertised.

59.     Specifically, Defendant knew, but failed to disclose, that Joint Juice does not provide the joint health benefits represented and that well-conducted, clinical studies have found the ingredients in Joint Juice to be ineffective in providing the joint health benefits represented by Defendant.

60.     Plaintiff and the other Class members have been and will continue to be deceived or misled by Defendant's false and deceptive joint health benefit representations. Plaintiff purchased Joint Juice during the Class period and in doing so, read and considered the Product's label and based his decision to purchase the Product on the joint health benefit representations on the Product packaging.  Defendant's joint health benefit representations and omissions were a material factor in influencing Plaintiff's decision to purchase the Product.

BLOOD HURST & O'REARDON, LLP

14

00057376

61.     The only purpose for purchasing Joint Juice is to obtain the represented joint health benefits.  Although it does not provide the represented, significant health benefits, Joint Juice retails for approximately $2.94 per quart.[8]

## CLASS DEFINITION AND ALLEGATIONS

62.     Plaintiff asserts Counts I and II on behalf of a class pursuant to Fed. R. Civ. Proc. 23(b)(2) and (3) defined as:

> All persons who purchased in the United States any Joint Juice product (the "Class").

Excluded from the Class is the Defendant, its parents, subsidiaries, affiliates, officers, and directors; those who purchased the Joint Juice products for the purpose of resale; all persons who make a timely election to be excluded from the Class; the judge to whom this case is assigned and any immediate family members thereof; and those who assert claims for personal injury.

63.     In the alternative, Plaintiff asserts Count III on behalf of a class pursuant to Fed. R. Civ. Proc. 23(b)(2) and (3) defined as:

> All those who purchased in Illinois any Joint Juice products (the "Illinois Class").

Excluded from the Illinois Class is the Defendant, its parents, subsidiaries, affiliates, officers, and directors; those who purchased the Joint Juice products for the purpose of resale; all persons who make a timely election to be excluded from the Class; the judge to whom this case is assigned and any immediate family members thereof; and those who assert claims for personal injury.

64.     The Class and Illinois Class are collectively referred to as the "Class," unless specifically indicated otherwise.

65.     Certification of Plaintiff's claims for class wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class wide basis using the same

---

[8]   At Wal-Mart's online store, a six-pack of 8-ounce bottles costs $4.42. http://www.walmart.com/ip/ Joint-Juice-Glucosamine-Chondroitin-Blend-Blueberry-Acai-4-6pk-8oz/14292593 (last visited Feb. 19, 2013).

BLOOD HURST & O'REARDON, LLP

00057376

1    evidence as would be used to prove those elements in individual actions alleging the same

2    claims.

3        66.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the

4    Class are so numerous that individual joinder of all Class members is impracticable.

5    Defendant has sold many thousands of units of Products to Class members.

6        67.    **Commonality and Predominance – Federal Rule of Civil Procedure**

7    **23(a)(2) and 23(b)(3).**   This action involves common questions of law and fact, which

8    predominate over any questions affecting individual Class members, including, without

9    limitation:

(a)    Whether the representations discussed herein that Defendant made
about its Joint Juice Products were or are true, or are misleading, or
likely to deceive;

(b)    Whether Defendant's conduct violates public policy;

(c)    Whether Defendant engaged in false or misleading advertising;

(d)    Whether Defendant's conduct constitutes violations of the laws
asserted herein;

(e)    Whether Plaintiff and the other Class members have been injured and
the proper measure of their losses as a result of those injuries; and

(f)    Whether Plaintiff and the other Class members are entitled to
injunctive, declaratory, or other equitable relief.

21       68.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are

22   typical of the other Class members' claims because, among other things, all Class members

23   were comparably injured through the uniform prohibited conduct described above.

24       69.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**

25   Plaintiff is an adequate representative of the Class because his interests do not conflict with the

26   interests of the other Class members he seeks to represent; he has retained counsel competent

27   and experienced in complex commercial and class action litigation; and Plaintiff intends to

28

BLOOD HURST & O'REARDON, LLP

00057376

16

prosecute this action vigorously.   The interests of the Class members will be fairly and adequately protected by the Plaintiff and his counsel.

70.   **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class as a whole.

71.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct.   Even if Class members could afford individual litigation, the court system could not.   Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.   By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS ALLEGED

## COUNT I

### Violation of Business & Professions Code §17200, *et seq.*
### (On behalf of the Class)

72.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

73.   As alleged herein, Plaintiff has suffered injury in fact and lost money or property as a result of Defendant's conduct because he purchased one of Defendant's falsely advertised Joint Juice Products in reliance on the false advertisements.

74.   The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL"), and similar laws in other states, prohibits any "unlawful," "fraudulent" or "unfair"

17

BLOOD HURST & O'REARDON, LLP

1   business act or practice and any false or misleading advertising.  In the course of conducting

2   business, Defendant committed unlawful business practices by, among other things, making

3   the representations (which also constitutes advertising within the meaning of §17200) and

4   omissions of material facts, as set forth more fully herein, and violating Civil Code §§1572,

5   1573, 1709, 1711, 1770(a)(5), (7), (9) and (16) and Business & Professions Code §§17200, *et*

6   *seq.*, 17500, *et seq.*, and the common law.

7       75.    Plaintiff, individually and on behalf of the other Class members, reserves the

8   right to allege other violations of law, which constitute other unlawful business acts or

9   practices.  Such conduct is ongoing and continues to this date.

10      76.    In the course of conducting business, Defendant committed "unfair" business

11  practices by, among other things, making the representations (which also constitute advertising

12  within the meaning of §17200) and omissions of material facts regarding Joint Juice Products

13  in its advertising campaign, including the Products' packaging, as set forth more fully herein.

14  There is no societal benefit from false advertising – only harm.  Plaintiff and the other Class

15  members paid for a valueless product that does not confer the benefits it promises.  While

16  Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its

17  false misrepresentations and omissions.  As a result, Defendant's conduct is "unfair," as it

18  offended an established public policy.  Further, Defendant engaged in immoral, unethical,

19  oppressive, and unscrupulous activities that are substantially injurious to consumers.

20      77.    Further, as set forth in this Complaint, Plaintiff alleges violations of consumer

21  protection, unfair competition, and truth in advertising laws in California and other states,

22  resulting in harm to consumers.  Defendant's acts and omissions also violate and offend the

23  public policy against engaging in false and misleading advertising, unfair competition, and

24  deceptive conduct towards consumers.  This conduct constitutes violations of the unfair prong

25  of Business & Professions Code §17200, *et seq.*

26      78.    There were reasonably available alternatives to further Defendant's legitimate

27  business interests, other than the conduct described herein.  Business & Professions Code

28  §17200, *et seq.*, also prohibits any "fraudulent business act or practice."  In the course of

BLOOD HURST & O'REARDON, LLP

00057376

conducting business, Defendant committed "fraudulent business act or practices" by, among other things, making the representations (which also constitute advertising within the meaning of §17200) and omissions of material facts regarding Joint Juice Products in its advertising campaign, including on the Products' packaging and labeling, as set forth more fully herein. Defendant made the misrepresentations and omissions regarding the efficacy of its Products, among other ways, by misrepresenting on each and every Joint Juice Product's packaging and labeling that the Products are effective when taken as directed, when, in fact, the representations are false and deceptive, and the Products do not confer the promised health benefits.

79.    Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §17200, *et seq.*

80.    Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions, which are described above.  This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's Joint Juice Products.  Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Products and Defendant's unlawful, unfair, and fraudulent practices.

81.    Defendant knew, or should have known, that its material representations and omissions would be likely to deceive the consuming public and result in consumers purchasing Joint Juice products and, indeed, intended to deceive consumers.

82.    As a result of its deception, Defendant has been able to reap unjust revenue and profit.

83.    Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct.  Accordingly, injunctive relief is appropriate.

84.    Plaintiff, on behalf of himself, all others similarly situated, and the general public, seeks restitution from Defendant of all money obtained from Plaintiff and the other members of the Class collected as a result of unfair competition, an injunction prohibiting

BLOOD HURST & O'REARDON, LLP

00057376

1    Defendant from continuing such practices, corrective advertising, and all other relief this Court

2    deems appropriate, consistent with Business & Professions Code §17203.

3                                      **COUNT II**

4    **Violation of the Consumers Legal Remedies Act – Civil Code §1750, *et seq.***
     **(On behalf of the Class)**
5

6          85.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

7          86.    This cause of action is brought pursuant to the Consumers Legal Remedies Act,

8    California Civil Code §1750, et seq. (the "Act") and similar laws in other states.  Plaintiff is a

9    consumer as defined by California Civil Code §1761(d).  The Products are "goods" within the

10   meaning of the Act.

11         87.    Defendant violated and continues to violate the Act by engaging in the

12   following practices proscribed by California Civil Code §1770(a) in transactions with Plaintiff

13   and the Class which were intended to result in, and did result in, the sale of its Joint Juice

14   Products:

15         (5)    Representing that [Joint Juice Products have] . . . approval, characteristics, . . .

16                uses [and] benefits . . . which [they do] not have . . . .

17                            *       *       *

18         (7)    Representing that [Joint Juice Products are] of a particular standard, quality or

19                grade . . . if [they are] of another.

20                            *       *       *

21         (9)    Advertising goods . . . with intent not to sell them as advertised.

22                            *       *       *

23         (16)   Representing that [Joint Juice Products] have been supplied in accordance with

24                a previous representation when [they have] not.

25         88.    Defendant violated the Act by representing and failing to disclose material facts

26   on its Joint Juice Products' labeling and associated advertising, as described above, when it

27   knew, or should have known, that the representations were false and misleading and that the

28   omissions were of material facts they were obligated to disclose.

BLOOD HURST & O'REARDON, LLP

89.    Pursuant to California Civil Code §1782(d), Plaintiff, individually and on behalf of the other members of the Class, seeks a Court order enjoining the above-described wrongful acts and practices of Defendant and for restitution and disgorgement.

90.    Pursuant to §1782 of the Act, Plaintiff notified Defendant in writing by certified mail of the particular violations of §1770 of the Act and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act.  A copy of the letter is attached hereto as Exhibit A.

91.    If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the Act, Plaintiff will amend this complaint to add claims for actual, punitive and statutory damages, as appropriate.

92.    Defendant's conduct is fraudulent, wanton, and malicious.

93.    Pursuant to §1780(d) of the Act, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

## COUNT III

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
### (On Behalf of the Illinois Class)
### (In the alternative to Counts I and II)

42.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

43.    The Illinois Consumer Fraud and Deceptive Business Practices Act. 815 Ill. Comp. Stat. 505/1, *et seq.* (for purposes of this Count III, "the Act"), like the consumer fraud acts of numerous other states across the nation, prohibits deceptive acts and practices in the sale of such products as Defendant's Joint Juice Products.

44.    Defendant does business in Illinois, sells and distributes its Joint Juice Products in Illinois, and is engaged in deceptive acts and practices in connection with the sale of these Products in a course of conduct involving trade and commerce in Illinois.

45.    Plaintiff was, at all relevant times, a citizen and resident of Illinois, and purchased his Joint Juice product in Illinois.

BLOOD HURST & O'REARDON, LLP

00057376

46.     Defendant's Joint Juice products purchased by Plaintiff and the other members of the Class were "consumer items" as that term is defined under the Act.

47.     Defendant misrepresented and deceptively concealed and/or omitted the material information known to Defendant as set forth above concerning its Joint Juice Products.

48.     Defendant's deceptive acts proximately caused actual injury and damage to Plaintiff and the other members of the Class.

49.     Defendant intended that Plaintiff and all of the other Class members rely on its representations concerning the Products.

50.     Defendant's conduct constitutes unfair acts or practices as defined in the Act because Defendant caused substantial injury to Class members that is not offset by countervailing benefits to consumers or competition and is not reasonably avoidable by consumers.

51.     Plaintiff's and the other Class members' injuries were proximately caused by Defendant's fraudulent and deceptive behavior, which was conducted with reckless indifference toward the rights of others, such that an award of punitive damages is appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in his favor and against Defendant, as follows:

A.     Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B.     Ordering Defendant to pay actual damages to Plaintiff and the other members of the Class;

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

00057376

1       C.      Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff

2   and the other members of the Class;

3       D.      Ordering Defendant to pay statutory damages, as allowable by the statutes

4   asserted herein, to Plaintiff and the other members of the Class;

5       E.      Awarding injunctive relief as permitted by law or equity, including enjoining

6   Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant

7   to engage in a corrective advertising campaign;

8       F.      Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and

9   the other members of the Class;

10      G.      Ordering Defendant to pay both pre- and post-judgment interest on any

11  amounts awarded; and

12      H.      Ordering such other and further relief as may be just and proper.

14  Dated: March 20, 2013                    BLOOD HURST & O'REARDON, LLP
                                             TIMOTHY G. BLOOD (149343)
15                                           THOMAS J. O'REARDON II (247952)

16                                           By: _____
17                                               TIMOTHY G. BLOOD

18                                           701 B Street, Suite 1700
19                                           San Diego, California 92101
                                             Telephone: (619) 338-1100
                                             Facsimile: (619) 338-1101
20                                           tblood@bholaw.com
                                             toreardon@bholaw.com
21
                                             GRANT & EISENHOFER P.A.
22                                           ADAM J. LEVITT*
                                             EDMUND S. ARONOWITZ*
23                                           30 North LaSalle Street, Suite 1200
                                             Chicago, Illinois 60602
24                                           Telephone: (312) 214-0000
                                             Facsimile: (312) 214-0001
25                                           alevitt@gelaw.com
                                             earonowitz@gelaw.com
26
                                             SIPRUT PC
27                                           JOSEPH J. SIPRUT*
                                             ALEKSANDRA M.S. VOLD*
28                                           TYLER ZANDERS*

CLASS ACTION COMPLAINT

00057376

BLOOD HURST & O'REARDON, LLP

17 N. State Street, Suite 1600
Chicago, Illinois 60602
Telephone: (312) 236-0000
Facsimile: (312) 948-9212
jsiprut@siprut.com
avold@siprut.com
tzanders@siprut.com

*Attorneys for Plaintiff*

BLOOD HURST & O'REARDON, LLP

# EXHIBIT A



**BLOOD
HURST &
O'REARDON** | LLP

701 B Street, Suite 1700 | San Diego, CA 92101
T | 619.338.1100 F | 619.338.1101
www.bholaw.com

Timothy G. Blood
tblood@bholaw.com

March 20, 2013

**VIA CERTIFIED MAIL (RETURN RECEIPT)**
**(RECEIPT NO. 7005 0390 0005 9156 4909)**

Mr. David Ritterbush
CEO
Premier Nutrition Corp.
228 Manhattan Beach Blvd.
Manhattan Beach, CA 90266

  Re:  Joint Juice®

Dear Mr. Ritterbush:

  We represent Vincent Mullins ("Plaintiff") and all other consumers similarly situated in an action against Premier Nutrition Corp. f/k/a Joint Juice, Inc. ("Premier Nutrition" or "defendant"), arising out of, *inter alia*, misrepresentations by Premier Nutrition to consumers that its Joint Juice® products provide consumers with health benefits, including supporting and nourishing cartilage, lubricating joints and helping with joint comfort.

  Plaintiff and others similarly situated purchased Joint Juice unaware of the fact that defendant's representations were deceptive and not truthful, including because there is no adequate scientific or clinical proof that Joint Juice provides the purported major health benefits to all persons. The full claims, including the facts and circumstances surrounding these claims, are detailed in the Class Action Complaint, a copy of which is attached and incorporated by this reference.

  These representations and omissions are false and misleading and constitute unfair methods of competition and unlawful, unfair, and fraudulent acts or practices, undertaken by defendant with the intent to result in the sale of Joint Juice to the consuming public.

  Defendant's practices constitute violations of the Consumers Legal Remedies Act, California Civil Code §1750 *et seq.* Specifically, defendant's practices violate California Civil Code §1770(a) under, *inter alia*, the following subdivisions:

   (5) Representing that goods or services have . . .approval, characteristics, . . . uses [or] benefits . . . which they do not have . . . .

         * * *

   (7) Representing that goods or services are of a particular standard, quality or grade . . . if they are of another.

         * * *

   (9) Advertising goods or services with intent not to sell them as advertised.

00057123


BLOOD
HURST &
O'REARDON | LLP

Mr. David Ritterbush
March 20, 2013
Page 2

\* \* \*

    (16)    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

As detailed in the attached Complaint, defendant's practices also violate California Business and Professions Code §17200 *et seq.*, and constitute a breach of warranty.

While the Complaint constitutes sufficient notice of the claims asserted, pursuant to California Civil Code §1782 and California Commercial Code §2607, we hereby demand on behalf of our client and all others similarly situated that defendant immediately correct and rectify these violations by ceasing the misleading marketing campaign, ceasing dissemination of false and misleading information as described in the enclosed Complaint, and initiating a corrective advertising campaign to re-educate consumers regarding the truth of the products at issue. In addition, Premier Nutrition must offer to refund the purchase price to all consumer purchasers of Joint Juice, plus provide reimbursement for interest, costs, and fees.

We await your response.

Sincerely,

TIMOTHY G. BLOOD

TGB:jk

Enclosure

cc:    Joseph J. Siprut
       Adam J. Levitt

00057123

# EXHIBIT B

1    BLOOD HURST & O'REARDON, LLP
     TIMOTHY G. BLOOD (149343)
2    THOMAS J. O'REARDON II (247952)
     701 B Street, Suite 1700
3    San Diego, CA  92101
     Telephone: (619) 338-1100
4    Facsimile: (619) 338-1101
     tblood@bholaw.com
5    toreardon@bholaw.com

6    GRANT & EISENHOFER P.A.
     ADAM J. LEVITT*
7    EDMUND S. ARONOWITZ*
     30 North LaSalle Street, Suite 1200
8    Chicago, Illinois  60602
     Telephone:  (312) 214-0000
9    Facsimile:  (312) 214-0001
     alevitt@gelaw.com
10   earonowitz@gelaw.com

11   SIPRUT PC
     JOSEPH J. SIPRUT*
12   ALEKSANDRA M.S. VOLD*
     TYLER ZANDERS*
13   17 N. State Street, Suite 1600
     Chicago, Illinois  60602
14   Telephone:  (312) 236-0000
     Facsimile:  (312) 948-9212
15   jsiprut@siprut.com
     avold@siprut.com
16   tzanders@siprut.com

17   Attorneys for Plaintiff

18                   **UNITED STATES DISTRICT COURT**

19        **NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION**

20   VINCENT D. MULLINS, individually and       Case No.:
     on behalf of all others similarly situated,
21                                               AFFIDAVIT OF THOMAS J. O'REARDON II
                                                 PURSUANT TO CALIFORNIA CIVIL CODE
22              Plaintiff,                       §1780(d)

23        v.                                     CLASS ACTION

24   PREMIER NUTRITION CORPORATION               **JURY TRIAL DEMANDED**
     f/k/a JOINT JUICE, INC.,
25              Defendant.

26

27

28

00057370
                    AFFIDAVIT PURSUANT TO CAL. CIVIL § 1780(d)

1    I, THOMAS J. O'REARDON II, declare as follows:

2         1.       I am an attorney duly licensed to practice before all of the courts of the State of

3    California.  I am a member of the law firm of Blood Hurst & O'Reardon, LLP, one of the

4    counsel of record for plaintiff in the above-entitled action.

5         2.       Defendant Premier Nutrition Corporation f/k/a Joint Juice, Inc. has done and is

6    doing business in San Francisco County.  Such business includes the development, marketing

7    and sale of its Joint Juice Products.  Furthermore, Defendant is maintains its headquarters in

8    San Francisco County.

9         I declare under penalty of perjury under the laws of the State of California that the

10   foregoing is true and correct.  Executed this 20th day of May, 2013, at San Diego, California.

11

12                                                */s/ Thomas J. O'Reardon II*
                                                 THOMAS J. O'REARDON II

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28