**VENABLE LLP**
Angel A. Garganta (SBN 163957)
  aagarganta@venable.com
Jessica L. Grant (SBN 178138)
  jgrant@venable.com
505 Montgomery Street, Suite 1400
San Francisco, CA 94111
Telephone:    (415) 653-3735
Facsimile:     (415) 653-3755

Daniel S. Blynn (*admitted pro hac vice*)
  dsblynn@venable.com
575 7th Street, NW
Washington, DC  20004
Telephone:    (202)344-4619
Facsimile:     (202)344-8300

Guido E. Toscano (SBN 266304)
  getoscano@venable.com
2049 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone:    (310) 229-9900
Facsimile:     (310) 229-9901

**ARNOLD & PORTER LLP**
Trenton H. Norris (SBN 164781)
  trent.norris@aporter.com
Anton A. Ware (SBN 257848)
  anton.ware@aporter.com
Jonathan L. Koenig (SBN 281737)
  jonathan.koenig@aporter.com
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Telephone:    (415) 471-3100
Facsimile:     (415) 471-3400

Attorneys for Defendant
PREMIER NUTRITION CORP.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VINCENT D. MULLINS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PREMIER NUTRITION CORP., f/k/a JOINT JUICE, INC.,<br><br>Defendant. | Case No. 3:13-cv-01271-RS<br><br>**DEFENDANT PREMIER NUTRITION CORP.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:     January 7, 2016<br>Time:    1:30 p.m.<br>Place    Courtroom 3 - 17th Floor<br>Judge:   Hon. Richard Seeborg |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 7, 2016, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 3, 17th Floor, of this Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Premier Nutrition Corp. ("Defendant" or "Premier") will and hereby does move the Court to grant summary judgment in favor of Premier on all of Plaintiff's claims.  This Motion is made under Federal Rule of Civil Procedure 56 on the grounds that no genuine issue of material fact exists with respect to Plaintiff's claims and Defendant is entitled to judgment as a matter of law.  This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declarations of Daniel A. Grande and Jonathan L. Koenig, the pleadings and papers on file herein, and such other matters as may be presented to the Court at the time of the hearing.

Dated: October 2, 2015

By: /s/ *Anton A. Ware*
    Anton A. Ware

    ARNOLD & PORTER LLP
    Trenton H. Norris
    Anton A. Ware
    Jonathan L. Koenig

    VENABLE LLP
    Angel A. Garganta
    Jessica L. Grant
    Daniel S. Blynn
    Guido E. Toscano

    Attorneys for Defendant PREMIER
    NUTRITION CORP.

1

## TABLE OF CONTENTS

2
**Page**

3 MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

4 I.    INTRODUCTION AND SUMMARY OF ARGUMENT .............................. 1

5 II.    STATEMENT OF ISSUES TO BE DECIDED ................................................. 3

6 III.   STATEMENT OF FACTS ................................................................................. 3

7 IV.   ARGUMENT ...................................................................................................... 9

8

9         A.    Legal Standards .................................................................................. 9

10              1.    Standard For Summary Judgment ....................................... 9

11              2.    Standard For UCL/CLRA False Advertising Claims ....................... 10

12                      a.    Lack Of Substantiation Claims Are Not Permitted ............... 10

13                      b.    Affirmative Evidence Of Falsity Is Required, And A Battle Of The Experts Is Not Enough To Avoid Summary

14                           Judgment ............................................................................ 10

15         B.    Plaintiff Cannot Establish That The Challenged Advertising Claims Are False .................................................................................................. 12

16

17              1.    Plaintiff Merely Presents An Impermissible Lack Of Substantiation Claim ........................................................... 12

18

19              2.    Plaintiff Has Not Adduced Scientific Evidence Capable Of Disproving The Advertising Claims .................................. 13

20                      a.    The OA Studies Do Not Disprove, And In Fact Support, The Claims ........................................................ 14

21

22                      b.    Plaintiff's Experts Fail To Identify Any Other Evidence Capable Of Disproving The Claims ...................................... 15

23              3.    Significant Undisputed Scientific Evidence Supports The Claims ................................................................................... 18

24

25              4.    Plaintiff's Own Statements Regarding Effectiveness Are Insufficient To Disprove The Claims ................................... 19

26

27         C.    Plaintiff Cannot Establish That The Advertising Claims Are Misleading ...................................................................................... 20

28

DEFENDANT PREMIER NUTRITION CORP.'S MOTION FOR SUMMARY JUDGMENT 3:13-cv-01271-RS

1.    Plaintiff Has Adduced No Evidence That Consumers Were Misled.................................................................................20

2.    Given The Express Disclaimer, No Reasonable Consumer Could Understand The Advertising To Imply That Joint Juice Treats OA ...........................................................................23

3.    Plaintiff Has Not Established The Existence Of Scientific Evidence Disproving Any Implied Message.....................................23

D.    Plaintiff Has Failed To Create A Triable Issue Of Fact As To Damages ...........................................................................24

V.    CONCLUSION .........................................................................25

DEFENDANT PREMIER NUTRITION CORP.'S MOTION FOR SUMMARY JUDGMENT 3:13-cv-01271-RS

1

# TABLE OF AUTHORITIES

2
**Page(s)**

3
**Cases**

4
*Aloudi v. Intramedic Research Group, LLC*,
   No. 15-cv-00882-HSG, 2015 WL 4148381 (N.D. Cal. July 9, 2015) ........................................ 10

5

6
*Brazil v. Dole Packaged Foods, LLC*,
   No. 12-CV-01831, 2014 WL 6901867 (N.D. Cal. Dec. 8, 2014) ................................................ 19

7
*Bronson v. Johnson & Johnson, Inc.*,
   No. C 12-04184, 2013 WL 1629191 (N.D. Cal. Apr. 16, 2013) ................................................ 10

8

9
*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................................................... 9

10
*Colgan v. Leather Tool Grp., Inc.*,
   135 Cal. App. 4th 663 (2006)............................................................................................... 10, 24

11
*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
   450 F.3d 130 (3rd Cir. 2006) ..................................................................................................... 22

12

13
*Dalberth v. Xerox Corp.*,
   766 F.3d 172 (2d Cir. 2014)........................................................................................................ 18

14

15
*Eckler v. Wal-Mart Stores, Inc.*,
   No. 12-CV-727-LAB-MDD, 2012 WL 5382218 (S.D. Cal. Nov. 1, 2012) ............... 1, 11, 14, 23

16
*Engel v. Novex Biotech LLC*,
   No. 14-cv-03457, 2015 WL 846777 (N.D. Cal. Feb. 25, 2015) (appeal pending) ..................... 13

17

18
*Ewert v. eBay, Inc.*,
   602 F. App'x 357 (9th Cir. 2015) .............................................................................................. 24

19

20
*Fraker v. Bayer Corp.*,
   No. CV F 08-1564, 2009 WL 5865687 (E.D. Cal. Oct. 6, 2009) ................................................ 13

21
*Franulovic v. Coca-Cola Co.*,
   No. 07-0539, 2009 WL 1025541 (D.N.J. Apr. 16, 2009), *aff'd sub nom.*, 390 Fed.
   Appx. 125 (3d Cir. 2010) ........................................................................................................... 20

22

23
*Hambleton Bros. Lumber Co. v. Balkin Enters.*,
   397 F.3d 1217 (9th Cir. 2005)........................................................................................................ 5

24
*Haskell v. Time, Inc.*,
   965 F. Supp. 1398 (E.D. Cal. 1997)..................................................................................... 12, 23

25

26
*In re GNC Corp.*,
   789 F.3d 505 (4th Cir. 2015)................................................................................................. 10, 18

27
*In re Vioxx Class Cases*,
   180 Cal. App. 4th 116 (2009)..................................................................................................... 24

28

*Johns v. Bayer*,
    No. 09-cv-1935, 2013 WL 1498965 (S.D. Cal. Apr. 10, 2013)............................................*passim*

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm.*,
    19 F.3d 125 (3d Cir. 1994)....................................................................................................... 21

*Kwan v. SanMedica Int'l, LLC*,
    No. 14-CV-03287-MEJ, 2015 WL 848868 (N.D. Cal. Feb. 25, 2015) (appeal
    pending)............................................................................................................................. 11, 13

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)................................................................................................................... 9

*Marshall v. PH Beauty Labs, Inc.*,
    No. 15-cv-02101, 2015 WL 3407906 (C.D. Cal. May 27, 2015) ........................................ 10, 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................................................... 9

*McCrary v. Elations Co.*,
    LLC, No. EDCV 13-0242 JGB, 2013 WL 6402217 (C.D. Cal. Apr. 24, 2013)................... 14, 23

*Nat'l Council Against Health Fraud, Inc. v. King Bio Pharms., Inc.*,
    107 Cal. App. 4th 1336 (2003).......................................................................................1, 10, 11

*Nissan Fire & Marine Ins. Co v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000).................................................................................................... 9

*Ogden v. Bumble Bee Foods, LLC*,
    No. 5:12-CV-01828-LHK, 2014 WL 27527 (N.D. Cal. Jan. 2, 2014) ...................................... 25

*Padilla v. Costco Wholesale Corp.*,
    No. 11 C 7686, 2013 WL 195769 (N.D. Ill. Jan. 16, 2013)............................................... 13, 14

*Pulaski & Middleman, LLC v. Google, Inc.*,
    —F.3d—, No. 12-16752, 2015 WL 5515617 (9th Cir. Sept. 21, 2015) .................................... 25

*Rahman v. Mott's LLP*,
    No. CV 13-3482 SI, 2014 WL 5282106 (N.D. Cal. Oct. 15, 2014),
    *reconsideration denied*, 2014 WL 6815779 (N.D. Cal. Dec. 3, 2014) ...................................... 22

*Rambus Inc. v. Hynix Semiconductor Inc.*,
    628 F. Supp. 2d 1114 (N.D. Cal. 2008) .............................................................................. 11, 18

*Ries v. Arizona Beverages USA LLC*,
    No. 10-01139 RS, 2013 WL 1287416 (N.D. Cal. Mar. 28, 2013)...................2, 12, 19, 20, 21, 25

*Scheuerman v. Nestle Healthcare Nutrition, Inc.*,
    No. CIV 10-3684, 2012 WL 2916827 (D.N.J. Jul. 17, 2012)............................. 10, 11, 13, 17, 21

*Stanley v. Bayer Healthcare LLC*,
    No. 11cv862-IEG(BLM), 2012 WL 1132920 (S.D. Cal. Apr. 3, 2012) ............. 10, 11, 17, 21, 23

*Weinberg v. Whatcom Cnty.*,
    241 F.3d 746 (9th Cir. 2001)................................................................................................... 24

1

**STATUTES**

2

21 U.S.C. § 343(r)(6)(A)...........................................................................................................3

3

**RULES**

4

Fed. R. Civ. P.
    Rule 30(e)..............................................................................................................................5
    Rule 56(c)..............................................................................................................................9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT PREMIER NUTRITION CORP.'S MOTION FOR SUMMARY JUDGMENT 3:13-cv-01271-RS

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff accuses Defendant Premier Nutrition Corp. ("Premier") of engaging in false and deceptive advertising by claiming that the glucosamine and chondroitin in Joint Juice™ help keep joints healthy, lubricated, and flexible.  First Amended Complaint, Dkt. #63 ("Complaint" or "FAC") ¶¶ 3, 31-33, 35.  To prevail under California's Unfair Competition Law ("UCL") and Consumers Legal Remedies Act ("CLRA"), Plaintiff must establish that these advertising statements have been scientifically disproven.  *Johns v. Bayer*, No. 09-cv-1935, 2013 WL 1498965, at *33-47 (S.D. Cal. Apr. 10, 2013).  Plaintiff has not made, and cannot make, any such showing.  Instead, Plaintiff presents a mere "lack of substantiation" claim, which is not cognizable under California law.  *Nat'l Council Against Health Fraud, Inc. v. King Bio Pharms., Inc*., 107 Cal. App. 4th 1336, 1345-48 (2003).

*First*, as Plaintiff's own experts have admitted, there are no scientific studies proving that glucosamine and chondroitin cannot help keep joints healthy, lubricated, and flexible.  *See infra*, pp. 5-6, 14-18.  Plaintiff points to studies addressing the efficacy of glucosamine and chondroitin as symptom-modifying drugs in the treatment of osteoarthritis ("OA") (FAC ¶¶ 38-49, 52-55), but Joint Juice is not advertised as a treatment for OA or any disease.  To the contrary, as required by federal law for all dietary supplement claims, Premier includes the following disclaimer on the Joint Juice label:  "This product is not intended to diagnose, treat, cure, or prevent any disease."  This "mismatch between the representations at issue and the evidence that allegedly debunks them" is fatal to Plaintiff's claims.  *Eckler v. Wal-Mart Stores, Inc*., No. 12-CV-727-LAB-MDD, 2012 WL 5382218, at *7 (S.D. Cal. Nov. 1, 2012).  *Second*, Plaintiff's own experts have admitted that there *are* scientific studies demonstrating that glucosamine and chondroitin *can and do* provide general joint health benefits.  *See infra*, pp. 6-8, 18-19.

Perhaps recognizing that Joint Juice is not advertised as a treatment for OA, and lacking any scientific studies that prove that Joint Juice does not provide the advertised general joint health benefits, Plaintiff has raised vague and conclusory assertions that Premier's advertising for Joint Juice, if not literally false, is misleading because it allegedly conveys an "implied" representation

that Joint Juice relieves joint *pain*, including for persons suffering from OA.  However, Plaintiff's "implied" false advertising claim also fails as a matter of law.  To prevail on such a claim, Plaintiff must prove: (1) that consumers in fact understood the advertising to convey such an implied message (which is typically established through a consumer survey), *and* (2) that the implied message is provably false.  *Johns*, 2013 WL 1498965, at \*48.  Plaintiff cannot satisfy either requirement.

*First*, Plaintiff has not conducted a consumer survey or adduced any other extrinsic evidence to prove the message that consumers actually receive from the Joint Juice advertising.  *See infra*, pp. 20-23.  Plaintiff's own individual misinterpretation of Premier's advertising is not enough to raise a disputed issue of fact, especially given that the advertising makes no reference to joint pain or OA and in fact disclaims any intention to treat, cure, or prevent any disease.  *Second*, even if there were evidence to show that consumers understood Premier's advertising to suggest that Joint Juice helps treat joint pain or other symptoms of OA (which there is not), Plaintiff has failed to satisfy her burden to produce scientific evidence *proving* that Joint Juice *does not and cannot* help provide relief from such symptoms.  To the contrary, as Plaintiff's own experts admit, a number of scientific studies show that glucosamine and chondroitin *can and do* provide joint health benefits to persons with OA.  *See infra*, pp. 6-8, 18-19.  Experts may disagree as to whether the full body of relevant scientific studies would adequately substantiate an OA-related claim, *see infra*, p. 24, but that goes to the adequacy of substantiation for the alleged implied claim, not to its falsity, and therefore is irrelevant.  *Johns*, 2013 WL 1498965, at \*48.

Not only is Plaintiff unable to establish liability on her false advertising claims, she also has failed to adduce any evidence in support of her claim for restitution/damages for the putative class.  Specifically, Plaintiff has made no effort to establish what a reasonable consumer would pay for Joint Juice absent the challenged advertising.  This failure by Plaintiff to support an essential element of her claims provides another independent basis for summary judgment for Premier.  *See Ries v. Arizona Beverages USA LLC*, No. 10-01139 RS, 2013 WL 1287416, at \*6 (N.D. Cal. Mar. 28, 2013).

Because Plaintiff cannot establish all essential elements of her false advertising claims,

1  Premier's motion for summary judgment should be granted.

2  **II.     STATEMENT OF ISSUES TO BE DECIDED**

3          1.  Has Plaintiff failed to raise a genuine issue of fact regarding whether the challenged

4  advertising claims are provably false or misleading?

5          2.  Has Plaintiff failed to raise a genuine issue of fact to support her claims for

6  restitution/damages?

7  **III.    STATEMENT OF FACTS**

8          On March 21, 2013, named plaintiff Vincent D. Mullins filed this putative class action

9  lawsuit against Premier asserting that its advertising claims for Joint Juice are false and misleading

10 in violation of the UCL and CLRA.  Dkt. # 1.  Mr. Mullins later withdrew as class representative.

11 Dkt. # 61.  Kathie Sonner ("Plaintiff") subsequently substituted in as the class representative and

12 filed the Complaint on September 12, 2014.

13         Joint Juice is a dietary supplement beverage in the joint health product category.  FAC ¶ 2.

14 Its main ingredients include glucosamine hydrochloride ("glucosamine"), chondroitin sulfate

15 ("chondroitin"), various vitamins and minerals, and, depending on flavor or variety, water, green

16 tea, natural flavor, and sweeteners.  Declaration of Jonathan L. Koenig in Support of Premier's

17 Motion for Summary Judgment ("Koenig Dec.") Exs. A-C.  In its advertising for the product,

18 Premier makes "general well-being" and "structure/function" claims (as defined in the Dietary

19 Supplement Health and Education Act of 1994, 21 U.S.C. § 343(r)(6)(A)), including for example by

20 stating that glucosamine and chondroitin help keep joints healthy, lubricated, and flexible.  FAC

21 ¶¶ 28-36.  In accordance with the requirements for such claims, Premier includes the following

22 disclaimer on the packaging of Joint Juice: "This product is not intended to diagnose, treat, cure, or

23 prevent any disease."  Koenig Dec. Exs. A-C.

24         Plaintiff is a resident of California and claims to have purchased a six-pack of eight-ounce

25 "Ready-to-Drink" Joint Juice sometime in the fall of 2013.  FAC ¶ 12.  Plaintiff does not have OA.

26 Koenig Dec. Ex. D (Sonner Dep.) 41:2-25.  Plaintiff alleges she purchased the product because she

27 hoped it would provide immediate relief from the shoulder pain and discomfort she allegedly was

28 experiencing at the time.  *Id.* 28:1-14, 39:12-23, 85:15-19.  Plaintiff claims that she drank a bottle of

Joint Juice on five consecutive days but did not experience relief from her pain and discomfort.  *Id.*

24:16-24, 28:12-14.  Although Joint Juice's advertising and packaging does not make any express

representation relating to pain relief, Plaintiff alleges that she expected Joint Juice to relieve her

joint pain in "about an hour," the same period in which she experiences relief when she takes

ibuprofen.  *Id.* 85:15-19.

Plaintiff alleges the following claims made in Joint Juice's labeling, packaging, online

marketing, or television advertising, are false or misleading:[1]

- "helps keep cartilage lubricated and flexible" (FAC ¶ 3);
- "drink daily for healthy, flexible joints" (*id.*);
- "originally developed for pro athletes by orthopedic surgeon Kevin R. Stone to keep joints healthy and flexible" (*id.* ¶ 31);
- "Glucosamine in *Joint Juice* stimulates production of lubricants your joints use to stay healthy and flexible" (*id.* ¶ 32);
- "taking glucosamine and chondroitin together—in the liquid formula found only in *Joint Juice* products—ensure[s] that you get a full day's supply of glucosamine (1,500 mg) and chondroitin to maintain healthy and happy joints" (*id.* ¶ 33);
- "the glucosamine and chondroitin lubricates and cushions the cartilage in my joints so I can move more easily . . . it works great for anyone who likes to keep moving!" (*id.* ¶ 35) (quoting television commercial by Joint Juice spokesman, Joe Montana); and
- "glucosamine and chondroitin have been proven to help maintain joint function and mobility" (*id.* ¶ 35)[2]

Plaintiff also offers the conclusory assertion that Premier "communicated the same

substantive message on all of the Products' packaging and labeling: that the Products will improve

the health of joints and relieve joint pain." *Id.* ¶ 4.  In fact, the word "pain" does not appear on any

Joint Juice advertising or packaging, and Plaintiff does not allege otherwise.  Nor does she identify

any specific element of Joint Juice's advertising that she contends conveys a joint pain message.  As

noted above, the Joint Juice labels contain the express limitation that Joint Juice "is not intended to

diagnose, treat, cure, or prevent any disease."  Koenig Dec. Exs. A-C.

Plaintiff alleges that the advertising claims are false because, "glucosamine, alone or in

---

[1]Plaintiff does not contend that she was exposed to each of these marketing claims.  FAC ¶ 12. Rather, she alleges she was exposed to the label of a Joint Juice "Weekly Pack" and to an unspecified Joint Juice television commercial featuring Joe Montana.  *Id.*

[2]This allegation is not in reference to any advertisement for the product or statement on the packaging of the product; rather, it is in reference to a single press release issued by Premier on May 11, 2011—two and a half years before Plaintiff purchased the product.  FAC ¶ 35 & n.5.

combination with other ingredients including chondroitin sulfate, is not effective in providing the represented joint health benefits," FAC ¶ 37, and "clinical studies [] show the ingredients in Defendant's Joint Juice products are ineffective," *id.* ¶ 57; *see also id.* ¶ 59 ("[C]linical studies have found the ingredients in Joint Juice to be ineffective in providing the joint health benefits represented by Defendant.").  Plaintiff has retained three experts—Dr. Lynn Willis, Dr. Stephen Graboff,[3] and Dr. Jeremiah Silbert—to opine on the issue of whether it has been scientifically proven that the ingredients in Joint Juice do not and cannot provide the advertised benefits.

It is undisputed that no scientific studies *disprove* any of the statements that Premier makes regarding the effects of glucosamine and chondroitin on the general well-being or structure and function of joints.  Indeed, Plaintiff's own expert admitted that it is simply impossible to form an opinion that Joint Juice does not provide the advertised joint health benefits for the very reason that no study proves this:

> Q: I'm looking for an opinion that you have that says that glucosamine and chondroitin do not provide any joint health benefits. That's what I'm looking for.
>
> A: I don't have that opinion. I don't know that.
>
> Q: Thank you.
>
> A: It's not possible for me to determine that, because no studies have been done.
>
> Q: And you haven't seen any studies that have concluded that glucosamine and chondroitin do not provide any joint health benefits?
>
> A: I have seen no studies in that vein at all.
> (Koenig Dec. Ex. E (Willis Dep.) 89:14-25)[4]

Another of Plaintiff's experts similarly was asked whether he could point "to a study that has concluded that it is scientifically impossible to maintain joint health, mobility and flexibility with glucosamine and chondroitin"; he answered with an unequivocal "No."  *Id.* Ex. F (Graboff Dep.) 118:8-12.  Indeed, that expert could not identify even a single scientific study to support the

---

[3]Concurrent with this Motion, Premier is moving to disqualify Dr. Graboff.  Dkt. # 81.

[4]After Dr. Willis' deposition, he improperly attempted to retract this acknowledgement by submitting a purported "errata" seeking to strike this admission and replace it with the following note: "I misunderstood the question.  Please see my declaration."  Concurrent with this Motion, Premier is moving to strike the errata on the ground that it is improper under Fed. R. Civ. P. 30(e).  Dkt. # 80; *see Hambleton Bros. Lumber Co. v. Balkin Enters.*, 397 F.3d 1217, 1224-26 (9th Cir. 2005).

1    assertion in his report (which he admitted was written entirely by Plaintiff's counsel) that the

2    advertised benefits are "medically and scientifically impossible." *Id.* 75:3-17, 157:9-20.[5]

3        It also is undisputed that studies in the scientific literature, including human clinical studies,

4    have found that orally consumed glucosamine and chondroitin *can and do* provide general joint

5    health benefits.  *See, e.g.*, *id.* Ex. E (Willis Dep.) 50:25-51:21, 100:12-17 (admitting scientific

6    studies have shown that individuals who take glucosamine and chondroitin have experienced

7    reductions in pain, reductions in joint space narrowing, and reductions in swelling and stiffness in

8    their joints); *id.* 40:24-41:14 (admitting that reductions in pain, swelling, and joint space narrowing

9    are benefits); *id.* 216:3-6 ("Q: You're aware that there are studies that show that glucosamine and

10   chondroitin have anti-inflammatory effects, correct? A: Correct."); *id.* 216:14-19 ("Q: You're aware

11   that there are studies that show that glucosamine and chondroitin prevent enzymatic activity that

12   would otherwise destroy cartilage cells? . . .  A: Yes."); *id.* 216:21-25 (agreeing "that preventing an

13   activity that would destroy cartilage cells is something that would promote general joint health"); *id.*

14   217:16-20 ("Q: Are you aware that there are scientific studies that have shown that glucosamine and

15   chondroitin may protect cartilage cells by inhibiting their degradation? A: Yes."); *see also id.* Ex. G

16   (Silbert Dep.) 206:17-21 (admitting other scientists have concluded glucosamine and chondroitin

17   help control OA and its symptoms).

18        Even though Premier makes no representations regarding the efficacy of glucosamine and

19   chondroitin on OA, multiple clinical studies regarding the effect of these ingredients on OA have

20   found joint benefits.  For example, the Glucosamine Chondroitin Arthritis Intervention Trial

21   ("GAIT") (Koenig Dec. Ex. K), a large multicenter, blinded, placebo-controlled study, showed a

22   significant improvement in a number of pain and function categories measured for OA patients

23

24   ───────────────

         [5]Two of Plaintiff's three experts admitted they are not qualified to opine on clinical studies, and
25   therefore these experts were unable to take clinical studies into account in forming their opinions in
     this case.  *See* Koenig Dec. Ex. G (Silbert Dep.) 48:11-17, 50:23-51:2 (admitting he is not qualified to
26   opine on clinical studies of glucosamine and chondroitin); *id.* 104:5-11 (stating he has not formed an
     opinion as to clinical studies of glucosamine and chondroitin as he thinks "it's not worthwhile doing
27   it" because he simply "do[es]n't think it [Joint Juice] can possibly work"); *id.* 106:17-107:3 (stating
     his "feeling" that whatever conclusion the clinical studies reached "as to whether [glucosamine and
28   chondroitin] are useful or not, it's an error"); *id.* Ex. F (Graboff Dep.) 181:7-18 (admitting he is not
     qualified to opine on clinical trials); *id.* 158:11-14 ("Q: So they did a randomized, double-blind,
     placebo-controlled trial.  Do you understand what that means? A: No").

1   taking glucosamine and chondroitin, including for persons in the moderate-to-severe pain subgroup.

2   Declaration of Daniel A. Grande in Support of Premier's Motion for Summary Judgment ("Grande

3   Dec.") Ex. A (Grande Report) 17-20; Koenig Dec. Ex. E (Willis Dep.) 56:5-16, 59:18-25 (admitting

4   that he does not challenge the finding in the GAIT study that patients with moderate-to-severe knee

5   pain experienced a significant decrease in pain when they took glucosamine and chondroitin); *see*

6   *also* Koenig Dec. Ex. E (Willis Dep.) 51:6-9 (admitting studies have shown that patients who took

7   glucosamine and chondroitin experienced a reduction in pain).  The Long-term Evaluation of

8   Glucosamine Sulfate ("LEGS") (Koenig Dec. Ex. L), another clinical study, covered a two-year

9   span and demonstrated a significant improvement in joint space narrowing from consumption of

10  glucosamine, which is an undisputed joint benefit.  Grande Dec. Ex. A (Grande Report) 18; Koenig

11  Dec. Ex. E (Willis Dep.) 71:1-13, 75:8-12, 228:11-13 (admitting that LEGS study authors described

12  finding clinically and statistically significant reductions in joint space narrowing); Koenig Dec. Ex.

13  E (Willis Dep.) 41:5-8 (admitting that joint space narrowing is a benefit).  Another recent clinical

14  study, titled Multicenter Osteoarthritis interVEntion trial with SYSDOA ("MOVES") (Koenig Dec.

15  Ex. M), was a double-blind study with 606 patients, which concluded that a combination of

16  glucosamine and chondroitin taken daily was as effective as celecoxib (an FDA-approved COX-2

17  inhibitor for pain) in reducing pain in the subgroup of patients with moderate-to-severe OA pain.

18  Grande Dec. Ex. B (Grande Supp. Report) 4; Koenig Dec. Ex. E (Willis Dep.) 233:2-10, 237:9-18

19  (admitting that the MOVES study showed that glucosamine and chondroitin together were as

20  effective as celecoxib in providing joint health benefits, including reducing pain, stiffness,

21  functional limitation, and joint swelling effusion, after six months in patients with OA).[6]

22        In addition to the human clinical studies, *in vitro* and animal studies have found that

23  glucosamine and chondroitin taken orally can reach the joints and provide benefits through

24  _____

25  [6]Plaintiff's two other "experts" admitted they were not qualified to opine on GAIT, LEGS, or
    MOVES.  *See supra*, p. 5 n. 6;  Koenig Dec. Ex. G (Silbert Dep.) 104:5-11, 215:14-19 (stating he did
26  not review GAIT, LEGS, or MOVES in forming his opinions in this case); *id.* Ex. F (Graboff Dep.)
    173:13-21 (Q: [T]he 2014 LEGS study actually contradicts your opinion that it's medically and
27  scientifically impossible for glucosamine and chondroitin to have any positive overall impact on joint
    health; correct? . . .  A: I don't know what this article is about.  I don't know what it means, so I can't
28  answer your question yes or no."); *id.* 180:4-8 (admitting he read the MOVES study because it was
    sent to him by Plaintiff's attorney but that he did not understand it).

recognized mechanisms of action (Grande Dec. Ex. A (Grande Report) 8-13), as Plaintiff's experts also have admitted.  *See, e.g.*, Koenig Dec. Ex. E (Willis Dep.) 50:5-17 (admitting that *in vitro* and animal studies have reported mechanisms of action by which glucosamine and chondroitin may enhance joint health); *id.* 216:3-217:9 (admitting *in vitro* and animal studies show glucosamine and chondroitin have anti-inflammatory effects, prevent enzymatic activity that would otherwise destroy cartilage cells, and may protect cartilage cells by inhibiting their degradation); *id.* Ex. G (Silbert Dep.) 133:15-20 (admitting studies have found that glucosamine taken orally makes its way to the articular cartilage); *id.* 138:18-25 (admitting a study in the scientific literature reported finding that glucosamine and chondroitin are bioavailable after oral dosing); *id.* 156:13-157:16, 164:10-13 (admitting that a study he believes to be a "good" study concluded that glucosamine is bioavailable after oral administration); *id.* Ex. F (Graboff Dep.) 149:15-17, 150:13-151:25, 154:6-16 (acknowledging that *in vitro* and animal studies have found that orally consumed glucosamine is rapidly absorbed, bioavailable at a steady state, and reaches and can be used by joint cartilage, but admitting such studies are beyond his knowledge level).

Unable to identify scientific evidence capable of affirmatively disproving Joint Juice's claims, Plaintiff and her experts assert that the claims lack sufficient substantiation in the scientific literature, including that certain of the studies *supporting* the benefits of glucosamine and chondroitin allegedly are "inconclusive" or open to interpretation.  *See, e.g.*, FAC ¶¶ 43-45 (stating that cited studies were "inconclusive" or "did not show" that the ingredients were efficacious); *id.* ¶ 46 (alleging evidence supporting the efficacy of glucosamine and chondroitin is "poor" and not "convincing," respectively); *id.* ¶ 55 (glucosamine "ha[s] never been shown to be effective"); Koenig Dec. Ex. H (Supp. Willis Report) ¶ 33 ("I am aware of no clinical evidence in the published clinical literature that even supports, let alone establishes, any of the promotional claims for Joint Juice™. . . ."); *id.* ¶ 37 (stating that the European Food Safety Authority "reached the same conclusion that I did; *i.e.*, that there were no well-designed published human studies from which 'conclusions could be drawn on the effect of dietary glucosamine on the maintenance of cartilage' in otherwise healthy individuals"); *id.* Ex. E (Willis Dep.) 39:14-20 ("Many of these studies—not all—but many of these studies can be interpreted another way.").

1    Plaintiff also makes the conclusory allegation that Joint Juice is "a *valueless* product that

2  does not confer the benefits it promises" (FAC ¶ 74 (emphasis added)), but the record establishes

3  that the ingredients in Joint Juice (which include glucosamine, chondroitin, various vitamins and

4  minerals, and, depending on flavor or variety, water, green tea, natural flavor, and sweeteners) have

5  value to consumers independent of the challenged advertising.  For example, Plaintiff has admitted

6  that the vitamins in Joint Juice "are valuable in and of themselves."  Koenig Dec. Ex. D (Sonner

7  Dep.) 90:21-91:2.  And Plaintiff's purported expert, Mr. Keegan, admitted that there are

8  glucosamine products marketed without any joint health claims whatsoever, and which nevertheless

9  sell for a market price greater than zero.  *Id.* Ex. I (Keegan Dep.) 86:20-88:8.  The undisputed

10  record thus establishes that an objective consumer would pay value (*i.e.*, a price greater than zero)

11  for Joint Juice even absent the challenged advertising, yet Plaintiff has produced no evidence

12  (expert or otherwise) from which a jury could measure that value.

13  **IV.  ARGUMENT**

14       **A.    Legal Standards**

15            **1.    Standard For Summary Judgment**

16       Summary judgment is appropriate where there is no genuine dispute of material fact and the

17  moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v.*

18  *Catrett*, 477 U.S. 317, 323-24 (1986).  The non-movant cannot avoid summary judgment by resting

19  on mere assertions—unsupported by record evidence—that the facts are sufficient to support his or

20  her claims.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  Instead, "the nonmoving party

21  must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita*

22  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "[A]fter suitable discovery, the

23  moving party may [prevail on summary judgment by] show[ing] that the nonmoving party does not

24  have enough evidence of an essential element of its claim or defense to carry its ultimate burden of

25  persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir.

26  2000).

27

28

1

2.      **Standard For UCL/CLRA False Advertising Claims**

2

a.      **Lack Of Substantiation Claims Are Not Permitted**

3

Under California law, a private plaintiff cannot demand substantiation of advertising

4

statements. *Nat'l Council Against Health Fraud, Inc. v. King Bio Pharms.*, 107 Cal. App. 4th 1336,

5

1345-48 (2003) ("[P]rosecuting authorities, but not private plaintiffs, [may] require substantiation of

6

advertising claims."). As a result, the plaintiff in a false advertising case always bears the burden of

7

producing evidence to prove, and ultimately proving, that the challenged advertising is false or

8

misleading. *Id.* False advertising claims that rest on a theory of lack of substantiation, instead of

9

provable falsehood, "are not cognizable under the California consumer protection laws." *Bronson*

10

*v. Johnson & Johnson, Inc.*, No. C 12-04184, 2013 WL 1629191, at *8 (N.D. Cal. Apr. 16, 2013);

11

*accord Marshall v. PH Beauty Labs, Inc.*, No. 15-cv-02101, 2015 WL 3407906, at *3 (C.D. Cal.

12

May 27, 2015); *Johns*, 2013 WL 1498965, at *40; *Scheuerman v. Nestle Healthcare Nutrition, Inc.*,

13

No. CIV. 10-3684, 2012 WL 2916827, at *7-8 (D.N.J. Jul. 17, 2012). Where a plaintiff's claim

14

boils down to an assertion that the advertising claims lack adequate support in the scientific

15

research, the defendant is entitled to judgment as a matter of law. *See, e.g.*, *Johns*, 2013 WL

16

1498965, at *40-47 (granting summary judgment to dietary supplement maker where plaintiff's

17

claims were premised on lack of substantiation rather than proof of falsity); *Stanley v. Bayer*

18

*Healthcare LLC*, No. 11cv862-IEG(BLM), 2012 WL 1132920 (S.D. Cal. Apr. 3, 2012) (same);

19

*Scheuerman*, 2012 WL 2916827, at *7-8 (same). In other words, an advertising claim is not false

20

simply because there may not be definitive evidence that supports it.

21

22

b.      **Affirmative Evidence Of Falsity Is Required, And A Battle Of**
**The Experts Is Not Enough To Avoid Summary Judgment**

23

To prove a violation of the UCL or CLRA, the plaintiff must establish that the challenged

24

advertising claims were actually false or objectively misleading. *Colgan v. Leather Tool Grp., Inc.*,

25

135 Cal. App. 4th 663, 682 (2006). A false advertising claim will be dismissed if the plaintiff

26

cannot allege that the challenged representations are actually, provably false. *See, e.g.*, *In re GNC*

27

*Corp.*, 789 F.3d 505, 516 (4th Cir. 2015) (affirming dismissal of false advertising claims under

28

California law where plaintiff had failed to allege a scientific consensus that glucosamine and

chondroitin were incapable of providing the advertised joint health benefits); *Aloudi v. Intramedic Research Group, LLC*, No. 15-cv-00882-HSG, 2015 WL 4148381, at *3-6 (N.D. Cal. July 9, 2015) (dismissing complaint alleging that dietary supplement did not work as advertised where plaintiff failed to allege scientific evidence specifically disproving the claimed benefits); *Kwan v. SanMedica Int'l, LLC*, No. 14-CV-03287-MEJ, 2015 WL 848868, at *5 (N.D. Cal. Feb. 25, 2015) (appeal pending) (dismissing false advertising claims where plaintiff did not allege "that a study exists showing [the represented product] benefits are categorically impossible to achieve"); *Eckler*, 2012 WL 5382218, at *3 (dismissing false advertising claims against glucosamine and chondroitin manufacturer where complaint failed to allege that scientific evidence actually disproved the advertising claims).  To avoid summary judgment, a false advertising plaintiff must affirmatively come forward with scientific evidence, available during the class period, that *disproves* the challenged advertising claims.  *See, e.g.*, *King Bio Pharms.*, 107 Cal. App. 4th at 1345-48 (plaintiff bears the burden of coming forward with evidence sufficient to "establish[]" the "falsity of the advertising claims"); *Johns*, 2013 WL 1498965, at *40 (granting summary judgment where plaintiffs had failed to raise a triable issue of fact "in the absence of affirmative scientific evidence available during the Class Period that proves that [the supplement] does not [provide the advertised benefit]").

      As noted above, evidence suggesting the scientific support underlying the advertising claims is not as strong as Plaintiff claims it should be, is not enough to raise a triable issue of fact.  *See Stanley*, 2012 WL 1132920, at *4-11 (granting summary judgment where all plaintiff could show was mixed scientific evidence on the effectiveness of the supplement, and where plaintiff lacked evidence the challenged claims were "actually false"); *Scheuerman*, 2012 WL 2916827, at *5-9, 11 (same); *Johns*, 2013 WL 1498965, at *40 (same).  Nor is a disagreement between experts sufficient to avoid summary judgment.  *Rambus Inc. v. Hynix Semiconductor Inc.*, 628 F. Supp. 2d 1114, 1122 (N.D. Cal. 2008); *Scheuerman*, 2012 WL 2916827, at *5.

      The standards articulated above apply *not only* to claims that the advertising is literally false, but *also* to claims that the advertising, although not literally false, is misleading in context. Specifically, to prevail on the latter type of claim, the plaintiff must (1) identify an implied message

allegedly conveyed to consumers by the advertising, (2) demonstrate by consumer survey evidence that a significant proportion of consumers actually receive that implied message, and (3) establish that the implied message is actually, provably false. *See, e.g.*, *Ries*, 2013 WL 1287416, at *6 (plaintiff "must demonstrate by extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to mislead consumers"); *Johns*, 2013 WL 1498965, at *48 (claim that advertising is likely to deceive must be supported with extrinsic evidence that implied message is actually false); *Haskell v. Time, Inc.*, 965 F. Supp. 1398, 1407 (E.D. Cal. 1997) (anecdotal evidence alone is insufficient to prove that the public is likely to be misled). A plaintiff may not evade the "'lack of substantiation' bar to recovery" by alleging that an advertising claim is *misleading because it is unsubstantiated*. *Johns*, 2013 WL 1498965, at *48.

### B.   Plaintiff Cannot Establish That The Challenged Advertising Claims Are False

#### 1.   Plaintiff Merely Presents An Impermissible Lack Of Substantiation Claim

Plaintiff's case boils down to a lack of substantiation claim. For example, Plaintiff's Complaint alleges that scientific studies supporting joint health benefits of glucosamine and chondroitin are "inconclusive" or "[do] not show" that the ingredients in Joint Juice are efficacious. FAC ¶¶ 43-45.[7] Plaintiff also asserts that the evidence supporting glucosamine is "poor" and the evidence supporting chondroitin is "not convincing." *Id.* ¶ 46. Plaintiff further criticizes the scientific support for the beneficial effects of glucosamine and chondroitin on the structure, function, and general well-being of joints in the following terms: (i) "a cause and effect relationship has not been established between the consumption of" glucosamine, either alone or in combination with chondroitin, "and the maintenance of normal joints" (*id*. ¶¶ 51, 56); (ii) "[t]he cost-effectiveness of these [glucosamine and chondroitin] dietary supplements alone or in combination in the treatment of OA has not been demonstrated in North America" (*id.* ¶ 54); and (iii) glucosamine "ha[s] never been shown to be effective." *Id.* ¶ 55. These are exactly the type of allegations that courts have held to sound in lack of substantiation, rather than actual falsity.

---

[7]Plaintiff's CLRA demand letter similarly states "defendant's representations were deceptive and not truthful, including because there is no adequate scientific or clinical proof that Joint Juice provides the purported major health benefits to all persons." FAC Ex. A.

1    Similar lack of substantiation claims consistently have been dismissed or disposed of on

2    summary judgment because they do not satisfy the plaintiff's burden of establishing falsity through

3    *affirmative* scientific evidence.  *See, e.g.*, *Marshall*, 2015 WL 3407906, at *3-5 (holding allegations

4    that scientific support for marketing claims was unreliable, suffered from a conflict of interest, and

5    was not peer reviewed, constituted a lack of substantiation claim that cannot serve as the basis for a

6    false advertising or UCL claim under California law); *Kwan*, 2015 WL 848868, at *4-8 (dismissing

7    complaint where plaintiff had alleged that advertising claim lacked evidentiary support but had

8    failed to "allege that a study exists showing [the represented product] benefits are categorically

9    impossible to achieve."); *Engel v. Novex Biotech LLC*, No. 14-cv-03457, 2015 WL 846777, at *4-7

10   (N.D. Cal. Feb. 25, 2015) (appeal pending) (dismissing complaint on lack of substantiation grounds

11   where plaintiff could not "allege that a study exists showing that [the advertised product] benefits

12   are categorically impossible to achieve"); *Fraker v. Bayer Corp*., No. CV F 08-1564, 2009 WL

13   5865687, at *8-9 (E.D. Cal. Oct. 6, 2009) ("If Plaintiff is going to maintain an action against

14   Defendant for false or misleading advertising, then Plaintiff will be required to adduce evidence

15   sufficient to present to a jury to show that Defendant's advertising claims with respect to [the

16   product] are actually false; not simply that they are not backed up by scientific evidence.").

17   
18          **2.      Plaintiff Has Not Adduced Scientific Evidence Capable Of Disproving
                        The Advertising Claims**

19   Plaintiff has presented no studies, evidence, or expert testimony demonstrating that the

20   represented benefits of Joint Juice "are categorically impossible to achieve," as is her burden.

21   *Engel*, 2015 WL846777, at *4.  Indeed, Plaintiff's own expert has admitted that such studies do not

22   exist.  Koenig Dec. Ex. E (Willis Dep.) 89:14-25.  This lack of affirmative evidence of falsity is

23   fatal to Plaintiff's case, and Premier is entitled to judgment as a matter of law. *See Johns*, 2013 WL

24   1498965, at *40; *Padilla v. Costco Wholesale Corp.*, No. 11 C 7686,  2013 WL 195769, at *4 (N.D.

25   Ill. Jan. 16, 2013); *Scheuerman*, 2012 WL 2916827, at *7-9.

26   Plaintiff's evidence purportedly directed at whether Premier's advertising statements are

27   false consists of (1) studies regarding the clinical effectiveness of glucosamine and chondroitin as a

28   treatment for the disease of OA; (2) expert reports and testimony discussing the OA studies, use of

1   glucosamine and chondroitin as treatments for OA, and the effect of glucosamine and chondroitin

2   on the joints; and (3) Plaintiff's own testimony regarding her subjective beliefs about the

3   effectiveness of Joint Juice.  None of this evidence raises a material question of fact as to whether

4   the actual advertising claims are false within the meaning of the UCL or CLRA.

5

6              **a.**       **The OA Studies Do Not Disprove, And In Fact Support, The Claims**

7           Plaintiff cannot establish that glucosamine and chondroitin are incapable of providing the

8   advertised general joint health benefits by relying on the studies cited in the Complaint, which

9   assess whether glucosamine and chondroitin are an effective treatment for the disease of OA.  *See,*

10  *e.g.*, FAC ¶¶ 38-39, 42-56.  The OA studies are not capable of disproving the challenged advertising

11  claims for the simple reason that the advertisements do not claim that Joint Juice is a treatment for

12  OA; to the contrary, the advertising expressly disclaims that the product is intended to treat,

13  prevent, or cure any disease. *See supra*, p. 2.

14          This is the conclusion reached by numerous courts faced with this precise question. *Eckler*,

15  2012 WL 5382218, at \*6-8 (dismissing case challenging advertising of joint health benefits of

16  glucosamine and chondroitin because "the studies [plaintiff] cites are all *osteoarthritis* studies")

17  (emphasis in original); *McCrary v. Elations Co., LLC*, No. EDCV 13-0242 JGB, 2013 WL

18  6402217, at \*4 (C.D. Cal. Apr. 24, 2013) ("[O]steoarthritis studies do not address the general claims

19  of joint comfort, health and flexibility found in Elations' advertising"); *Padilla*, 2013 WL 195769,

20  at \*4 (dismissing with prejudice a claim alleging that "reliable scientific evidence" rebutted

21  glucosamine chondroitin supplement's advertised benefits because "[plaintiff] has failed to make

22  any connection between the clinical studies that he cites and the actual representations appearing on

23  the Glucosamine with MSM product label").  Indeed, Plaintiff's own expert has acknowledged that

24  clinical trials of glucosamine and chondroitin that deal with the use of these agents to treat OA "do

25  not directly address the focus of this lawsuit; i.e., the claims that the glucosamine and chondroitin in

26  Joint Juice™ maintain and prolong normal joint function and health."  Koenig Dec. Ex. H (Willis

27  Supp. Report) ¶ 78.

28          Furthermore, the OA studies cited by Plaintiff apply a standard for assessing the clinical

effectiveness of glucosamine and chondroitin for treatment of a disease, which is much higher than the standard for assessing whether a product affects the structure and function of the body or promotes general well-being, which is what Joint Juice claims to do. *See* Grande Dec. Ex. A (Grande Report) 15-16; Koenig Dec. Ex. E (Willis Dep.) 150:18-22; *see also Johns*, 2013 WL 1498965, at *23 ("the level of substantiation for a structure/function claim and a health claim [relating to treatment of a disease] is markedly different"). Because Plaintiff fails to show, through expert reports or otherwise, how studies regarding the effectiveness of glucosamine and chondroitin in treating OA can *disprove* the advertising statements at issue, these studies cannot demonstrate that Premier's advertising claims are false.

In any event, most of the studies cited by Plaintiff, as well as multiple clinical studies regarding the effectiveness of glucosamine and chondroitin in treating the symptoms of OA, have actually found that these substances can and do provide joint health benefits—including to persons suffering from OA. *See supra*, pp. 6-7 (discussing benefits found in the GAIT, LEGS, and MOVES studies). Given what is known about the mechanisms of action of glucosamine and chondroitin, the results of clinical studies finding that these substances have effects strong enough to modify disease symptoms of OA populations strongly supports Premier's advertising claim that these ingredients promote joint health generally. Grande Dec. Ex. A (Grande Report) 16.[8]

### b. Plaintiff's Experts Fail To Identify Any Other Evidence Capable Of Disproving The Claims

None of Plaintiff's experts has identified scientific evidence demonstrating that glucosamine and chondroitin cannot and do not provide the advertised general joint health benefits. Indeed, two of Plaintiff's experts have admitted no such evidence exists and that as a result, such an opinion cannot be formed. Koenig Dec. Ex. E (Willis Dep.) 89:14-25 ("Q: I'm looking for an opinion that you have that says that glucosamine and chondroitin do not provide any joint health benefits.

---

[8]By contrast, a finding that glucosamine or chondroitin was not proven effective in modifying OA disease symptoms to a clinically-significant degree cannot establish that glucosamine or chondroitin is incapable of helping to promote general joint well-being or to maintain the structure or function of joints. Grande Dec. Ex. A (Grande Report) 16; *see also* Koenig Dec. Ex. H (Willis Supp. Report) ¶ 78; *id.* Ex. E (Willis Dep.) 150:18-22.

1   That's what I'm looking for.  A: I don't have that opinion.  I don't know that. . . .  It's not possible

2   for me to determine that, because no studies have been done");[9] *id.* Ex. F (Graboff Dep.) 118:8-12

3   ("Q: Can you point me to a study that has concluded that it is scientifically impossible to maintain

4   joint health, mobility, and flexibility with glucosamine and chondroitin? A: No."); *see also id.*

5   157:9-20 ("Q: [Your report] states, 'Claims that Joint Juice is capable of relieving joint pain,

6   comforting and/or lubricating the joints and that Joint Juice can maintain overall joint health,

7   mobility and flexibility are false because these results are medically and scientifically impossible.'

8   . . . With regard to this scientifically impossible, can you point me to a single study that supports

9   your claim?  A: No.").[10]

10          Plaintiff's third expert, Dr. Silbert, also could not identify an affirmative scientific study

11   disproving the advertised joint health benefits, and instead rested on his fifteen-year-old belief that

12   joint supplements cannot have any effect, so "[w]hatever [the advertisements for Joint Juice]

13   say . . . [he] do[es]n't believe it."  *Id.* Ex. G (Silbert Dep.) 27:11-28:20, 38:21-25.  Yet Dr. Silbert

14   admitted that this belief is based on decades-old *in vitro* studies examining only one mechanism of

15   action through which glucosamine and chondroitin can affect the joints (cartilage formation), and

16   that such studies are not capable of categorically disproving the advertised joint health benefits,

17   which may be delivered through other mechanisms of action.  *Id.* 196:7-23, 197:12-198:1, 198:13-

18   25, 199:14-200:3, 200:14-19.  For example, Dr. Silbert never studied whether glucosamine or

19   chondroitin might affect joints through other proven mechanisms of action such as by providing

20   anti-inflammatory benefits, affecting enzymatic activity resulting in protection of cartilage cells, or

21   increasing lubrication of joints.  *Id.* 198:13-25, 199:14-200:3, 200:14-19.  Moreover, the *in vitro*

22   studies on which Dr. Silbert relies are outdated and do not take into account later clinical studies

23   showing joint health benefits—studies about which Dr. Silbert admits he is not qualified to opine.

24   *Id.* 201:5-20 (acknowledging that "exhaustive clinical investigations" may "demonstrate

25

26          [9]As noted, *supra* at p. 5 n.4, Dr. Willis attempted improperly to withdraw this admission after
    the fact.

27          [10]Dr. Graboff's inability to cite studies supporting the statements in his report is unsurprising
    given that the report was written entirely by Plaintiff's counsel.  Koenig Dec. Ex. F (Graboff Dep.)

28   75:3-17.

unequivocally whether glucosamine might have value in the treatment or prevention of [OA]," but that he has not reviewed these studies); *see also id.* 201:21-202:9 (postulating that if these studies show a positive result, something other than the mechanism of action of cartilage formation (*i.e.*, what he previously studied) would be indicated as the reason).[11]

The experts' failure to identify any affirmative scientific studies or other evidence establishing that Joint Juice's advertised benefits are not possible—and their admissions that no such evidence exists—are fatal to Plaintiff's case. *Stanley*, 2012 WL 1132920 (granting summary judgment where all plaintiff could show was mixed scientific evidence on the effectiveness of the probiotics and no expert had stated that the challenged claims were "actually false"). Furthermore, the experts' conclusory statements as to whether they *believe* Joint Juice is capable of providing the advertised joint health benefits are unsupported and meaningless from an evidentiary standpoint. *See Scheuerman*, 2012 WL 2916827, at *8 (rejecting expert conclusion where expert's report "[did] not actually provide the factual basis to support such conclusion").

Unable to point to affirmative evidence disproving the advertising claims, Plaintiff's experts instead attempt to criticize the scientific substantiation *supporting* those claims. Yet, as discussed above, the experts' opinions that the advertised benefits are unproven, as well as their criticisms of the relevance, quality, and results of the scientific studies that *support* Premier's advertising claims, can only establish a lack of substantiation, not affirmative falsity. This is not enough to meet Plaintiff's burden. *Scheuerman*, 2012 WL 2916827, at *7-8 (plaintiffs unable to meet burden to prove falsity where their case "boil[ed] down to a claim that Nestle's scientific support underlying its claim . . . is not as strong as it should be").

Given the admissions of Plaintiff's experts on deposition, there is no *material* disagreement between the parties' experts—all agree that no scientific evidence exists to disprove the challenged

---

[11]Dr. Willis and Dr. Graboff did not opine that there is no mechanism of action through which glucosamine and chondroitin can provide joint health benefits. Dr. Graboff admitted he did not analyze and has formed no opinions as to whether glucosamine and chondroitin can improve joint health through mechanisms of action other than rebuilding cartilage. Koenig Dec. Ex. F (Graboff Dep.) 118:13-24; 122:7-14. Dr. Willis does not know the mechanisms of action through which glucosamine and chondroitin affect the joints because, as he admits, he is not an expert in anything related to cartilage. *Id.* Ex. E (Willis Dep.) 214:6-215:9.

advertising claims.  But even if there were a disagreement among the experts, that too would be insufficient, where, as here, Plaintiff has not presented affirmative evidence establishing that the product does not or cannot deliver the advertised benefits.  *See Rambus*, 628 F. Supp. 2d at 1122 ("A mere disagreement between experts is not sufficient to raise a triable issue of fact."); *see also In re GNC Corp.*, 789 F.3d 505 (4th Cir. 2015) (allegations of lack of scientific consensus in support of advertising claims insufficient as a matter of law to plead a claim for false advertising under California consumer protection statutes); *Dalberth v. Xerox Corp.*, 766 F.3d 172, 189 (2d Cir. 2014) ("'an expert's report is not a talisman against summary judgment'" and "'summary judgment is not *per se* precluded because there are conflicting experts'") (citations omitted).

### 3.    Significant Undisputed Scientific Evidence Supports The Claims

Although it is not Premier's burden to present substantiation for its advertising claims, it is undisputed that existing scientific evidence shows that glucosamine and chondroitin provide joint health benefits.  This scientific evidence includes (1) *in vitro* and animal studies that have established the bioavailability of oral glucosamine and chondroitin and the mechanisms of action by which these ingredients can provide joint benefits, and (2) human clinical studies that have shown both structural benefits (*e.g.*, reduced joint space width narrowing) and symptomatic benefits (*e.g.*, pain relief) after taking glucosamine and chondroitin.[12]  This showing, too, is fatal to Plaintiff's claims.

*In vitro* studies have examined the effect of glucosamine and chondroitin on cartilage cells in tissue cultures and have demonstrated multiple mechanisms of action through which glucosamine and chondroitin can provide joint health benefits, including through increasing aggrecan (a building block of cartilage), inhibiting COX-2 activity (a source of pain), and affecting enzymatic activity to reduce inflammation and destruction of cartilage cells.  Grande Dec. Ex. A (Grande Report) 10; Koenig Dec. Ex. E (Willis Dep.) 50:5-17, 216:3-217:20 (admitting studies have shown these effects).  In addition, preclinical animal studies have demonstrated that glucosamine and chondroitin taken orally reach joint tissue (as shown through carbon-tracing), are bioavailable, and

---

[12]As discussed above, Plaintiff's experts' disagreement as to the weight or persuasiveness of this evidence supporting the claims is insufficient to establish falsity.

1    provide joint health benefits including, for example, reduced cartilage destruction and reduced

2    inflammatory activity.  Grande Dec. Ex. A (Grande Report) 11; Koenig Dec. Ex. E (Willis Dep.)

3    46:8-15, 50:5-17, 210:11-211:23, 212:12-15, 214:9-22, 216:7-217:20 (admitting studies have made

4    these findings); *id.* Ex. G (Silbert Dep.) 133:15-20, 138:18-25 (admitting studies have found

5    glucosamine reaches the joints and is bioavailable); *id.* Ex. F (Graboff Dep.) 155:7-15; 156:2-9,

6    145:24-147:6; 149:15-17, 150:16-25, 151:18-25, 154:6-16, 156:2-9, 155:7-15 (admitting studies

7    regarding bioavailability of glucosamine and chondroitin are outside Graboff's expertise).  Such

8    studies are not subject to any possible "placebo effect."  Grande Dec. Ex. A (Grande Report) 20.

9            The findings of the *in vitro* and animal studies are further supported by human clinical

10   studies.  Dr. Willis—Plaintiff's only expert who purports to be qualified to opine on clinical

11   studies—has admitted that multiple studies (including GAIT, MOVES, and LEGS) have concluded

12   that glucosamine and chondroitin provide joint health benefits.  *See supra*, pp. 4-5; Koenig Dec.

13   E (Willis Dep.) 40:24-41:14, 50:25-51:9, 51:16-21, 56:5-16, 59:18-25, 71:1-13, 233:2-10; 237:9-18.

14   And although Dr. Silbert has admitted he is not qualified to opine on the clinical studies, he also

15   acknowledged that other scientists have concluded glucosamine and chondroitin help control OA

16   and its symptoms and that "many, many people that are using [glucosamine and chondroitin]" do in

17   fact say it helps control OA and its symptoms.  *Id.* Ex. G (Silbert Dep.) 48:11-17, 50:23-51:2,

18   103:6-104:11, 106:17-107:3, 206:8-13, 206:17-21.  Similarly, Dr. Graboff acknowledged the

19   existence of such clinical studies in the literature, but admitted they are beyond his expertise.  *Id.*

20   Ex. F (Graboff Dep.) 173:13-174:2; 180:4-8.

21           In light of the undisputed fact that multiple scientific studies have concluded that

22   glucosamine and chondroitin provide joint health benefits, Plaintiff cannot meet her burden of

23   establishing that the claimed joint health benefits of the ingredients in Joint Juice are false.

24   
25                **4.    Plaintiff's Own Statements Regarding Effectiveness Are Insufficient To
                          Disprove The Claims**

26           Plaintiff's own belief that Joint Juice did not provide the advertised benefits is not scientific

27   evidence of falsity or deception, and is not sufficient to defeat summary judgment.  *Brazil v. Dole*

28   *Packaged Foods, LLC*, No. 12-CV-01831, 2014 WL 6901867, at *5 (N.D. Cal. Dec. 8, 2014); *Ries*,

2013 WL 1287416, at \*6-7.  Plaintiff's belief that the product does not deliver the advertised benefits is based on nothing more than her subjective observation that, after consuming the product for just five days, she did not experience relief of her joint pain, even though neither the Joint Juice commercial she viewed nor the product packaging made any express representation about joint pain at all, let alone a promise of efficacy in such a short period of time.  Koenig Dec. Ex. D (Sonner Dep.) 24:16-25:15, 59:15-16, 66:8-15, 85:15-19, 89:6-10; 132:12-16.[13]  Plaintiff's subjective experience does not raise a material question of fact as to whether Joint Juice can deliver the advertised benefits.  *See Franulovic v. Coca-Cola Co.*, No. 07-0539, 2009 WL 1025541, at \*6 (D.N.J. Apr. 16, 2009), *aff'd sub nom.*, 390 Fed. Appx. 125 (3d Cir. 2010).

      **C.**      **Plaintiff Cannot Establish That The Advertising Claims Are Misleading**

As noted above, to prevail on a claim that the Joint Juice advertising is misleading or likely to deceive, in addition to identifying an implied message allegedly conveyed to consumers by the advertising, the plaintiff must (1) demonstrate by consumer survey evidence that a significant proportion of consumers actually receive that implied message, *and* (2) establish that the implied message is provably false.  *Ries*, 2013 WL 1287416, at \*6; *Johns*, 2013 WL 1498965, at \*48. Plaintiff can do neither.

      **1.**      **Plaintiff Has Adduced No Evidence That Consumers Were Misled**

Although Plaintiff has made vague and conclusory assertions to the effect that Premier's marketing may imply to consumers that Joint Juice is effective in alleviating joint pain, without regard to whether the consumer has OA, *see, e.g.*, FAC ¶ 4 (alleging in conclusory fashion that Premier's marketing conveys to consumers that Joint Juice "will . . . relieve joint pain"), Plaintiff has introduced no consumer survey or other extrinsic evidence to establish that any such implied message was actually conveyed to consumers.  This is fatal to Plaintiff's claim that the advertising

---

[13]Plaintiff says she believes that the product should have worked in six days because it is sold in a six-pack, but inexplicably took the product for five days only, thereby failing to complete the full dosage cycle under her own standard.  Koenig Dec. Ex. D (Sonner Dep.) 62:23-63:1 ("If a package [sic] is sold in a six pack, I would assume that in six days I'm going to feel different; otherwise, they'd sell it in a 12 pack or a 25 pack or a 50 pack or a hundred pack.");  *id.* 24:16-24 (stating Plaintiff consumed one bottle per day for five days before arriving at her belief that the product does not work).

1   is misleading.  *See Ries*, 2013 WL 1287416, at *6; *Johns*, 2013 WL 1498965, at *40.[14]

2           The conclusory assertions of Plaintiff's purported marketing expert, Mr. Keegan, do not

3   raise any disputed issue of material fact as to an implied message.  Mr. Keegan asserts, without

4   evidence, that some consumers may have been led by the Joint Juice advertising to believe that Joint

5   Juice would be effective in relieving joint pain.  *See, e.g.*, Koenig Dec. Ex. J (Keegan Report) 7

6   ("The primary message that is communicated in Joint Juice's marketing communications is the Joint

7   Juice product promotes joint health *and/or reduces joint pain*." (emphasis added)).  But Mr. Keegan

8   did not undertake a consumer survey to ascertain what message consumers take away from the

9   challenged Joint Juice advertising claims; indeed, he offers no extrinsic evidence of *any* consumer's

10  actual understanding of the product claims.  *Id.* Ex. I (Keegan Dep.) 167:9-13, 168:9-15.  Nor did

11  Mr. Keegan even bother to review the advertising claims at issue to see whether they make any

12  express reference to "joint pain" (they do not), having already made up his mind (again, without

13  extrinsic evidence) that the distinction between "joint health" and "joint pain" is a "distinction

14  without a difference to a consumer."  *Id.* 172:9-174:5.[15]  An expert's unsupported beliefs of this

15  nature are not capable of creating a material issue of disputed fact.  *Scheuerman*, 2012 WL

16  2916827, at *8 (rejecting plaintiffs' expert's conclusion where "his report does not actually provide

17  the factual basis to support such conclusion"); *see also Johnson & Johnson-Merck Consumer*

18  *Pharm. Co. v. Rhone-Poulenc Rorer Pharm.*, 19 F.3d 125, 136 (3d Cir. 1994) (holding that an

19  expert's personal opinion is not the standard used to measure the existence of implied claim or

20  whether consumers were misled).[16]

21

22  _____

       [14]Plaintiff does not have OA (Koenig Dec. Ex. D (Sonner Dep.) 41:2-25), and, therefore, in
23  purchasing Joint Juice could not have relied on any mistaken belief that the product is intended to treat
    OA.

24       [15]In Mr. Keegan's view, then, not only Joint Juice but all of the hundreds of glucosamine
    products currently on the market and advertised for joint health (Koenig Dec. Ex. I (Keegan Dep.)
25  82:19-84:23, 110:18-25), are misbranded drugs advertised unlawfully for treatment of pain—a view
    the FDA evidently does not share.  Mr. Keegan ignores that federal law specifically authorizes dietary
26  supplement labeling to bear statements describing the role of ingredients like glucosamine and
    chondroitin in promoting general joint well-being and maintaining the structure and function of joints.
27  *See Stanley*, 2012 WL 1132920, at *7 (describing DSHEA regime for supplement labeling).

       [16]Moreover, Mr. Keegan has no formal training or education in marketing research or
28  consumer surveys, he is not aware of any instance in which a court accepted his qualifications as an
    expert in this area, and he has been held *not* to be qualified in at least one recent case.  Koenig Dec.

(Footnote Cont'd on Following Page)

1    Lacking any extrinsic evidence of Joint Juice consumers actually having received any

2    implied message relating to treatment of OA or joint pain, Plaintiff and Mr. Keegan seek to infer the

3    existence of such a message from supposed evidence that Premier "targeted" its advertising on a

4    demographic that included sufferers of joint pain and OA.  Koenig Dec. Ex. J (Keegan Report) ¶ 62.

5    But such purported evidence of Premier's intent is irrelevant as a matter of law because, "in a false

6    advertising case brought under the UCL and CLRA, the products' advertised benefits, as expressed

7    through the products' packaging and advertisements, are the claims that are 'at issue' in the

8    litigation," and "intent of the defendant is irrelevant."  *Johns*, 2013 WL 1498965, at *22-23; *see*

9    *also Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3rd Cir. 2006)

10   ("That Curay-Cramer intended to send these [implied] messages by signing the advertisement does

11   not change the fact that the advertisement itself, viewed objectively, does not achieve that goal.  It is

12   the objective message conveyed, not the subjective intent of the person sending the message, that is

13   determinative").  To the extent Plaintiff intends to argue that an implied message can be inferred

14   from the mere fact that Premier in some instances placed advertisements for Joint Juice in arthritis-

15   themed periodicals or in response to Google keyword searches for terms relating to joint pain or

16   arthritis, this again fails as a matter of law without a consumer survey or other extrinsic evidence

17   establishing whether the context in which the advertisement was placed actually misled a significant

18   proportion of consumers.  *See, e.g.*, *Rahman v. Mott's LLP*, No. CV 13-3482 SI, 2014 WL 5282106,

19   at *9 (N.D. Cal. Oct. 15, 2014) (granting summary judgment where plaintiff's  expert report without

20   a consumer survey failed to raise a genuine issue of fact as to whether a reasonable consumer would

21   understand "No Sugar Added" claim to mean the product was healthier, lower in sugar, or lower in

22   calories than other products), *reconsideration denied*, 2014 WL 6815779 (N.D. Cal. Dec. 3,

23   2014).[17]  Plaintiff's failure to adduce any such evidence requires summary judgment for Premier.

24

---

25   (Footnote Cont'd From Previous Page)
     Ex. I (Keegan Dep.) 99:16-100:13 (admitting Keegan was disqualified in *Warner Bros. Entm't Inc. v.*
26   *Global Asylum Inc.*, No. 2:12-cv-09547-PSG-CW, Dkt. # 60 (C.D. Cal. Jan. 29, 2013)).

27      [17]Similarly, Mr. Keegan makes reference to the fact that certain Joint Juice packaging includes a
     statement to the effect that a portion of the proceeds from the purchase of Joint Juice are donated to the
28   Arthritis Foundation, accompanied by a logo of the Arthritis Foundation.  Koenig Dec. Ex. J (Keegan
     Report) ¶ 14 & n. 10; *id.* Ex. A (packaging showing logo).  Plaintiff again has adduced no evidence of
     what, if anything, this statement or logo may have conveyed to consumers of Joint Juice, and
     (Footnote Cont'd on Following Page)

1

2

### 2.    Given The Express Disclaimer, No Reasonable Consumer Could Understand The Advertising To Imply That Joint Juice Treats OA

No reasonable consumer could understand the Joint Juice marketing to imply that Joint Juice is a treatment for the symptoms of OA, including joint pain, because the Joint Juice advertising *expressly disclaims* that it treats or prevents any disease.  *See McCrary*, 2013 WL 6402217, at *4 (finding as a matter of law that glucosamine product did not make an implied health claim that it would treat OA where the packaging made no reference to arthritis and instead "directly contradict[ed] any supposed reference or inference to osteoarthritis by disclaiming that it treats any disease"); *Stanley*, 2012 WL 1132920, at *8 (finding probiotic product did not make an implied claim that it would "relieve diarrhea" where it disclaimed treatment of any disease); *see also Eckler*, 2012 WL 5382218, at *3 & n.4 (rejecting allegation that express advertising claim that glucosamine supplement "supports joint comfort, rebuilds cartilage, and lubricates joints" could be understood to suggests the product "provides benefits to all persons and for all stages of joint disease—especially when a disclaimer on the packaging says, very clearly, that [the product] 'is not intended to diagnose, treat, cure, or prevent any disease'").

### 3.    Plaintiff Has Not Established The Existence Of Scientific Evidence Disproving Any Implied Message

Even if Plaintiff could show—despite the absence of any extrinsic evidence and despite the express disclaimer to the contrary—that a reasonable consumer likely would understand the advertising claims to mean that Joint Juice relieves joint pain and other symptoms of OA, Plaintiff has not established the existence of scientific evidence *disproving* such a claim; a lack of substantiation is not enough.  *See Johns*, 2013 WL 1498965, at *48 (rejecting plaintiff's attempt to "plead around the 'lack of substantiation bar'" by alleging that defendant's representations were deceptive because they were unsubstantiated); *accord Haskell*, 965 F. Supp. at 1407.  Plaintiff's scientific evidence does not establish that the ingredients in Joint Juice *cannot* alleviate joint pain or other symptoms of OA, as would be required to establish actual falsity of the alleged implied message.  *See supra*, pp. 6-7, 10-11,

27

28

(Footnote Cont'd From Previous Page)
Mr. Keegan candidly admitted in his deposition that he was "not sure" what the logo would necessarily communicate to consumers.  *Id.* Ex. I (Keegan Dep.) 177:18-178:21.

15.  The studies on which Plaintiff relies at most raise questions as to whether the evidence in support of the effectiveness of glucosamine and chondroitin is robust enough to justify their widespread adoption by doctors as a treatment regimen for OA, *see supra*, pp. 6-7, 15—but this goes to the adequacy of substantiation for the alleged implied claim, not to its falsity.  Plaintiff's own experts admit, moreover, that several of those same studies have shown that glucosamine and chondroitin *can and do* provide joint health (including pain relief) benefits to persons with OA.  *See supra*, pp. 6-7.  Because Plaintiff has thus failed to come forward with affirmative scientific evidence *disproving* the alleged implied advertising claim, Premier is entitled to summary judgment.  *Johns*, 2013 WL 1498965, at *48.

### D.  Plaintiff Has Failed To Create A Triable Issue Of Fact As To Damages

Not only has Plaintiff failed to establish that the challenged advertising is false or misleading, she also has failed to present any evidence (expert or otherwise) from which a jury could determine the amount of damages, here restitution, for the putative class.  This provides a further independent basis for summary judgment for Premier.  *See Ewert v. eBay, Inc*., 602 F. App'x 357, 359 (9th Cir. 2015) ("When damages are an essential element of the plaintiffs' claim, failure to 'offer competent evidence of damages' supports a grant of summary judgment."); *Weinberg v. Whatcom Cnty*., 241 F.3d 746, 751-52 (9th Cir. 2001) (holding where plaintiff "failed to offer competent evidence of damages, dismissal on summary judgment was appropriate with respect to all claims for which [plaintiff] bore the burden of establishing the amount of actual harm he suffered as a result of the [defendant's] actions").  Proof of a measurable amount of restitution, supported by substantial evidence, is an essential element of Plaintiff's claims under the UCL and CLRA.  *Colgan v. Leatherman Tool Grp., Inc*., 135 Cal. App. 4th 663, 700 (2006) (measure of restitution under UCL and CLRA must be supported by "substantial evidence"); *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 136 (2009) ("[I]n order to obtain class wide restitution under the UCL, plaintiffs need establish not only a misrepresentation that was likely to deceive but also the existence of a 'measurable amount' of restitution, supported by the evidence.") (internal citation omitted).  In a false advertising case, the amount of restitution is measured as the "difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information." *Pulaski & Middleman, LLC v. Google, Inc*., —F.3d—, No. 12-

16752, 2015 WL 5515617, at *8 (9th Cir. Sept. 21, 2015).  Thus, to avoid summary judgment, a plaintiff in a putative class action for false advertising must present substantial evidence of what a reasonable consumer would have paid for the product absent the challenged advertising claims.  *Ries*, 2013 WL 1287416, at *7-8 (granting summary judgment where plaintiff failed to present evidence of measure of restitution); *Ogden v. Bumble Bee Foods, LLC*, No. 5:12-CV-01828-LHK, 2014 WL 27527, at *12-13 (N.D. Cal. Jan. 2, 2014) (same).  Plaintiff has not introduced any expert testimony on damages and has not presented *any* evidence (let alone "substantial evidence") of what a reasonable consumer would have paid for Joint Juice if Premier had not made the challenged advertising claims.  Plaintiff cannot simply assert, without evidence, that Joint Juice is valueless, particularly given that there is evidence in the record establishing: (1) glucosamine products without joint health advertisements sell for a price greater than zero, and (2) the other ingredients in Joint Juice also have value independent of the advertising claims.  *See supra*, p. 9.  Accordingly Premier is entitled to summary judgment on this basis as well.  *Ries*, 2013 WL 1287416, at *7-8.

## V.      CONCLUSION

For the foregoing reasons, Premier respectfully requests that the Court grant its motion for summary judgment on all of Plaintiff's claims.

Dated: October 2, 2015                          Respectfully submitted,


By:/s/ *Anton A. Ware*
        Anton A. Ware

        ARNOLD & PORTER LLP
        Trenton H. Norris
        Anton A. Ware
        Jonathan L. Koenig

        VENABLE LLP
        Angel A. Garganta
        Jessica L. Grant
        Daniel S. Blynn
        Guido E. Toscano

        Attorneys for Defendant
        PREMIER NUTRITION CORP.

35343899v3