**VENABLE LLP**
Angel A. Garganta (SBN 163957)
  aagarganta@venable.com
Jessica L. Grant (SBN 178138)
  jgrant@venable.com
505 Montgomery Street, Suite 1400
San Francisco, CA 94111
Telephone:    (415) 653-3735
Facsimile:    (415) 653-3755

Daniel S. Blynn (*admitted pro hac vice*)
  dsblynn@venable.com
575 7th Street, NW
Washington, DC  20004
Telephone:    (202)344-4619
Facsimile:    (202)344-8300

Guido E. Toscano (SBN 266304)
  getoscano@venable.com
2049 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone:    (310) 229-9900
Facsimile:    (310) 229-9901

**ARNOLD & PORTER LLP**
Trenton H. Norris (SBN 164781)
  trent.norris@aporter.com
Anton A. Ware (SBN 257848)
  anton.ware@aporter.com
Jonathan L. Koenig (SBN 281737)
  jonathan.koenig@aporter.com
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Telephone:    (415) 471-3100
Facsimile:    (415) 471-3400

Attorneys for Defendant
PREMIER NUTRITION CORP.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VINCENT D. MULLINS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PREMIER NUTRITION CORP., f/k/a JOINT JUICE, INC.,<br><br>Defendant. | Case No. 3:13-cv-01271-RS<br><br>**DEFENDANT PREMIER NUTRITION CORP.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     January 21, 2016<br>Time     1:30 p.m.<br>Place    Courtroom 3 - 17th Floor<br>Judge:  Hon. Richard Seeborg |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT ..........................................................................................................................1

    A. Plaintiff Misstates The Standard For UCL/CLRA False Advertising Claims .............1

        1. Affirmative Scientific Evidence Of Falsity Is Required .................................1

        2. The Standard Is Not Lowered For "Misleading" Claims................................2

        3. Dietary Supplement Claims Need Not Meet A Standard Of Clinical Effectiveness .................................................................................................3

    B. Plaintiff Cannot Establish That The Advertising Claims Are False ............................4

        1. Plaintiff's *Arguments* That Studies Show Joint Juice "Does Not Work" Are Belied By Plaintiff's Own Experts' Admissions...........................4

        2. Bald Assertions That Joint Juice "Does Not Work" Are Not Affirmative Scientific Evidence.....................................................................7

        3. Plaintiff Cannot Establish Falsity By Pointing To Scientific Uncertainty.....................................................................................................8

        4. Plaintiff Cannot Establish Falsity Through Reliance On Clinical Treatment Protocols ........................................................................................9

        5. Because Plaintiff Lacks Affirmative Scientific Evidence, Her Claims Boil Down To A Lack of Substantiation.........................................................10

    C. Plaintiff Cannot Establish That The Advertising Claims Are Misleading.................10

        1. Plaintiff Has Adduced No Evidence Of Consumers' Actual Understanding Of The Advertising................................................................10

        2. Plaintiff Has Not Established That Existing Scientific Evidence Disproves Any Implied Message Of Treatment Of Pain Or OA ...................12

    D. Plaintiff Admits She Lacks Evidence Of An Appropriate Measure Of Restitution, And Premier Is Entitled To Summary Judgment On This Ground ........13

III. CONCLUSION ...................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aloudi v. Intramedic Research Grp., LLC*,
    No. 15-cv-00882-HSG, 2015 WL 4148381 (N.D. Cal. Jul. 9, 2015) ........................................... 2

*Arroyo v. Pfizer*,
    No. C-12-4030 EMC, 2013 WL 415607 (N.D. Cal. Jan. 31, 2013) ............................................. 8

*Brazil v. Dole Packaged Foods, LLC*,
    No. 12–CV–01831–LHK, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) .................................. 15

*Cabral v. Supple, LLC*,
    No. EDCV 12-00085-MWF, 2012 WL 4343867 (C.D. Cal. Sep. 19, 2012) ............................... 8

*Dorfman v. Nutramax Labs., Inc.*,
    No. 13 cv 0873 WQH (RBB), 2013 WL 5353043 (S.D. Cal. Sep. 23, 2013) ........................... 12

*Eckler v. Wal-Mart Stores, Inc.*,
    No. 12-CV-727-LAB-MDD, 2012 WL 5382218 (S.D. Cal. Nov. 1, 2012) ............................ 2, 7

*In re Neurontin Mktg. & Sales Practices Litig.*,
    712 F.3d 21 (1st Cir.), *cert. denied*, —U.S. —, 134 S. Ct. 786 (2013) ........................................ 3

*In re POM Wonderful LLC*,
    No. ML 10-02199 DDP, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ................................... 15

*In re Tobacco Cases II*,
    240 Cal. App. 4th 779 (2015) .................................................................................................. 14

*In re Vioxx Class Cases*,
    180 Cal. App. 4th 116 (2009) .................................................................................................. 14

*Johns v. Bayer Corp.*,
    No. 09-cv-1935 DMS (JMA), 2010 WL 2573493 (S.D. Cal. Jun. 24, 2010) ........................... 12

*Johns v. Bayer Corp.*,
    No. 09-cv-1935 AJB (DHB), 2013 WL 1498965 (S.D. Cal. Apr. 10, 2013) ......................*passim*

*Kwan v. SanMedica Int'l, LLC*,
    No. 14-cv-03287-MEJ, 2015 WL 848868 (N.D. Cal. Feb. 25, 2015) (*appeal
    pending*) ..................................................................................................................................... 2

*Ries v. Ariz. Beverages USA LLC*
    No. 10-01139, 2013 WL 1287416 (N.D. Cal. Mar. 28, 2013) ....................................... 10, 13, 14

*Scheuerman v. Nestle Healthcare Nutrition, Inc.*,
    No. CIV. 10-3684, 2012 WL 2916827 (N.D.J. Jul. 17, 2012) ................................................ 3, 8

- ii -
DEFENDANT'S REPLY ISO MOTION FOR SUMMARY JUDGMENT 3:13-cv-01271-RS

*Stanley v. Bayer Healthcare LLC*,
  No. 11cv862-IEG(BLM), 2012 WL 1132920 (S.D. Cal. Apr. 3, 2012) ........................ 3, 4, 10, 12

*Thomas v. Global Vision Prods., Inc.*,
  No. RG03091195, 2008 WL 7184817 (Cal. Super. Ct. May 14, 2008) ...................................... 14

*Thomas v. Imbriolo*,
  No. A130517, 2012 WL 1427360 (Cal Ct. App. 1st Dist. Apr. 25, 2012) ................................. 14

*United States v. Bayer Corp.*,
  No. 07-01(JLL), 2015 WL 5822595 (D.N.J. Sep. 24, 2015) .......................................................... 4

*Weinberg v. Whatcom Cnty.*,
  241 F.3d 746 (9th Cir. 2001) ....................................................................................................... 13

**STATUTES AND RULES**

21 U.S.C.
  § 331(d) ......................................................................................................................................... 4
  § 350 .............................................................................................................................................. 4
  § 355(a) ......................................................................................................................................... 4

21 C.F.R. § 314.126 ............................................................................................................................ 4

Cal. R. Ct. 8.1115 ............................................................................................................................. 14

**OTHER AUTHORITIES**

FDA, Guidance for Industry: Substantiation for Dietary Supplement Claims Made
  Under Section 403(r) (6) of the Federal Food, Drug, and Cosmetic Act (Dec.
  2008) .............................................................................................................................................. 4

FTC, Dietary Supplements: An Advertising Guide for Industry ........................................................ 4

# I. INTRODUCTION

Plaintiff's own experts have admitted there are *no scientific studies* proving that glucosamine and chondroitin, the key ingredients in Joint Juice, cannot help keep joints healthy, lubricated, and flexible, as Premier claims.  This is fatal to Plaintiff's case.  Rather than addressing this defect, Plaintiff attempts to skirt it in two ways.  First, she *argues* that studies disprove the advertising claims, even though her experts were unable to identify any such study.  Second, Plaintiff *argues* that consumers understand Joint Juice's advertising to convey that it treats osteoarthritis and pain, even though Plaintiff has no evidence of this, and the advertising disclaims treatment of any disease.  Given that she has no evidence capable of disproving the actual advertising claims, nor evidence capable of showing any implied claim was both made and scientifically disproven, Plaintiff has failed to raise a triable issue of fact.

Plaintiff's claims fail for the additional reason that she has presented no evidence in support of restitution or damages for the putative class.  Indeed, Plaintiff's Opposition cites to *not a scintilla* of evidence from which a measurable amount of damages or restitution could be determined.  Instead, Plaintiff *argues* (without evidentiary support) that a class would be entitled to a full refund, but admits that "the amount may be the return of the full purchase price [or] *something less*."  Plaintiff's Opposition to MSJ ("Opp.") at 25 (emphasis added).  Indeed, here, the proper measure would be "something less" because Joint Juice has undisputed value absent the advertising.  But Plaintiff has presented no evidence from which a trier of fact could measure the difference between the actual value and the amount received.  Accordingly, Premier is entitled to summary judgment on this independent ground.

# II. ARGUMENT

## A. Plaintiff Misstates The Standard For UCL/CLRA False Advertising Claims

### 1. Affirmative Scientific Evidence Of Falsity *Is* Required

Contrary to Plaintiff's contentions, the law is clear that in order to prevail on her claims, Plaintiff must establish that the advertising statements at issue have been scientifically disproven. *Johns v. Bayer Corp.*, 2013 WL 1498965, at **33-47 (S.D. Cal. Apr. 10, 2013) ("[I]n the absence of affirmative scientific evidence available during the Class Period that proves that [the supplement]

does not [provide the advertised benefit], the strength of [defendant's] evidence is irrelevant and Plaintiffs' claims are based on 'lack of substantiation' rather than proof of falsity."); *Aloudi v. Intramedic Research Grp., LLC*, 2015 WL 4148381, at **3-6 (N.D. Cal. Jul. 9, 2015) (dismissing complaint alleging that dietary supplement did not work as advertised where plaintiff failed to allege scientific evidence specifically disproving claimed benefits); *Kwan v. SanMedica Int'l, LLC*, 2015 WL 848868, at *5 (N.D. Cal. Feb. 25, 2015) (*appeal pending*) (dismissing false advertising claims where plaintiff did not allege "that a study exists showing [the represented product] benefits are categorically impossible to achieve"); *Eckler v. Wal-Mart Stores, Inc.*, 2012 WL 5382218, at *3 (S.D. Cal. Nov. 1, 2012) (dismissing false advertising claims against glucosamine manufacturer where complaint failed to allege that scientific evidence actually disproved advertising claims).

## 2. The Standard Is Not Lowered For "Misleading" Claims

Plaintiff argues she "is not required to show categorical impossibility or even actual falsity" because she pleads a misleading advertising claim. Opp. at 15. Plaintiff misunderstands what a "misleading" claim entails. *See Johns*, 2013 WL 1498965, at *48. To prevail on her misleading claim, Plaintiff must prove: (1) that consumers in fact understood the advertising to convey a message other than what is expressly stated (which is typically established through a consumer survey), *and* (2) that such implied message is provably false. *Id*. In arguing for a lower burden, Plaintiff confuses the distinction between determining *what message* an advertisement conveys with whether that conveyed message is *provably false*.

A similar argument was addressed in *Johns*, 2013 WL 1498965, at *47. There, the plaintiffs attempted to base their UCL and CLRA claims on allegations that dietary supplement claims were both false *and* misleading. The plaintiffs argued that they could prevail on the misleading claim merely by showing the capacity or likelihood to deceive, and without presenting scientific evidence of falsity. *Id.* The court rejected this argument, holding that where the underlying factual allegation is that the express and implied advertising claims are unsupported by the science, plaintiffs carry the burden to establish through affirmative evidence that both the express and the implied claims are provably false. *Id.* at 48. Thus, claims of misleading advertising do not lower the standard for disproving the message conveyed.

Plaintiff also suggests that she need not prove actual falsity because she seeks to proceed under a "totality of the evidence" standard. Opp. at 17. Plaintiff relies only on a First Circuit case in which the challenged advertising claims were *drug claims*, the veracity of which had been directly tested in double-blind randomized controlled studies, numerous of which found the drug ineffective. *Id.* at 18 (citing *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21 (1st Cir.), *cert. denied*, —U.S. —, 134 S. Ct. 786 (2013)). In that case, the plaintiff *had met* the burden of proving actual falsity by pointing to affirmative scientific evidence available during the class period showing that the drug was not effective *for the indications at issue*. *Id.* Because that was a drug case, the randomized controlled studies were the standard from which to judge the claims. *Id.* In contrast, dietary supplements need not meet a standard of clinical effectiveness. *See infra* at 3-4. In any event, examining the totality of the evidence does not lower the requirement to prove actual falsity. *See Johns*, 2013 WL 1498965, at *42 (granting summary judgment in favor of defendant on ground that "totality of the evidence supports [the advertising claim]" where "there was no scientific research available [during the class period] that conclusively established, in light of other available studies, that [the supplement] did not [provide the advertised benefit]"). As discussed further herein, Plaintiff has not presented evidence of affirmative falsity of the claims, and therefore has failed to raise a triable issue of fact. *Stanley v. Bayer Healthcare LLC*, 2012 WL 1132920, at **4-11 (S.D. Cal. Apr. 3, 2012) (granting summary judgment where all plaintiff could show was mixed scientific evidence on effectiveness of supplement, and where plaintiff lacked evidence the challenged claims were "actually false"); *Scheuerman v. Nestle Healthcare Nutrition, Inc.*, 2012 WL 2916827, at **5-9, 11 (D.N.J. Jul. 17, 2012) (same); *Johns*, 2013 WL 1498965, at *40 (same).

**3. Dietary Supplement Claims Need Not Meet A Standard Of Clinical Effectiveness**

Plaintiff suggests that the scientific standard by which the Joint Juice claims should be assessed is "clinical efficacy," and that if the claims do not meet this standard, or if it is "uncertain" whether they do, then Plaintiff has proven falsity. *See, e.g.*, Opp. at 1 (arguing that Premier is "hoping that 'uncertain' clinical efficacy will be enough"); *id.* ("Even if it were true that the clinical efficacy of glucosamine and chondroitin was 'uncertain,' Plaintiff would still win…."); *id.* at 6

("Premier does not and cannot cite to so much as a single clinical study that found the combination of glucosamine and chondroitin was more effective in relieving pain or improving mobility or flexibility than placebo."); *id.* at 10 ("these agents are no more clinically effective than placebo treatment"). Plaintiff is mistaken—clinical effectiveness is not the standard, and Plaintiff cannot prevail even if she were to show Joint Juice has not been proven clinically effective.

*It bears repeating that Joint Juice is a dietary supplement, not a drug*. *See Stanley*, 2012 WL 1132920, at *7 (explaining distinction between the two). The federal Dietary Supplement Health & Education Act of 1994 ("DSHEA") specifically authorizes dietary supplement labeling to bear statements describing the role of ingredients like glucosamine and chondroitin in promoting general joint well-being and maintaining the structure and function of joints. *See* 21 U.S.C. § 350. DSHEA "ensure[s] that supplements can be marketed and sold without following the stringent requirements imposed on drugs." *See United States v. Bayer Corp.*, No. 07-01(JLL), 2015 WL 5822595, at *3 (D.N.J. Sep. 24, 2015). Whereas new drugs must be pre-approved by the FDA and typically must be supported by randomized, placebo-controlled, double-blind clinical trials, dietary supplements are subject to no such requirements. *Id.* (citing 21 U.S.C. §§ 331(d), 355(a); 21 C.F.R. § 314.126). The FTC (which, unlike Plaintiff, has authority to demand substantiation of supplement claims) requires only that dietary supplement claims be supported by "competent and reliable scientific evidence." *Id.*[1] Accordingly, evidence that supplements are not clinically effective in treating a disease cannot establish that Premier's supplement claims are false, because that is not the standard by which dietary supplement claims are assessed. *See Stanley*, 2012 WL 1132920, at *7.

    **B.**    **Plaintiff Cannot Establish That The Advertising Claims Are False**

        **1.**    **Plaintiff's *Arguments* That Studies Show Joint Juice "Does Not Work" Are Belied By Plaintiff's Own Experts' Admissions**

Neither Plaintiff nor her experts have identified any study showing that Joint Juice cannot provide the advertised general joint health benefits. Plaintiff's vague and generalized *arguments*

---

[1] *See also* FDA, Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403(r) (6) of the Federal Food, Drug, and Cosmetic Act (Dec. 2008) (randomized, controlled clinical trials for dietary supplements may not be "possible, practical, or ethical"); FTC, Dietary Supplements: An Advertising Guide for Industry, at 3 (stating that the relevant standard is "competent and reliable scientific evidence.").

that Joint Juice "does not work" and that "[t]he promises Premier makes have been proven false time and again" (Opp. at 16) are unsupported in the record and contrary to the statements of Plaintiff's experts:

| Plaintiff's Arguments | Plaintiff's Experts |
|---|---|
| • "The science proves Joint Juice does nothing." Opp. at 1.<br><br>• "The properly conducted scientific studies…conclude that glucosamine and chondroitin do not work." *Id.*<br><br>• "Joint Juice does not and cannot work as advertised." *Id.* at 6.<br><br>• "Glucosamine and chondroitin do not work for people without arthritis." *Id.* at 7.<br><br>• "The meta-analyses studies, the well-conducted clinical studies, the basic science studies…clearly state that the express and implied claims like those made by Premier are false and misleading." *Id.* at 8.<br><br>• "The scientific evidence is overwhelming and demonstrates that Premier's claims are false and misleading." *Id.* at 10.<br><br>• "Basic [s]cience [c]oncludes [o]ral [g]lucosamine and [c]hondroitin [d]o [n]ot [g]et [t]here and [w]ould [n]ot [w]ork if [t]hey [d]id." *Id.* at 8.<br><br>• "Plaintiff has presented extensive evidence that the ingredients at issue do not provide the advertised benefits." *Id.* at 14.<br><br>• "The promises Premier makes have been proven false time and again." *Id.* at 16.<br><br>• "[S]ubstantial evidence exists that the oral glucosamine and chondroitin in Joint Juice do not do what Premier claims in its advertising." *Id.* | • Q: I'm looking for an opinion that you have that says that glucosamine and chondroitin do not provide any joint health benefits. That's what I'm looking for.<br>A: I don't have that opinion. I don't know that.<br>Q: Thank you.<br>A: It's not possible for me to determine that, because no studies have been done.<br>Q: And you haven't seen any studies that have concluded that glucosamine and chondroitin do not provide any joint health benefits?<br>A: I have seen no studies in that vein at all. (Koenig Dec. Ex. E (Willis Dep.) at 89:14-25)<br><br>• Q: Can you point me to a study that has concluded that it is scientifically impossible to maintain joint health, mobility and flexibility with glucosamine and chondroitin?<br>A: No.  (*Id*. Ex. F (Graboff Dep.) at 118:8-12)<br><br>• Q: [Your report] states, 'Claims that Joint Juice is capable of relieving joint pain, comforting and/or lubricating the joints and that Joint Juice can maintain overall joint health, mobility and flexibility are false because these results are medically and scientifically impossible.'. . . With regard to this scientifically impossible, can you point me to a single study that supports your claim?<br>A: No.  (*Id.* at 157:9-20.)<br><br>• Q: Are you aware of studies that have been reported in the scientific literature that have shown glucosamine and chondroitin to have benefits or positive outcome beyond the placebo effect?<br>A: Yes.  (Declaration of Anton A. Ware |

|   |   |
|---|---|
| | ("Ware Dec.") Ex. A (Willis Dep.) at 48:9-15.) |
| | • Q: You're aware that there are studies that show that glucosamine and chondroitin have anti-inflammatory effects, correct?<br>A: Correct. (Koenig Dec. Ex. E. (Willis Dep.) at 216:3-6.) |
| | • Q: You're aware that there are studies that show that glucosamine and chondroitin prevent enzymatic activity that would otherwise destroy cartilage cells?<br>A: Yes. (*Id.* at 216:14-19.) |
| | • Q: Are you aware that there are scientific studies that have shown that glucosamine and chondroitin may protect cartilage cells by inhibiting their degradation?<br>A: Yes. (*Id.* at 217:16-20.) |
| | • Q: [Y]ou are aware that in the scientific literature, there is a disagreement, some scientists believe that glucosamine and chondroitin provide joint health benefits and some don't?<br>A: With joint health benefits, it depends on what evidence you're looking at. If you are looking at isolated cells and animal studies, which is the only place that you're going to find that information, sure. There are people who have done those studies and they believe that there is a mechanism by which these agents may enhance joint health. (*Id.* at 50:5-16.) |

Thus, Plaintiff's own experts have admitted in no uncertain terms that no studies disprove the general joint health advertising claims made by Premier with respect to Joint Juice. That Plaintiff has no way to overcome these admissions, which are fatal to her case, is evident from Plaintiff's complete failure to address these admissions in her Opposition, and by her improper attempt to claw one of the admissions back through a purported "errata."

Significantly, Plaintiff's experts did not point to studies of the clinical effectiveness of glucosamine in treating OA when asked to identify studies disproving the general joint health claims—because that is not what those studies measured. *See supra* at 5-6; *see also*, Koenig Dec. Ex. H (Willis Supp. Report) ¶ 78 (clinical trials of glucosamine and chondroitin as treatments for

OA "do not directly address the focus of this lawsuit; i.e., the claims that the glucosamine and chondroitin in Joint Juice™ maintain and prolong normal joint function and health."); *Eckler*, 2012 WL 5382218, at *7 (dismissing claims challenging glucosamine supplement because of "mismatch" between representations at issue and OA study evidence alleged to debunk those representations).[2]

### 2. Bald Assertions That Joint Juice "Does Not Work" Are Not Affirmative Scientific Evidence

Unable to identify any scientific studies showing that glucosamine does not provide general joint health benefits, Plaintiff points to bald assertions by her experts that Joint Juice "does not work." For example, Plaintiff relies on Dr. Silbert's statement in his report that glucosamine "[does] not get [to joints] and would not work if [it] did." Opp. at 13. However, during his deposition, when confronted with studies showing exogenous glucosamine reaches the joints, Dr. Silbert admitted "[o]f course glucosamine gets there. Of course it does." Ware Dec. Ex. B (Silbert Dep.) at 134:18-19; *see also* Koenig Dec. Ex. G (Silbert Dep.) at 133:15-19 ("Q: So in the scientific literature are reports of glucosamine being taken orally that actually makes its way to the articular cartilage, correct? A: Yes, that's correct."); Ware Dec. Ex. B (Silbert Dep.) at 162:17-22, 174:25-175:5, 176:10-14 (admitting that multiple studies have shown that orally-ingested glucosamine does make its way to the joints ("it gets there") and can be used by the joints ("it is bioavailable")). He also admitted that his own conclusion that glucosamine does not work was based on considering only one possible way in which glucosamine and chondroitin can affect joints: cartilage formation. Koenig Dec. Ex. G (Silbert Dep.) at 196:7-23, 197:12-198:1, 198:13-25, 199:14-200:3, 200:14-19. Dr. Silbert never studied or considered studies of other mechanisms of action by which glucosamine and chondroitin can affect joint health, such as by providing anti-inflammatory benefits, affecting enzymatic activity resulting in protection of cartilage cells, or increasing lubrication of joints. *Id.*

---

[2] As Premier has explained previously, the results of clinical studies finding that glucosamine and chondroitin have effects strong enough to modify certain OA disease symptoms strongly supports Premier's advertising claim that these ingredients promote joint health generally. By contrast, a finding that glucosamine or chondroitin was not proven clinically effective in modifying certain OA disease symptoms cannot establish that glucosamine or chondroitin is incapable of helping to promote general joint health or flexibility. Grande Dec. Ex. A (Grande Report) at 16; *see also* Koenig Dec. Ex. H (Willis Supp. Report) ¶ 78; *id.* Ex. E (Willis Dep.) at 150:18-22.

198:13-25, 199:14-200:3, 200:14-19.  While, Dr. Silbert personally feels that "[w]hatever [the advertisements for Joint Juice] say . . . [he] do[es]n't believe it," this is not affirmative scientific evidence disproving the claims.  *Id.* Ex. G (Silbert Dep.) at 27:11-28:20, 38:21-25.  Similarly, Dr. Graboff's report (written by Plaintiff's counsel) asserts that it is "medically and scientifically impossible" for glucosamine to provide the advertised benefits.  However, when asked at his deposition to identify a single scientific study to support this assertion, Graboff could not do so.  *Id.*, Ex. F (Graboff Dep.) at 75:3-17, 157:9-20.  These naked expert assertions are not evidence and do not raise a triable issue of fact.  *See Scheuerman*, 2012 WL 2916827, at *8 (rejecting expert conclusion where expert's report "[did] not actually provide the factual basis to support such conclusion").  Plaintiff makes no effort to address this flaw in her expert "evidence."[3]

### 3.      Plaintiff Cannot Establish Falsity By Pointing To Scientific Uncertainty

Plaintiff argues that the science is "uncertain" and therefore all of Premier's express advertising claims are likely to mislead a reasonable consumer.  Opp. at 1-2.  But Plaintiff cannot carry her burden of establishing falsity by pointing to unsettled science.  *See Arroyo*, 2013 WL 415607, at **5-9, *Johns*, 2013 WL 1498965, at *48.

Plaintiff attempts to bolster her argument by suggesting that Premier internally "acknowledge[s] the real state of the science" as uncertain.  Opp. at 9.  In support of this assertion, Plaintiff cites to a statement that Joint Juice was pleased when its competitor, Supple, was advised to discontinue certain claims relating to its glucosamine product.  Declaration of Timothy G. Blood ISO Opp. to MSJ, Ex. 9.  Plaintiff conveniently fails to state what those claims were:  Supple's advertisements had expressly claimed "the key ingredients are 'clinically proven' effective to *treat the pain* and immobility *associated with arthritis*."  *See Cabral v. Supple, LLC*, 2012 WL 4343867, at *1 (C.D. Cal. Sep. 19, 2012) (emphasis added).  Thus, Supple was making the very type of advertising claims that Premier does not make.  The fact that Premier was pleased that its

---

[3] Likewise, Plaintiff's assertion that studies have demonstrated that glucosamine and chondroitin are not effective for *certain groups* cannot establish falsity of the advertising claims, even if it were supported by adequate evidence (it is not).  *See Arroyo v. Pfizer*, 2013 WL 415607 (N.D. Cal. Jan. 31, 2013) (dismissing claims where expert's reference to limited benefits to the "average person" from supplement left open the possibility that some consumers may receive benefits).

competitor—which was expressly marketing the product as clinically proven to treat a disease—was no longer being permitted to do so, says nothing about the state of the science. Plaintiff cites other statements by Premier employees that purportedly suggest "blemishes" or "weakening" of the scientific evidence in support of glucosamine as a treatment of OA, but even if these isolated and out of context statements reflected Premier's view on the state of the science (they do not), that would not prove that Joint Juice cannot provide the advertised general joint health benefits.[4] *See Johns*, 2013 WL 1498965, at *39 ("[T]he Court finds Plaintiffs inappropriately pluck quotes from internal [defendant] documents in an attempt to convey a particular message."). Premier's internal musings are not what matters; the actual scientific evidence is what matters, and Plaintiff has failed to present any scientific evidence capable of disproving the claims. *See supra* at 5-8.

### 4. Plaintiff Cannot Establish Falsity Through Reliance On Clinical Treatment Protocols

Plaintiff contends that clinical treatment protocols provide "that glucosamine and chondroitin do not work, [and] should not be used." Opp. at 7. Plaintiff also asserts that "the clinical practice guidelines clearly state that the express and implied claims like those made by Premier are false and misleading." *Id.* at 8. However, the protocols and guidelines do not support either of these contentions. Rather, those documents merely recommend against prescription of glucosamine in a clinical setting *as a drug for the treatment of osteoarthritis*. Declaration of Timothy G. Blood ISO CC, Exs. 61-64. They did not find that general joint health claims related to glucosamine are false or that glucosamine and chondroitin "do not work." In fact, the basis for the recommendation included "the lack of availability of prescription-quality preparations evaluated and approved for the indication of OA by the FDA." *Id.*, Ex. 63 at 472. In other words, glucosamine is not a drug, so it may be inappropriate for doctors to prescribe it as a drug in a clinical setting for the treatment of OA. Furthermore, the guidelines indicate that numerous studies found that glucosamine performed better than placebo. *Id.*, Ex. 62 at 102. In any event, whether or not a substance is recommended under a *clinical treatment* protocol for a disease does not determine

---

[4] Plaintiff also argues that Premier includes chondroitin in the product because consumers expect it and competitors include it, (Opp. at 9), but even if true this does not show that Premier made any false statement about chondroitin.

whether it can provide general well-being or structure-function benefits as a dietary supplement. *See supra* at 3-4.

### 5. Because Plaintiff Lacks Affirmative Scientific Evidence, Her Claims Boil Down To A Lack of Substantiation

Plaintiff argues that this case does not fall within the rubric of a lack of substantiation claim because Plaintiff has offered evidence of falsity. But, as shown above, Plaintiff has presented no evidence capable of disproving the actual advertising claims, and her experts have admitted that no such evidence exists. Accordingly, this case *is* a lack of substantiation case, and Plaintiff's attempts to distinguish the lack of substantiation cases are unavailing. *See e.g.*, Opp. at 13-14. For example, in *Johns*, 2013 WL 1498965, at \*\*43, 44, the court explained that "in the absence of affirmative evidence that scientific research did not support the [claim] . . . the strength of [defendant's] evidence is irrelevant and Plaintiffs' claims are based on 'lack of substantiation' rather than proof of falsity." Similarly, in *Stanley*, 2012 WL 1132920, at \*\*4-11, the court granted summary judgment on lack of substantiation grounds where all plaintiff could show was mixed scientific evidence on the effectiveness of the supplement and lacked evidence the challenged claims were "actually false." The facts here are essentially the same: Plaintiff has no evidence capable of disproving the actual advertising claims, and at best has mixed evidence as to the *clinical effectiveness* of Joint Juice in treating OA, something the product does not claim to do. *See supra* at 5-9.

### C. Plaintiff Cannot Establish That The Advertising Claims Are Misleading

A claim that advertising is misleading or likely to deceive requires evidence that a significant proportion of consumers actually understood the advertising to convey an implied message, *and* that the implied message is provably false. *Ries v. Ariz. Beverages USA LLC*, 2013 WL 1287416, at \*6 (N.D. Cal. Mar. 28, 2013); *Johns*, 2013 WL 1498965, at \*48. Plaintiff's Opposition fails to overcome her lack of evidence to establish *either* prong.

#### 1. Plaintiff Has Adduced No Evidence Of Consumers' Actual Understanding Of The Advertising

Plaintiff's claim that Premier's advertising is misleading fails in the first instance because Plaintiff has not conducted a consumer survey (or adduced other competent evidence) to establish that a significant proportion of consumers actually understood the advertising to convey an implied

message about treatment of OA or pain.  Plaintiff's purported marketing expert, Mr. Keegan, argued that Premier's own internal studies demonstrated consumers' understanding of the advertising, but at deposition Mr. Keegan was unable to point to any study that had tested consumers' understanding of any particular challenged advertising claim.  *See* Ware Dec. Ex. C (Keegan Dep.) at 115:5-117:14; 129:25-141:22; 157:6-21; 159:3-160:7; 167:9-168:15 (pointing to one study that asked how consumers first heard about Joint Juice and to another study that measured impact of celebrity endorsement on purchase intent).  Rather, Mr. Keegan simply *assumed* that any customer who purchased Joint Juice must have been influenced by Premier's marketing to believe that Joint Juice would be effective in treating whatever joint ailment the customer suffered.  *See id.* at 161:22-164:13; 171:20-174:5; 194:6-197:3; 206:17-207:3.  But Mr. Keegan's assumption is not evidence, especially where there is evidence in the record demonstrating that the assumption is faulty because it fails to account for the fact that consumers purchase Joint Juice based on pre-existing beliefs about glucosamine formed independent of any advertising by Premier.  *Id.* at 92:3-19; 194:6-195:7; *see generally* Opp. to Class Cert. at 7-8.[5]

Plaintiff attempts to overcome the lack of survey evidence of consumers' understanding of the advertising by pointing to miscellaneous Premier documents that Plaintiff alleges show acknowledgements by Premier that many of its customers buy Joint Juice to alleviate joint pain, as well as an intention by Premier to target such consumers.  Opp. at 11.  This fails on the law and the facts.  As a legal matter, the intent of the advertiser is irrelevant.  *Johns*, 2013 WL 1498965, at **22-23.  As a factual matter, Premier's beliefs and intentions do not evidence consumers' understanding.[6]  Plaintiff also points to the fact that the Joint Juice label contains a statement that Joint Juice is a sponsor of the Arthritis Foundation, but presents no evidence of what effect (if any)

---

[5] Plaintiff also attempts to establish consumer *understanding* by describing the *characteristics* of Joint Juice purchasers.  Opp. at 11.  For example, Plaintiff points to Mr. Keegan's assertion that "a majority of current and potential consumers of the Joint Juice product suffer from joint pain and/or are concerned about joint health issues," but this merely describes consumers in the market rather than explain consumer understanding of the advertising.  *Id.*

[6] For example, Plaintiff points to a statement made by Premier to a California state regulator in the context of determining whether Joint Juice is regulated under the California Beverage Container Recycling and Litter Reduction Act.  Opp. at 3.  But Premier's position on how Joint Juice should be categorized for purposes of that unique statute is not probative of how consumers in fact understand Joint Juice's advertising.

this has on consumers' understanding of the advertising claims. Opp. at 3-4. Plaintiff argues that this statement "increased purchase intent," but even if it did (there is no evidence of this), that would not mean that it conveyed any implied meaning beyond the stated message that a portion of the proceeds from sales of Joint Juice are contributed to the Arthritis Foundation. *Id.* at 5.

Finally, as discussed in Premier's opening brief, Plaintiff cannot establish an implied claim because no reasonable consumer could understand the advertising to imply treatment of pain or OA given the express disclaimer that "[t]his product is not intended to diagnose, treat, cure or prevent any disease." Premier's MSJ at 1, 3. Plaintiff has no evidence showing that consumers would understand this straightforward statement to mean something other than what it says. Instead, Plaintiff argues the disclaimer is ineffective, relying on cases that declined to dismiss claims involving similar disclaimers at the motion to dismiss stage. Opp. at 17 (citing *Dorfman v. Nutramax Labs., Inc.*, 2013 WL 5353043 (S.D. Cal. Sep. 23, 2013); *Johns v. Bayer Corp*., 2010 WL 2573493 (S.D. Cal. Jun. 24, 2010)). But we are not at the motion to dismiss stage, and at summary judgment Plaintiff must come forward with evidence of consumer understanding, which she has failed to do. *Stanley*, 2012 WL 1132920, at *8 (granting summary judgment where plaintiff lacked evidence a drug claim had been conveyed where product contained same disclaimer).[7]

### 2. Plaintiff Has Not Established That Existing Scientific Evidence Disproves Any Implied Message Of Treatment Of Pain Or OA

Even had Plaintiff established that the Joint Juice marketing includes an implied claim for treatment of OA or pain, Plaintiff has failed to present evidence capable of disproving such a claim. Plaintiff argues that "Premier does not and cannot cite to so much as a single clinical study that found the combination of glucosamine and chondroitin was more effective in relieving pain or improving mobility or flexibility than placebo." Opp. at 6. As a threshold matter, it is *not* Premier's burden to substantiate its advertising claims. Nevertheless, Premier in fact *has* identified

---

[7] While Plaintiff relies on the motion to dismiss decision in *Johns*, that court subsequently granted summary judgment in favor of the defendants because the plaintiffs had failed to present evidence capable of establishing that the advertising misled consumers, and stated that the disclaimer is included "so as to not mislead consumers." *Johns*, 2013 WL 1498965, at *9 n.11.

multiple studies showing positive effects of glucosamine for treatment of OA symptoms.[8]  Plaintiff addresses none of these findings of positive effects.

Moreover, the only expert retained by Plaintiff who claims to be qualified to interpret human clinical trials, Dr. Lynn Willis, conceded that the MOVES, LEGS, and GAIT studies found positive effects.  Dr. Willis admitted at deposition that he does not challenge that the MOVES study showed that glucosamine and chondroitin together were as effective as celecoxib in reducing pain, stiffness, functional limitation and joint swelling/effusion, Ware Dec. Ex. A (Willis Dep. at 233:2-10; 237:9-18), nor the finding in the GAIT study that patients with moderate-to-severe knee pain experienced a significant decrease in pain when they took glucosamine and chondroitin, (*id.* at 51:6-9, 56:5-16, 59:18-25), nor the finding in LEGS that demonstrated "a statistically significant reduction of 2-year joint space narrowing compared to placebo" from consumption of glucosamine, *id.* at 71:1-13, 75:8-12, 228:11-13, 245:12-17).  Thus, the sworn testimony of Plaintiff's expert shows that peer-reviewed human clinical trials have concluded that taking glucosamine and chondroitin can and does provide pain reduction and OA benefits, and Plaintiff therefore cannot carry her burden to show that these benefits are impossible to achieve.

### D. Plaintiff Admits She Lacks Evidence Of An Appropriate Measure Of Restitution, And Premier Is Entitled To Summary Judgment On This Ground

Plaintiff questions whether summary judgment can be granted when a plaintiff fails to present evidence from which restitution or damages can be measured.[9]  The law is clear that it can. *Weinberg v. Whatcom Cnty.*, 241 F.3d 746, 751–52 (9th Cir. 2001).  Indeed, that is what this Court did in *Ries v. Arizona Beverages USA LLC*, 2013 WL 1287416, at *8 (N.D. Cal. Mar. 28, 2013), under similar facts.  In *Ries*, the plaintiff brought UCL and CLRA claims, but failed to present "a scintilla of evidence from which a finder of fact could determine the amount of restitution or

---

[8] *See, e.g.*, Koenig Dec. Ex. M, Multicenter Osteoarthritis interVEntion trial with SYSDOA ("MOVES") (concluding that glucosamine and chondroitin taken daily was as effective as celecoxib (an FDA-approved COX-2 inhibitor) in reducing pain in subgroup of patients with moderate-to-severe OA pain); *Id.*, Ex. L, Long-term Evaluation of Glucosamine Sulfate ("LEGS") (demonstrating significant improvement in joint space narrowing from consumption of glucosamine); *Id.*, Ex. K, Glucosamine Chondroitin Arthritis Intervention Trial ("GAIT").

[9] Plaintiff contends Premier moved only as to entitlement to restitution, but Premier's motion also refers to damages.  MSJ at 24-25.  Plaintiff lacks evidence as to any measure of monetary relief.

1    disgorgement to which plaintiffs might be entitled if this case were to proceed to trial." *Id.* This
2    Court held that this "alone provides an independent and sufficient basis to grant defendants
3    summary judgment." *Id*.  Plaintiff fails to even acknowledge *Ries*, much less explain why the
4    outcome reached there does not apply here.  Like the plaintiff in *Ries*, Plaintiff has not offered a
5    *scintilla* of evidence supporting *any* measure of damages.  Plaintiff's assertion that there is a
6    disputed issue of fact because she believes she "is entitled to restitution in an amount *up to* the full
7    refund," misses the point.  Opp. at 23 (emphasis added).  She has *no evidence* from which to
8    measure the appropriate amount, along the range from zero to the full purchase price.

9         Plaintiff implicitly acknowledges that the full refund is not the proper measure, stating that
10   "the amount may be the return of the full purchase price [or] *something less*." Opp. at 25 (emphasis
11   added).  Indeed, here it must be "something less" in order to account for the undisputed market
12   value of the product attributes independent of the advertising claims, including the hydration,
13   vitamin C, vitamin D, antioxidants, taste, and calories.  Koenig Dec. Ex. D (Sonner Dep.) at 90:21-
14   91:2 (admitting value independent of advertising); *id.*, Ex. I (Keegan Dep.) at 86:20-88:8; 88:20-
15   92:19 (admitting consumers pay money for glucosamine marketed without joint health
16   representations); *see also In re Tobacco Cases II*, 240 Cal. App. 4th 779 (2015) (rejecting plaintiffs'
17   full refund model because it failed to measure difference between what they paid for product and
18   actual value); *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009) ("The difference between what
19   the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution. In
20   order to recover under this measure, there must be evidence of the actual value of what the plaintiff
21   received.") (internal citations omitted).  Yet, Plaintiff has adduced no evidence from which to
22   measure that value.  Accordingly, Plaintiff has failed to meet her burden, and Premier is entitled to
23   summary judgment.

24        Plaintiff's reliance on "full refund" cases is unavailing here.[10]  The principal assumption of

---

[10] Plaintiff cites the unpublished case of *Thomas v. Imbriolo*, 2012 WL 1427360 (Cal Ct. App. 1st Dist. Apr. 25, 2012).   Unpublished California state court decisions are not precedent and are not to be cited in any court. Cal. R. Ct.  8.1115. In any event, even in *Thomas*, the court earlier held "[i]t was appropriate and within the province of the jury to reduce the Class' recovery of damages  to reflect some measure of the value of the Avacor product, for example, the value to the consumer of a shampoo for grooming and hygiene purposes." *Thomas v. Global Vision Prods., Inc*., 2008 WL 7184817 (Cal. Super. Ct. May 14, 2008). Taking this into account in calculating restitution under the
(Footnote Cont'd on Following Page)

the full refund model is "that not a single consumer received a single benefit, be it hydration, flavor, energy, or anything else of value, from Defendant's juices." *In re POM Wonderful LLC*, 2014 WL 1225184, at *3 n.2 (C.D. Cal. Mar. 25, 2014).  Here, the product has undisputed value, including various vitamins and minerals, and, depending on flavor or variety, water, green tea, natural flavor, and sweeteners.  Koenig Dec. Exs. A-C.  Plaintiff's proposed full refund model has been rejected in false advertising cases like this one because it ignores the undisputed evidence that consumers would be willing to pay something (more than zero) for Joint Juice if it were marketed without the allegedly misleading advertising.  *See POM Wonderful*, 2014 WL 1225184, at *3 (rejecting full refund as measure of damages because it "makes no attempt to account for benefits conferred upon Plaintiffs"); *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) (rejecting full refund model because it ignored value of products absent challenged advertising, including calories, nutrition, vitamins, and minerals, and failed to account for fact that a premium may be placed on product for reasons beyond just advertising, such as brand loyalty and product quality).  By contrast, in all of the cases relied on by Plaintiff, there was no evidence that the products had value independent of the advertised benefits.

### III.    CONCLUSION

For the foregoing reasons, Premier respectfully requests that the Court grant its motion.

Dated: December 14, 2015                    Respectfully submitted,

By  /s/   Anton A. Ware
      Anton A. Ware

ARNOLD & PORTER LLP
Trenton H. Norris
Anton A. Ware
Jonathan L. Koenig

VENABLE LLP
Angel A. Garganta
Jessica L. Grant
Daniel S. Blynn
Guido E. Toscano

Attorneys for Defendant
PREMIER NUTRITION CORP.

35395752

---

(Footnote Cont'd From Previous Page)
UCL, the court concluded "that the amount to be restored should be adjusted to reflect the equitable nature of the remedy including the value to the consumer of the product received." *Id.*