# Exhibit C

1

2
         UNITED STATES DISTRICT COURT

3
      NORTHERN DISTRICT OF CALIFORNIA

4
        SAN FRANCISCO DIVISION

5

6
------------------------------------
VINCENT D. MULLINS, et al.,

7
           Plaintiffs,

8
      vs.           Index No.

9
                   C-13-01271
PREMIER NUTRITION CORPORATION   -RS

10
f/k/a JOINT JUICE, INC.,

11
           Defendant.
------------------------------------

12

13

14

15
      DEPOSITION OF MARK KEEGAN

16
       New York, New York

17
     Wednesday, June 10th, 2015

18

19

20

21

22

23
Reported by:
Jeremy Frank, MPM

24
JOB NO. 393517

25

         1

BARKLEY
Court Reporters

```
1                        Keegan
2    although I can't say specifically.
3         Q.    Would you also expect that
4    consumers of, that some consumers of Joint
5    Juice also would have preconceived beliefs
6    about glucosamine that would have been
7    informed from sources other than Joint Juice's
8    advertising?
9              MR. O'REARDON:   Objection, vague
10        and ambiguous, speculation.
11        A.    You said about glucosamine?
12        Q.    Yes.
13        A.    I'm sorry.
14              MR. WARE:   Can you read back the
15        question.
16              (Whereupon the aforementioned
17        testimony was read back by the Court
18        Reporter.)
19        A.    I do.
20        Q.    Have you done anything to assess
21    the proportion of Joint Juice consumers who
22    would have preconceived beliefs about
23    glucosamine that were informed from sources
24    other than the Joint Juice advertising?
25              MR. O'REARDON:   Objection, vague
```

92

BARKLEY
Court Reporters

```
 1                    Keegan

 2    consumers including their opinions regarding

 3    the marketing message.

 4         Q.     We are going to come back to that.

 5              Look at the third sentence.  How

 6    in your opinion could the trier of fact use

 7    the information available in these market

 8    research studies to determine the marketing

 9    message conveyed to purchasers of Joint Juice

10    by Joint Juice's marketing materials?

11         A.     Well, a number of the materials

12    produced by Joint Juice in this case expose

13    consumers to some of their marketing messages,

14    and review their reaction and impression of

15    that marketing.  In addition, the materials

16    reviewed the marketing campaign and discuss

17    the objective of that campaign from the

18    message to the target audience, to the

19    intended communications of that campaign.  A

20    number of the materials discuss the Joint

21    Juice brand, what it means to consumers and

22    what they intend to convey and embody in the

23    brand of Joint Juice.

24              So there are quite a number of

25    materials that speak to the intended marketing
```

115

BARKLEY
Court Reporters

1                              Keegan

2    message that is being delivered or anticipated

3    being delivered, communicated to consumers as

4    well as some direct exposure of that message

5    to consumers and a measurement of their

6    reaction to that message.

7        Q.    When you refer to direct exposure

8    to consumers of marketing messages and the

9    reaction and impression of the consumers to

10   that marketing message, what are you referring

11   to?

12       A.    In particular there was a study

13   that I refer to in this declaration, that

14   Schireson study where they expose consumers to

15   the brand endorsement by Joe Montana and

16   measure consumer impression of that

17   endorsement and other measurements of that

18   marketing message which include Joe Montana

19   and other communications, and that's one

20   example.  There are others, I would have to go

21   through and catalog them; there is quite a few

22   examples of that.

23       Q.    Can you think of any other

24   examples other than the one that you just

25   mentioned in which the market research studies

                            116

MARK KEEGAN

BARKLEY
Court Reporters

1                          Keegan

2    involved exposing consumers to a marketing

3    message and reviewing their reaction to that

4    message?

5         A.    I believe some of the focus group

6    work that was done by Joint Juice involved

7    that type of activity.

8         Q.    Are you aware of whether any of

9    that focus group work consumers were exposed

10   to actual existing advertising claims of Joint

11   Juice?

12        A.    I would have to look specifically

13   at what happened in those focus groups, I'm

14   not sure.

15        Q.    We are going to come back to this

16   in some detail.  The opinions that you state

17   in paragraph six of your declaration, those

18   again are based on your review of the studies

19   commissioned by Joint Juice and other

20   documents that you list in the Exhibit 2

21   declaration.

22             Is that correct?

23        A.    Yes.

24        Q.    Did you do anything else to reach

25   the opinions that you state in paragraph six?

                          117

BARKLEY
Court Reporters

1                          Keegan

2    produced include information about sources of

3    information that the consumers have that

4    consumers attribute to inferring their

5    perception of the product.  Those information

6    sources include the marketing efforts of Joint

7    Juice.  So we have here a case in which a

8    company has carefully and informatively

9    designed a marketing communication to a

10   specific target audience, a comprehensive

11   communication about their product.

12                  That company has then expended

13   great time and treasure to communicate that

14   message to this target audience.  That company

15   then has spoken to those very consumers of

16   their product who have shown their perceptions

17   of the product to be in line with those

18   communications and have identified at least in

19   part the marketing efforts of the company as

20   the source of their opinions regarding the

21   product.  So for me that is far from an

22   assumption, that is a very informed opinion

23   about how these consumers perceive this

24   product.

25           Q.    Which of the studies that you

BARKLEY
Court Reporters

Keegan

1

2   reviewed present data that demonstrates that

3   consumer perceptions about Joint Juice have

4   been informed by Joint Juice's marketing

5   efforts?

6          A.    I believe the MindReader studies

7   address that issue, and perhaps some others.

8          Q.    We can look at those after the

9   break.

10             When you refer to marketing

11   messages in this statement, what messages are

12   you referring to?

13         A.    Marketing messaging regarding

14   joint health, and there are quite a few.

15         Q.    You state that the data in the

16   studies commissioned by joint -- from the data

17   in the studies commissioned by Joint Juice, it

18   can be concluded that consumers have received

19   and understand this messaging.

20             Can you point to data in the

21   studies that demonstrates that any particular

22   Joint Juice advertising claims were in fact

23   received by consumers?

24             MR. O'REARDON:  I want to point out

25   Anton wasn't reading directly from the

130

BARKLEY
Court Reporters

1                           Keegan

2           opinion, he was paraphrasing.

3           A.     The studies show that consumers of

4    the Joint Juice product often have perceptions

5    of the product that are in line with the

6    communications as designed by Joint Juice

7    regarding joint health.  So as such, their

8    perceptions are aligned with many of the

9    marketing communications of Joint Juice.

10          Q.     You then draw the further

11   inference that those consumers must have

12   received the marketing message conveyed by

13   Joint Juice.

14                 Is that correct?

15          A.     As I have answered, I would say

16   that in part at least the marketing

17   communications by Joint Juice has been

18   effective by the consumers' own attribution as

19   to the source of their perceptions about the

20   product.

21          Q.     We are going to take a look at

22   those specific studies after the break.

23                 Other than those studies that you

24   just referenced, on what else are you basing

25   your conclusion that consumers must have

                           131

MARK KEEGAN

BARKLEY
Court Reporters

Keegan

1

2 received and understood the marketing

3 messaging conveyed by Joint Juice?

4          A.     I base it on everything that I

5 have seen in this case; the comprehensive and

6 targeted positioning of Joint Juice from their

7 brand brief to their advertising to their

8 market research has always been consistent

9 with their positioning the product as a

10 targeted market of those suffering from joint

11 pain, and position their product as a product

12 that addresses that joint pain.  So the

13 studies confirm a lot of what you would expect

14 to see in the broader review of the materials

15 in the case.

16          MR. WARE:  Let's take a break for

17     lunch.

18          THE VIDEOGRAPHER:  Going off the

19     record.  The time is 12:47.

20          (Whereupon, an off-the-record

21     discussion was held.)

22

23

24

25

132

MARK KEEGAN

BARKLEY
Court Reporters

1                    Keegan

2          A F T E R N O O N   S E S S I O N

3              (Time noted:  1:59 p.m.)

4

5              THE VIDEOGRAPHER:  We will go back

6         the record.  The time is 1:59, beginning

7         of DVD number three.

8              Q.    Mr. Keegan, I want to follow up on

9    one of the answers that you gave not long

10   before we broke for lunch.  You said if my

11   notes can be trusted, that in at least one of

12   the studies commissioned by Joint Juice, Joint

13   Juice consumers identified at least in part

14   Joint Juice marketing efforts as having

15   informed their perceptions of the Joint Juice

16   products.

17              Do you recall giving that answer?

18         A.    I do.

19         Q.    You mentioned that that may have

20   been one of the MindReader studies, I wanted

21   to take a look at that study together with

22   you.  I believe it also relates to a statement

23   in your declaration about that study.

24              MR. WARE:  Why don't we go ahead

25         and mark from the MindReader study, what

                       133

MARK KEEGAN

1                          Keegan

2          exhibit are we up to, 4?  This will be

3          marked as Exhibit 4.

4                   (Exhibit 4, Joint Juice MindReader

5          consumer research study, marked for

6          identification, as of this date.)

7          Q.    This is a document Bates stamped

8   JointJuice132512, it is a MindReader consumer

9   research survey dated June 2013.

10                Mr. Keegan, do you recognize this

11  document?

12         A.    I do.

13         Q.    I would like to turn your

14  attention to page six of the presentation.

15  I'm sorry, wrong page, page four of the

16  presentation marked as Exhibit 4.  Do you see

17  that this page is titled All Users/First Touch

18  Point.

19                Do you see that at the very top of

20  the page?

21         A.    Yes.

22         Q.    Then the first bullet there says

23  Top five ways users first heard about Joint

24  Juice are:  And then it lists the top five

25  ways.

134

MARK KEEGAN

1                        Keegan

2                Do you see that?

3        A.        I do.

4        Q.        Now was this what you were

5    referring to when you stated earlier that in

6    one of the studies consumers at least in part

7    had identified Joint Juice marketing efforts

8    as having informed their perceptions of the

9    product?

10       A.        In part, yes.

11       Q.        Okay.

12                Now, what this in fact refers to

13   is the ways in which Joint Juice consumers

14   first heard about Joint Juice.

15                Is that correct?

16       A.        Yes.

17       Q.        And there is an indication that

18   the number one answer was from a friend,

19   family member or coworker at 25 percent; do

20   you see that?

21       A.        I do.

22       Q.        Then there are subsequent answers

23   including grocery store ad or coupon book at

24   18 percent, TV ads at 16 percent and sample at

25   store or event 13 percent, magazine or

135

MARK KEEGAN

1                         Keegan

2    newspaper ad at 10 percent.

3                    Do you see that?

4         A.    Yes.

5         Q.    Those percentages refer to the

6    percentage of the survey respondents who

7    identified that particular source of

8    information is where they first heard about

9    Joint Juice.

10                   Is that correct?

11        A.    Yes.

12        Q.    Now, this does not address Joint

13   Juice consumers' perceptions of the joint

14   health benefit of Joint Juice, correct?

15                MR. O'REARDON:  Objection, vague

16        and ambiguous.

17        A.    This addresses as it states the

18   ways users first heard about Joint Juice.

19        Q.    You would agree it does not

20   address whether any particular advertising

21   claim was received by consumers, would you

22   not?

23                MR. O'REARDON:  Objection, vague

24        and ambiguous.

25        A.    While I would not they are

                         136

BARKLEY
Court Reporters

1                          Keegan

2    identifying advertising sources that Joint

3    Juice has used as sources of hearing about

4    Joint Juice.  So I think the contrary, it

5    seems to identify Joint Juice advertising as

6    being communicated to them.

7          Q.    It does not address when 18

8    percent after survey -- strike that.

9              When 18 percent after survey

10   respondents indicated they first heard about

11   Joint Juice from a grocery store ad or coupon

12   book, that does not tell you anything about

13   the impact that that grocery store ad or

14   coupon book may have had on the consumers'

15   perceptions of the joint health benefits of

16   the product, does it?

17              MR. O'REARDON:  Calls for

18        speculation.

19        A.    It does.

20        Q.    What does it tell you?

21        A.    It tells me that Joint Juice's

22   informed and targeted and comprehensive

23   marketing campaign not only reached their

24   target customer but also affected a sale, so

25   it tells me quite a bit about the messaging in

137

BARKLEY
Court Reporters

1                                    Keegan

2      that campaign.

3              Q.     Does this in fact indicate that

4      the advertising effected a sale, is it

5      possible a consumer first heard about Joint

6      Juice from a grocery store ad but then

7      sometime later decided to actually purchase

8      the product for some other reason?

9                  MR. O'REARDON:   Objection,

10            incomplete hypothetical, calls for

11            speculation, lacks foundation.

12             A.     It is certainly possible that a

13     consumer could have, could indicate that they

14     first heard of Joint Juice from a marketing

15     communication from Joint Juice, and then for

16     some other reason decided to purchase Joint

17     Juice.  That hypothetical is certainly within

18     the realm of possibility, however, if I'm a

19     marketing manager at Joint Juice and I found

20     out that a consumer of someone who has tried

21     my product first heard about the product from

22     a marketing communication that I was

23     responsible for, then I'm having a good day.

24             Q.     This survey response does not

25     address how consumers understood any

138

BARKLEY
Court Reporters

1                          Keegan

2    particular advertising claim, does it?

3           A.    I don't believe so, no.

4           Q.    This survey response does not

5    address the extent to which any particular

6    advertising claim influenced the purchase

7    decision of consumers, does it?

8                 MR. O'REARDON:   Objection, vague

9           and ambiguous.

10          A.    I believe it does.

11          Q.    In what way?

12          A.    We have here Joint Juice consumers

13   being surveyed.   They are indicating in this

14   survey that the first time they heard of Joint

15   Juice was in part from the marketing

16   communications from Joint Juice.   So I think

17   that is informative as to how that marketing

18   messaging was received by the consumers and

19   that they became consumers.

20          Q.    Does this indicate what marketing

21   message was contained in the grocery store ad?

22          A.    It does not.

23          Q.    Does it indicate what advertising

24   claim was contained on the coupon book?

25          A.    It does not.

                           139

MARK KEEGAN

1                          Keegan

2          Q.    Does it indicate what advertising

3    claim was contained in the TV advertisement?

4          A.    No.

5          Q.    Did it indicate what advertising

6    claim was contained in the sample at a store

7    or event?

8          A.    No.

9          Q.    Does it indicate what advertising

10   claim was contained in the magazine or

11   newspaper ad?

12         A.    No.

13         Q.    There is no, this does not address

14   in any way -- let me strike that.

15               There is no specific advertising

16   claim that can be assessed as a result of this

17   survey response there?

18               MR. O'REARDON:   Objection, vague

19         and ambiguous.

20         A.    Beyond the categories given here,

21   no.

22         Q.    What is the specific claim you

23   were asserting impacted consumers on the basis

24   of this survey response?

25         A.    I don't know that I made that

140

MARK KEEGAN

BARKLEY
Court Reporters

1                    Keegan

2     assertion.

3          Q.      You have not, you're not asserting

4     that this reflects that any specific

5     advertising claim has impacted Joint Juice

6     consumers purchasing decisions.

7                  Is that correct?

8          A.      What I asserted or stated here in

9     response to your question about the

10    effectiveness of the advertising effect of

11    Joint Juice is that this does tell me, this

12    does inform me about the effectiveness of that

13    advertising given that these consumers of

14    Joint Juice have identified in certain of

15    these categories marketing communications that

16    Joint Juice has directed at consumers and they

17    have become consumers having first heard about

18    the product through these communications.  So

19    that does inform me as to the effectiveness of

20    those communications in general, but no

21    communication, no specific claim is not

22    identified here in this survey response.

23          Q.     The survey response tells you

24    something about the effectiveness of the

25    advertising in making consumers aware of the

141

MARK KEEGAN

Keegan

2  on the packages, so this would provide

3  information as to how that marketing messaging

4  related to joint health, how effective that is

5  for consumers.

6          Q.     Let me pause, refocus a little

7  bit.  My original question was in response to

8  your answer earlier that consumers themselves

9  had identified Joint Juice marketing efforts

10 as having informed their perceptions of the

11 Joint Juice product.  And you pointed us

12 initially, we initially looked at the survey

13 response where Joint Juice consumers were

14 pointing to particular modes of marketing by

15 which they first became aware of Joint Juice.

16          Is there anything else in this

17 survey, in this study in which survey

18 correspondents themselves identified in your

19 view Joint Juice marketing as having informed

20 their perceptions of the Joint Juice product?

21          A.     I don't believe so, no.

22          Q.     Now you mentioned in the other

23 MindReader study there might also be

24 something, I just want to make sure we are

25 focused on the same question, but do you

157

MARK KEEGAN

1                       Keegan

2          Q.    Put that aside.

3                MR. WARE:  Let's go ahead and mark

4          as a new exhibit, 7, a document Bates

5          stamped JointJuice114452.

6                (Exhibit 7, Joint Juice MindReader

7          presentation survey study, marked for

8          identification, as of this date.)

9          Q.    This is a presentation titled

10   JointJuice MindReader dated May 2nd, 2012.  Is

11   this the other MindReader survey that you had

12   in mind, Mr. Keegan?

13         A.    It is.

14         Q.    Can you let me know if there is

15   anything in this survey that you believe

16   reflects Joint Juice consumers having

17   identified Joint Juice marketing as having

18   informed their perceptions of the Joint Juice

19   product?

20         A.    Well, I think the best answer to

21   your question, the respondents in this study

22   were shown stimuli, they were shown

23   advertising by Joint Juice and asked about

24   their perceptions of that advertising.  So the

25   whole study is based I think on what you asked

                         159

BARKLEY
Court Reporters

Keegan

2   about how they perceived the marketing of

3   Joint Juice.

4        Q.    Isn't it correct that the purpose

5   of this study was to assess the impact of the

6   celebrity endorsement?

7        A.    Yes.

8        Q.    Is there anything in this study

9   that measured the extent to which any of the

10  challenged Joint Juice advertising claims

11  impacted Joint Juice consumers' decision to

12  purchase the product?

13       A.    Well, to the extent that it is

14  testing a specific communication related to

15  the challenged claims in this case, then it

16  appears to be wholly on point, but the

17  question I'm not sure how to answer.

18       Q.    When you referred in one of your

19  earlier answers to a study in which Joint

20  Juice consumers had been directly presented

21  with a Joint Juice advertisement and been

22  asked about their reactions, was this the

23  study that you had in mind?

24       A.    This is --

25            MR. O'REARDON:   Objection, asked

160

BARKLEY
Court Reporters

```
1                           Keegan

2          and answered.

3          A.      -- one of the studies, yes.

4          Q.      Is there anything in this study

5    that attempts to assess what consumers

6    understood the challenged Joint Juice

7    advertising claims to mean?

8               MR. O'REARDON:   Objection, vague

9          and ambiguous.

10         A.      Yes.

11         Q.      What is that?

12         A.      At the end of the study, the last

13   page 28, 28, 29, 30, they have verbatim

14   responses from the respondents to give insight

15   as to their understanding of the claims.

16         Q.      Anything other than these pages?

17         A.      Again, I just want to make sure I

18   have the very specific question correct.   Is

19   it is there anything in this study that tells

20   us, I'm lost, if you don't mind, if I can get

21   it repeated or if you can repeat the question.

22         Q.      The question was whether there was

23   anything in the study that attempted to assess

24   what consumers understood the challenged Joint

25   Juice advertising claims to be.
```

MARK KEEGAN

BARKLEY
Court Reporters

1                        Keegan

2          A.     Page 11 they rank, they have

3    consumer feedback on features of the product.

4    And these are people in the target market that

5    have just seen the Joint Juice advertisement,

6    so they are giving rankings here of various

7    components of the product including some of

8    the challenged claims as you refer to them.

9    So this is informative on that issue.

10              The challenged claims presented in

11   the commercial of this target audience has

12   seen is, also there is feedback on that on

13   page 12 where they give their reaction to

14   components of the claims and commercial, how

15   they believe it, is it relevant, is it

16   factual, was it important, was it memorable

17   and so on, all listed here on page 12.

18              And the audience here for this

19   survey or those suffering from joint health

20   issues they have just seen a Joint Juice

21   commercial that is touting the benefits of

22   Joint Juice for joint health.  And on page 13

23   they are indicating how likely they would be

24   to purchase the product.  So that gives good

25   information about their interpretation of

                          162

MARK KEEGAN

BARKLEY
Court Reporters

1              Keegan

2   those joint health claims, those to the extent

3   are more likely to purchase it, they are

4   interpreting those joint health claims to be

5   effective for their use.

6          Q.     Is that an assumption that you're

7   making?

8          A.     Well, I don't know how I would

9   characterize it except to say that I have here

10  a study done by a reputable group that has

11  brought in people in the target market for the

12  Joint Juice product has shown them a Joint

13  Juice commercial that I have seen that it

14  shows the joint health benefits of the joint

15  health, of the Joint Juice product.  These

16  potential consumers are then asked how likely

17  they would be to purchase the product, and

18  they are rating their likelihood of purchase.

19  So as a marketing expert that tells me quite a

20  bit about how they are interpreting the

21  communications in that commercial.

22         Q.     Well, what does it tell you about

23  how they are interpreting the communications

24  in that commercial?

25         A.     Well, to the extent that they

163

MARK KEEGAN

BARKLEY
Court Reporters

Keegan

1

2  being in the target market, to the extent that

3  they seen the commercial and they are willing

4  to buy the product, that would tell me that

5  they are perceiving the communications to tell

6  them that this is a product that would benefit

7  their joint health issues.  And to the extent

8  that they are not purchasing the product, are

9  not indicating their willingness to purchase a

10  product, that would tell me that our

11  commercial is not effective in communicating

12  the joint health benefits to someone who has

13  joint health needs.

14      Q.   Does this survey indicate whether

15  the respondents as of the time of the survey

16  were already consumers of glucosamine?

17      A.   Let's see, I believe that these

18  respondents are people with joint health

19  issues.  I don't know that there is a

20  reference to glucosamine in this summary.

21      Q.   Do you see on page 11 that one of

22  the product features that was tested was that

23  the Joint Juice is easier to take than pills.

24          Do you see that?

25      A.   I do.

164

BARKLEY
Court Reporters

1                        Keegan

2    validity of these results.

3                    So the fact that whether or not

4    they have used glucosamine doesn't appear to

5    be reported in here and does not concern me in

6    terms of evaluating or taking away what I have

7    taken away from the study.

8         Q.      Let's move on from this document,

9    we are running low on time.   In connection

10   with your work in this case you did not design

11   or conduct any consumer perception surveys; is

12   that correct?

13        A.      That's correct.

14        Q.      You didn't undertake any effort to

15   survey the extent to which the Joint Juice

16   marketing materials or product packaging may

17   have been impacted the purchase decision of

18   Joint Juice consumers?

19                MR. O'REARDON:   Objection, vague

20        and ambiguous.

21        A.      Well, I have, of course I reviewed

22   all of the materials that I have stated in the

23   case and submitted the opinions that I have

24   submitted.

25        Q.      Right, but you haven't undertaken

                        167

BARKLEY
Court Reporters

```
1                        Keegan
2    to go out and design or conduct a survey to
3    measure the extent to which the Joint Juice
4    marketing materials or product packaging may
5    have impacted the purchase decision of Joint
6    Juice consumers.
7              Is that correct?
8        A.    It is.
9        Q.    You similarly have not designed or
10   conducted any survey to gage how Joint Juice
11   consumers understand particular advertising
12   claims that are contained on the Joint Juice
13   marketing materials or the product packaging;
14   is that correct?
15       A.    It is.
16       Q.    Have you undertaken any efforts to
17   ascertain how Joint Juice consumers understand
18   the disclaimer on the Joint Juice packaging
19   with, "The product is not intended to
20   diagnose, treat, cure or prevent any disease?"
21            MR. O'REARDON:  Objection, vague
22         and ambiguous, assumes facts not in
23         evidence.
24       A.    I have not.
25       Q.    Okay.
```

168

BARKLEY
Court Reporters

Keegan

1

2      Q.      Did you draw any distinction in

3   your mind between a joint health claim and a

4   joint pain claim?

5      A.      As I have described I use joint

6   health as an umbrella term to reference all

7   types of joint ailments both existing and

8   preventative which would include joint pain.

9      Q.      What was your basis for saying

10  that Joint Juice marketing materials or

11  packaging communicates that Joint Juice

12  reduces joint pain?

13     A.      Review of their marketing

14  materials in addition to a review of their

15  internal communications regarding the intended

16  messaging of those campaigns, in addition to

17  their commission studies on their position in

18  the marketplace and effectiveness of their

19  marketing communications.

20     Q.      Are you aware of any consumer

21  facing Joint Juice advertisement that makes a

22  reference to joint pain?

23          MR. O'REARDON:   Objection, vague

24       and ambiguous.

25     A.      Well, I have, there are a number

171

BARKLEY
Court Reporters

1                        Keegan

2    of sample advertisements that I have put in my

3    report and they say all kinds of things.  Like

4    on this page, "A bottle a day helps keep your

5    joints in play," and many other phrases of

6    that ilk.  Whether any of those many various

7    phrases uses the word I believe you said joint

8    pain, I don't know.

9          Q.     Let me pose a very specific

10   question.  In the course of your work on this

11   case have you seen any consumer facing on

12   Joint Juice advertisement that used the words

13   joint pain?

14         A.     I believe that's the exact same

15   question I just answered, but I'll answer it

16   again.  I have reviewed a wide range of

17   customer facing marketing materials in the

18   case that have all types of joint health

19   issues in those communications.  I haven't

20   specifically reviewed them to see if they use

21   the exact term joint pain, so I can't say.  I

22   would have to review my records in this case.

23   I can't recall any as I sit here, but it is

24   not particularly relevant to me.

25         Q.     Why do you say it is not relevant?

172

MARK KEEGAN

BARKLEY
Court Reporters

1                          Keegan

2          A.      Because its a distinction without

3     a difference to a consumer.  These are

4     consumers that are targeted because they have

5     joint pain, and the marketing message to

6     consumers is that this is a product that will

7     help you with your joint health issues.  So

8     consumers typically don't draw these fine line

9     distinctions.  The marketing campaign has a

10    message, if you can get across a broad

11    message, you succeeded.

12             And in this case their message is

13    we are going to help with whatever joint

14    health ailments you have, however you describe

15    them, and we are targeting people with those

16    messages that have at least in part that have

17    joint pain specifically.  So that's why

18    whether that particular term joint pain is

19    used or not, that's not important to me

20    because I don't think its important to

21    consumers.

22          Q.      You haven't conducted a survey to

23    determine whether or not in fact it would be

24    important to consumers whether the product is

25    advertised as addressing joint health or joint

173

1                     Keegan
2    pain.
3              Isn't that correct?
4         A.    I have not myself conducted that
5    research, no.
6         Q.    Let's take a look at the specific
7    list of marketing statements that you list in
8    paragraph 14 of your declaration.  You state,
9    the first that you mention is, "Drink daily
10   for healthy, flexible joints."
11             Do you see that?
12        A.    I do.
13        Q.    Does that phrase in your opinion
14   communicate a joint pain message?
15        A.    Yes.
16        Q.    In what way does that communicate
17   a joint pain message?
18        A.    Well, joint pain is related to
19   joint health, it is related to joint
20   flexibility, and this message says "Drink
21   daily for healthy, flexible joints."  So I
22   think its directly related to for someone that
23   has joint pain, this message is right on
24   point.
25        Q.    In your view any claim that

174

MARK KEEGAN

BARKLEY
Court Reporters

```
 1                        Keegan
 2        Q.    You infer that from the fact that
 3   the person is looking for a glucosamine
 4   product?
 5        A.    I do.
 6        Q.    So anyone who purchased Joint
 7   Juice because they are looking for a
 8   glucosamine product in your view has been
 9   necessarily been influenced by Joint Juice's
10   joint health marketing claims?
11             MR. O'REARDON:  Objection, vague
12        and ambiguous.
13        A.    I don't know if I ever said that.
14   So is that the question?
15        Q.    That is the question, yes.
16        A.    Can I get that again?
17             MR. WARE:  If you can read it back,
18        that would be great.
19             (Whereupon the aforementioned
20        testimony was read back by the Court
21        Reporter.)
22        A.    Yes, I would expect that purchaser
23   to be influenced by the marketing communi-
24   cations of Joint Juice.
25        Q.    If the purchaser was looking for a
```

194

MARK KEEGAN

BARKLEY
Court Reporters

1                          Keegan

2    glucosamine supplement does that not suggest

3    to you that that purchaser had some

4    preexisting belief about glucosamine

5    independent of the Joint Juice marketing

6    claims?

7           A.    Yes, it does suggest that to me.

8           Q.    Because we are short on time I

9    want to move ahead to what you described as

10   category two.  In your recategorization of the

11   open-ended survey responses in paragraph 19

12   you refer to, you describe this category as,

13   "Answers that could reasonably be interpreted

14   as indicating the contested claims."

15          Do you see that?

16          A.    I do.

17          Q.    And again you don't mean to imply

18   that this category is comprised of responses

19   that reasonably could be interpreted as

20   indicating the respondent purchased product

21   because of one or more of the disputed

22   advertising claims, do you?

23          MR. O'REARDON:  Objection,

24      argumentative, vague and ambiguous.

25          A.    I would expect purchasers of Joint

                         195

MARK KEEGAN

1                        Keegan

2    Juice to be based on the totality of what I

3    reviewed, to be influenced by Joint Juice's

4    marketing communications in some way.  So we

5    have a universe here of people that purchased

6    Joint Juice, and they have been asked why they

7    purchased the product.  So yes, I would expect

8    these people to be influenced by their

9    marketing in their, the verbatim provided

10   provides some information in that regard.

11        Q.     Did I understand you correctly in

12   your answer just now to be saying that the

13   mere fact that a consumer purchased Joint

14   Juice in your view is in itself an indication

15   that that purchaser was influenced by the

16   Joint Juice marketing claims?  Is that

17   correct?

18        A.     Not quite.

19               To put it in my words I would say

20   that a purchaser of Joint Juice I would expect

21   to be influenced by the marketing communi-

22   cations of Joint Juice, yes.

23        Q.     All purchasers of Joint Juice you

24   expect to be influenced by the marketing

25   communication of Joint Juice?

                         196

MARK KEEGAN

1                         Keegan

2          A.     I would in some degree which would

3    vary.

4          Q.     Did that expectation inform your

5    decisions as to how to code the survey

6    responses?

7          A.     My knowledge of this product,

8    their marketing communications, their target

9    market and the people in this universe

10   informed the context of the coding, yes.

11         Q.     Now, any response that could be

12   interpreted as indicating any reason related

13   to joint health as a purchasing motivation was

14   lumped into the second category; is that

15   correct?

16         A.     No.

17         Q.     In what respect is that not

18   correct?

19         A.     Your characterization is that

20   anything that could be, I disagree with.  I

21   think that this second tier categorization was

22   looking at in the context of this survey in

23   these purchasers which responses could

24   reasonably be interpreted to be related to

25   joint health issues.

                       197

BARKLEY
Court Reporters

Keegan

1

2      Q.    I have got about 10 more minutes

3  worth of questions.  Can you bear with me for

4  another 10 minutes?

5      A.    I can, yes.

6      Q.    Thank you, I appreciate that.

7           THE VIDEOGRAPHER:  I have nine

8       minutes of tape left.  I thought we were

9       ending at 4:00, so I didn't adjust to

10      that.

11           THE WITNESS:  If you want to take

12      two minutes to change tape, I'm happy to.

13           THE VIDEOGRAPHER:  Why don't we go

14      until we get right to the end, then we

15      will --

16           MR. WARE:  That's fine.

17      Q.    So at least part of your evidence

18  for the influence that Joint Juice's marketing

19  has on Joint Juice consumers purchasing

20  decisions is the fact that they purchased the

21  product itself.  Did I understand that

22  correctly from your answer just now?

23      A.    Yes.

24      Q.    Is it not possible that someone

25  could purchase Joint Juice without having been

206

BARKLEY
Court Reporters

```
 1                      Keegan
 2   influenced by Joint Juice's marketing?
 3         A.      No, I don't believe it is.
 4         Q.      Is that your opinion with respect
 5   to any consumer product that the fact of the
 6   purchase of the product necessarily implies
 7   that the marketing of product has had some
 8   impact on the purchaser's decision?
 9               MR. O'REARDON:  Objection,
10           incomplete hypothetical, vague and
11           ambiguous.
12         A.      There are probably a billion
13   consumer products in the world so I'll it
14   limit to this case if you don't mind.  But
15   I'll say that marketing communications include
16   the packaging, labeling of the product, they
17   include the branding in this case of the
18   product which is prominent.  And for a
19   purchaser to purchase this product all of
20   those things are communicated to that
21   purchaser, at least if not other communi-
22   cations, and Joint Juice's case is a very
23   comprehensive campaign.
24               So in the case of Joint Juice I
25   would say that yes, every purchaser has been
```

207

BARKLEY
Court Reporters

1                          Keegan

2                  C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                           : ss.

5    COUNTY OF NEW YORK     )

6

7         I, Jeremy Frank, a Notary Public within

8    and for the State of New York, do hereby

9    certify:

10        That MARK KEEGAN, the witness whose

11   deposition is hereinbefore set forth, was duly

12   sworn by me and that such deposition is a true

13   record of the testimony given by the witness.

14        I further certify that I am not related

15   to any of the parties to this action by blood

16   or marriage, and that I am in no way

17   interested in the outcome of this matter.

18        IN WITNESS WHEREOF, I have hereby

19   set my hand on the 17th day of June, 2015.

20

21                        _____

22                        JEREMY FRANK, MPM

23

24

25


                            230


MARK KEEGAN