1

2

3

4

5

6

7                         UNITED STATES DISTRICT COURT

8                        NORTHERN DISTRICT OF CALIFORNIA

9

10   VINCENT D. MULLINS, et al.,              Case No.  13-cv-01271-RS

               Plaintiffs,

11

        v.                                    **ORDER RULING ON EVIDENTIARY**
12                                            **MOTIONS AND DENYING MOTION**
     PREMIER NUTRITION CORPORATION,           **FOR SUMMARY JUDGMENT**
13
               Defendant.
14

15              **I.      INTRODUCTION**

16         Plaintiff Kathie Sonner[1] contends defendant Premier Nutrition Corporation peddles what

17   amounts to worthless snake oil:  Joint Juice, a liquid dietary supplement containing glucosamine

18   hydrochloride ("glucosamine") and chondroitin sulfate ("chondroitin").  Joint Juice advertisements

19   and packages encourage readers to drink the product to help keep joints flexible and lubricated.

20   According to Sonner, the real aim of these advertisements is impliedly to promote Joint Juice as a

21   remedy for pain and stiffness in arthritic joints.  In an effort to relieve joint pain and stiffness,

22   Sonner contends she bought a six-pack of Joint Juice, drank a few bottles, but was ultimately

23   dissatisfied with the product.  Armed with numerous meta-analyses, clinical trials, treatment

24   protocols, and expert reports, Sonner now argues that glucosamine and chondroitin do not and

25   cannot palliate arthritic joints or improve the function of healthy joints, as Premier impliedly and

26

27   _____

     [1] Vincent Mullins was initially the named plaintiff.  In September 2014, the parties stipulated to
28   substitute Sonner as the class representative.  Dkt. 64.

United States District Court
Northern District of California

United States District Court
Northern District of California

expressly advertises.  To remedy what she contends amounts to consumer fraud, she asserts claims for violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, and the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*  FACC ¶ 62, Counts I & II.

In its motion for summary judgment, Premier disavows any suggestion that it has made representations suggesting Joint Juice is a remedy for symptoms of osteoarthritis ("OA") and contends that Sonner has introduced no evidence establishing the existence of implied messages. It further contends that its express or implied statements about the general joint health benefits of Joint Juice are unsubstantiated, at worst, or are supported by scientific research, at best.  In Premier's view, that the studies of glucosamine and chondroitin are equivocal means Sonner can show only that Premier's health claims are unsubstantiated; claims for relief which are unavailable to private plaintiffs.  Finally, Premier challenges Sonner's ability to prove her restitution damages—a full refund—and therefore summary judgment is required.

Contrary to Premier's position, Sonner does not assert a lack of substantiation case properly relegated to state prosecuting authorities.  Such a claim arises where, absent any evidence suggesting a representation is false or misleading, a plaintiff demands a defendant either "put up or shut up."  Here, by contrast Sonner has advanced evidence which directly supports the contention that certain of Premier's representations are false or misleading.  In other words, her argument is more than a call for Premier simply to substantiate its product benefit claims, but instead represents an evidentiary showing which requires the traditional analysis of whether or not there exist disputed issues on the false and misleading nature of Premier's representations.

The answer to that inquiry is that Sonner has successfully raised triable issues of fact. Marketing research shows that consumers consistently buy and use Joint Juice because they have joint pain, raising the reasonable inference that consumers believe the product would provide a remedy for such afflictions.  Furthermore, reviewing the scientific literature available and the testimony of Sonner's expert witnesses, a jury could reasonably conclude researchers have shown definitively that glucosamine and chondroitin do not relieve the pain and stiffness of OA sufferers

and that ingested glucosamine and chondroitin are not bioavailable in amounts sufficient to reap any joint health benefit.  Although Premier has offered expert testimony and scientific research suggesting that the research is equivocal, Sonner has offered principled critiques of each of those studies.  If a jury agrees with those criticisms, then it may also logically decide that it is misleading to claim Joint Juice can provide benefit in the face of substantial evidence to the contrary.  Finally, this record supports Sonner's claim that a full refund may be appropriate.  In light of the myriad triable issues of fact, summary judgment must be denied.

Also at issue are four evidentiary motions:  to exclude the testimony of Sonner's expert Steven Graboff, MD, and Premier's experts Daniel Grande, Ph.D., and Hal Poret; and a motion to strike the errata sheet to the deposition of Sonner's expert Lynn Willis, Ph.D.  Although Sonner has identified numerous, credible reasons to question the reliability of the opinions of Grande and Poret, these witnesses' opinions are not so ungrounded in reliable methods or explanation to require exclusion.  She will be able adequately to expose the weaknesses of their testimony with effective cross-examination.  Graboff, on the other hand, has offered opinions about the bioavailability of ingested glucosamine and chondroitin—subject matter beyond his expertise as a clinical orthopedic surgeon.  Accordingly, he may not offer such opinions.  Finally, Willis has submitted three changes to his deposition testimony that impermissibly contradict his original answers.  Accordingly they must be stricken.  Two of the challenged edits are clarifying rather than contradictory, and therefore may remain.[2]

## II.     FACTS AND PROCEDURAL HISTORY

### A.  Glucosamine and Chondroitin—Joint Juice's Main Ingredients

Glucosamine and chondroitin are the main ingredients in Joint Juice.  Derived from glucose, glucosamine helps the synthesis of aggrecan, glycoproteins and glycosaminoglycans, which are essential for the construction and maintenance of the connective tissues and lubricating

---

[2] Sonner also moves for class certification, which is addressed in a separate order filed contemporaneously herewith.

fluid in the joints.  Koenig Decl. Ex. H, Willis Suppl. Decl. ¶ 15.  In other words, glucosamine is part of the complex mechanism that "provides cartilage with its viscoelastic ability to bear loads." Blood Decl. CC Ex. 49, Grande Report at 6, 8.  Chondroitin is also a "building block" of aggrecan and a "major component" of cartilage tissue.  *Id.* at 9; *see also* Blood Decl. CC Ex. 46, [3]  Silbert Decl. ¶ 9.  The body produces both carbohydrates naturally.

There is no dispute that endogenous glucosamine and chondroitin are essential for biosynthesis of the connective tissue between movable joints.  Sonner's claims rise or fall based on whether the proteins in the joints can utilize ingested exogenous glucosamine and chondroitin.

**B.  Joint Juice Labels and Advertisements**

Since 2004, Premier has manufactured and marketed Joint Juice, a fruit-flavored beverage that contains 1,500 mg of glucosamine and 200 mg of chondroitin per serving, vitamins and minerals, water, flavorings, and sweeteners.  Koenig Decl. Exs. A-C.  Joint Juice Extra Strength RTD contains 1,500 mg of glucosamine and 1,200 mg of chondroitin.  The doses of glucosamine and chondroitin in Joint Juice are consistent with other glucosamine products in the market.  Joint Juice differentiates itself from the other glucosamine products by offering the supplement in drinkable form with vitamins and minerals.  *See* Blood Decl. MSJ Ex. 3, Ritterbush Dep. 29:17-24.

Joint Juice's bright orange labels announce that the product contains glucosamine and chondroitin, in addition to vitamin D3 and antioxidants.  *See* Koenig Decl. Exs. A, B, C (Joint Juice labels).  Premier includes three types of graphics:  pictures of fruit and juice; outlines of people running and jumping; and an x-ray image of a knee.  *See* Blood Decl. CC Ex. 9 (Joint Juice label exemplars).  The label explains the purpose of consuming glucosamine and chondroitin:  "A

---

[3] Sonner's attorney submitted multiple declarations related to the seven motions pending, including a motion for class certification, cross-referenced to avoid duplication.  "Blood Decl. CC" refers to Blood's declaration submitted in support of plaintiff's motion for class certification, "Blood Decl. MSJ" refers to the declaration submitted in opposition to Premier's motion for summary judgment, and "Blood Decl. Mot to Exclude Grande" relates to the declaration in support of Sonner's motion to exclude Grande's testimony.

United States District Court
Northern District of California

full day's supply of glucosamine combined with chondroitin helps keep cartilage lubricated and flexible." *E.g.*, Koenig Decl. Ex. C.  Some products suggest the consumer "hydrate [and] lubricate your joints," Blood Decl. CC Ex. 9 at 000045,[4] while others suggest consumers regularly use the product:  "Drink Daily for Healthy, Flexible Joints," Blood Decl. CC Ex. 9.  In smaller print, Joint Juice proclaims:  "Whether you're a gardener or a marathoner, your joints will love this.  Originally developed for pro athletes by orthopaedic surgeon Kevin R. Stone, M.D., Joint Juice combines glucosamine and chondroitin with Vitamin D3 and antioxidants.  A bottle a day keeps your joints in play."  Koenig Decl. Ex. A, B.  The label on the Joint Juice Easy Shot offers a slightly different variation:  "Whether you're climbing stairs or scaling mountains, your joints will love this.  Developed by orthopaedic surgeon Kevin R. Stone, M.D., each shot provides a full day's supply of Glucosamine plus Chondroitin, Vitamin D3 and Antioxidants.  Easy, fast-absorbing, and tastes great!"  Koenig Decl. Ex. C.

Included on each Joint Juice label is the Arthritis Foundation logo, website address, and toll-free phone number.  *See* Koenig Decl. Exs. A, B, C.  Joint Juice advertises that it will donate "a portion of the proceeds" from the purchase "to the Arthritis Foundation with a minimum contribution of $75,000 to help people take control of arthritis."  Koenig Decl. Ex. C.  On the back of the product, Premier has included the following mandatory disclaimer:  "These statements have not been evaluated by the FDA.  This product is not intended to diagnose, treat, cure or prevent any disease."  *Id.*

**C.  The Joint Juice Marketing Strategy**

When developing its marketing plan, Premier chose to "[t]arget consumers [who] are aware of glucosamine as a remedy for joint discomfort and arthritis."  Blood Decl. CC Ex. 7 at 1415.  Specifically, Premier identified its target consumers as "[b]aby boomers (age 46-64) who

---

[4] When possible, this order provides the Bates number associated with the document.  In many instances, that is not possible, and therefore the order tries to use the original document's page numbers.  When neither option is available, the order refers to the page number generated by the ECF filing system.

are living with joint pain"; "[t]hose concerned with joint health"; "arthritis sufferers"; those who suffer from "[o]ther joint pain/limited mobility" because of "[o]veruse, strenuous athletics, [and] injury"; and those between the ages of thirty and ninety.  Blood Decl. CC Ex. 21, Ex. 22 at 022799.  The Joint Juice marketing plan sought to "generate [a]wareness about the beneficial uses of glucosamine" and Joint Juice.  Decl. CC Ex. 23 at 071436.  In an effort to "lend credibility to the Joint Juice products and the benefits of glucosamine," Premier chose to mention Joint Juice's creator, Dr. Stone, in many of its advertisements.  Blood Decl. CC Ex. 23 at 071437.  In addition, Joint Juice brand guidelines emphasized a need to promote the "key performance benefits" of the product, namely "elasticity, mobility, durability, endurance, recovery, pain relief, [and] happy joints."  Blood Decl. CC Ex. 25 (2009 Joint Juice Brand Guidelines).

In an effort to encourage consumers to try Joint Juice, Premier created print advertisements, disseminated coupons, and hired legendary quarterback Joe Montana to speak in a commercial that aired on television.  The print advertisements depict runners, gardeners, golfers, tennis players, and women climbing stairs in high heels.  *See* Blood Decl. Ex. 19 at 000022-29.  Cartoon dialog bubbles emanate from the joints with exclamations of joy:  "Yippee!" "Yay!" "Wheeee!"  Underneath each picture are statements such as "Joint Juice fingers are happy to weed every weekend" and "Joint Juice backs are happy to play 18 more holes."  *Id.* at 000022, 24.  These advertisements encourage users to "[k]eep your joints happy."  Blood Decl. CC Ex. 19 at 000022-28.  Premier also circulated print advertisements featuring Joe Montana, who tells the reader to "[k]eep doing what you love."  *Id.* at 000029.  In television advertisements, Joe Montana delivers the following message about the putative benefits of drinking Joint Juice:

> My joints have gotten a little stiff lately and at first I thought I had to live with it because of pro-football and just getting older.  Then my doctor told me about Joint Juice.  Now I drink it every morning, and it's much easier to swallow than those big pills.  Just a bottle each day lets me keep doing the things I love, no matter what I'm up to.  See, the glucosamine and chondroitin lubricates and cushions the cartilage in my joints, so I can move more easily all day long.  It was originally developed by an orthopedic surgeon for pro-athletes, but it works great for anyone who likes to keep moving.  It just took a little while to start kicking in for me and that's when I started feeling really great!  So join me for the Joint Juice challenge

United States District Court
Northern District of California

1   and get back to doing what you love.

2   Blood Decl. CC Ex. 27; *see also id.* Ex. 28.

3        As part of its online advertising campaign, Premier bid on various Google AdWords.

4   When a Google user types in keywords, Google.com and its affiliates display advertisements for

5   those companies that bid successfully for the AdWords.  Blood Decl. CC Ex. 36, Keegan Decl. ¶

6   21.  Premier bid on the following AdWords:  "joint health supplement," "arthritis treatments,"

7   "how to stop arthritis," "supplement for arthritis," "glucosamine," "chondroitin," and "arthritis

8   cures."  Blood Decl. CC Ex. 35.  In addition, Premier pays for advertising space in *Arthritis*

9   *Today*, the Arthritis Foundation's magazine.  Keegan Decl. ¶ 24.  Overall, Premier was satisfied

10  that it had created "a clear brand name [and] identity" and "innovative communication" with

11  consumers.  Blood Decl. CC Ex. 18.

12      **D.  Joint Juice Market Research:  Why do people buy Joint Juice?**

13       In 2009, Premier commissioned Schireson Associates to conduct market research to gain a

14  better understanding of Joint Juice customers, to test the effectiveness of the Joint Juice marketing

15  concepts, and to identify how to improve the appeal of the product.  Blood Decl. Ex. 7 at 001416.

16  A group of 203 Joint Juice target customers responded to questions that probed the purchasers'

17  reasons for buying the product.  *Id.*  Most respondents reported that they take glucosamine

18  supplements because they suffered arthritis and joint pain or stiffness.  *Id.* at 001422-23.  When

19  asked about the specific features of the Joint Juice packaging that would prompt the consumer to

20  try Joint Juice, 59% identified the Arthritis Foundation endorsement.  *Id.* at 001441.  To sum up

21  the findings, Schireson offered the following analysis:  "Target consumers are aware of

22  glucosamine as a remedy for joint discomfort and arthritis, but awareness of Joint Juice [was]

23  low" and "[i]nterest in glucosamine as a preventative [was also] low."  *Id.* at 001415.

24       Subsequently, in 2010, Premier hired Zoomerang to conduct further market research

25  generated by a survey of those who purchased Joint Juice from the online store or signed up for

26  the Joint Juice newsletter within the preceding six months.  Blood Decl. CC Ex. 15.

27  Of those who responded to the questions, 95% of respondents were experiencing joint pain.  *Id.*

28

United States District Court
Northern District of California

Two-thirds of these consumers bought Joint Juice to alleviate joint pain.  *Id.*  When asked about how they first learned about Joint Juice, approximately 71% of respondents cited Premier's advertisements—store shelves, television and print advertisements, coupons, product samples, and store displays.  *See id.*

More recently, Premier teamed up with MindReader to gain additional insight into "[c]onsumer behavior relating to Joint Juice usage:  purchases, reasons for usage, and why they did not continue to use" the product.  Blood Decl. CC Ex. 39 at 132513.  Pain relief was, again, the principle reason most survey respondents bought Joint Juice.  *Id.* at 132514.  When asked how users learned about Joint Juice, the majority of respondents identified advertisements:  grocery store advertisements or coupon books (18%); television advertisements (16%), samples at a store or events (13%), and magazine or newspaper advertisements (10%).  *Id.* at 132515.  A quarter of users learned about Joint Juice from friends or family.  *Id.*  Turning to the reasons people chose to start using Joint Juice, MindReader discovered that the main reason for consumption was to ease joint pain.  *Id.* at 132519-20.[5]  A significant portion of regular and occasional users admitted that they experience joint pain—85% and 75% respectively.

Premier's internal customer data further confirm that a significant majority of Joint Juice users purchase the product because they have joint pain.  *See, e.g.*, Blood Decl. MSJ Ex. 1 at 020721 (noting that 90% of Joint Juice users have joint pain symptoms); Blood Decl. CC Ex. 15 ("95% of users suffer from joint pain."); Blood Decl. Ex. 16 at 101642 ("92% of the current Joint Juice users have joint pain symptoms (OA, RA, Joint pain, etc.)").

**E.  Joint Juice Sales**

Since launching the Joint Juice advertising campaign, consumers have spent more than $156 million to purchase Joint Juice.  Blood Decl. CC Ex. 44.  Most Joint Juice customers—

---

[5] The survey creators gave participants a list of options from which to select as many answers that applied.  More than half of respondents chose to use Joint Juice because it was easy to use or liked the liquid form.  *See* Blood Decl. Ex. 39 at 132518.  There is no indication as to whether there is any overlap between those who drink Joint Juice because they believe it has palliative qualities and those who identified other qualities, such as the liquid form, flavor, or price.

1    nearly eighty-five percent— purchase the product at Costco, Sam's Club, and Walmart.  Blood

2    Decl. CC Ex. 3, Ritterbush Dep. 119:2-23; *see also id.* Ex. 4 (2014 Sales Plan).  Many national

3    drug and grocery stores—Kroger, Walgreens, CVS, and Rite Aid, for example—sell Joint Juice

4    products, as well.  Blood Decl. CC Ex. 4.

5        **F.  Jeremey Keegan:  Joint Juice's Implied Message**

6            To evaluate whether Premier's marketing strategy, expressed claims, and implied claims

7    influence consumers who purchase Joint Juice, Sonner retained Jeremey Keegan, whose

8    consulting firm conducts consumer research and examines marketing materials.  Premier has not

9    challenged Keegan's competence to testify.  Keegan did not conduct a consumer survey.  Rather,

10   he reviewed Premier's marketing materials, advertisements, and commissioned marketing

11   research, such as the MindReader study and the Shireson study—both of which he believes are

12   methodologically sound and reveal why consumers purchase Joint Juice.

13           In particular, Keegan contends that the results of the MindReader survey reveal "that the

14   primary appeal and driving reason" consumers purchase Joint Juice are "joint health and joint

15   pain."  Keegan Decl. ¶ 34.  That so many people purchase Joint Juice to alleviate joint pain or to

16   promote joint health, he contends, demonstrates that Premier's marketing efforts to target those

17   groups are effective, thus he draws a causal connection between the marketing campaign and

18   consumer action.  *Id.* ¶¶ 37-38.  In addition, he contends that the Schireson study exposed

19   consumers' interest in glucosamine products and provided a reason for Premier to emphasize that

20   Joint Juice contains glucosamine—an agent linked to joint pain and the maintenance of joint

21   flexibility.  *Id.* ¶ 41.  These findings, Keegan explains, helped Premier craft an advertising

22   campaign building on the perceived efficacy of glucosamine.  *Id.* at ¶ 46.  Although Keegan could

23   not evaluate the quality of Premier's other marketing studies, such as the Zoomerang studies or

24   focus groups, he noted that these studies demonstrate that a significant majority of Joint Juice

25   users buy the product to combat joint-health problems—information, he states, that commonly

26   assist companies as they develop their marketing messages.  *See* Keegan Decl. ¶¶ 49, 53-54, 58.

27   Based on the results of these marketing surveys, Keegan opines, "Joint Juice effectively positioned

28

United States District Court
Northern District of California

itself as a joint health product through its marketing materials" and consumers understand Premier's implied claims about the palliative and structural benefits of drinking the product. Keegan Decl. ¶ 63.

### G. Hal Poret's Consumer Survey

As part of this litigation, Premier retained Hal Poret to conduct a consumer survey. His online survey directed questions to 400 respondents—200 of whom had purchased Joint Juice before, and 200 of whom had purchased a product containing glucosamine, but not Joint Juice. The survey began with an open-ended question: "[T]ell us why you decided to purchase Joint Juice." Poret Report at 4 (emphasis in original). The respondents had the option to list up to twenty reasons for their purchasing decision, including an option to select "I don't know." *Id.* Next, Poret asked respondents to select from a list of choices the "reasons or factors that influenced your decision to purchase Joint Juice[.]" *Id.* The respondents who purchased another glucosamine product answered identical open and closed questions. The following were some of the choices offered: "I had generally heard about or read about the benefits of glucosamine"; "Statements or information I read on the Joint Juice bottle or packaging"; "Statements or information I read/heard in other advertising for Joint Juice"; "A doctor or other healthcare professional recommended I take Joint Juice/a glucosamine product"; "A friend or co-worker recommended I take Joint Juice/a glucosamine product"; "The product is vegetarian"' "Price/less expensive"; "Liked the taste"; "Endorsed by Joe Montana"; "Product contains chondroitin"; "Orange packaging[.]" *See* Poret Report at 5-6. There were two "control choices," i.e., statements that were false: (1) "Statements or information I read/heard in promotions on a home shopping channel or website, such as HSN or QVC"; and (2) "Endorsed on the Dr. Oz show or website." Poret Report at 6. Participants had the opportunity to select as many answers as they wanted.

Once the survey results were received, Poret grouped those answers identifying statements on the packaging and in advertisements and the Joe Montana endorsement. Those who reported that the statements on the packaging influenced their purchasing decision were asked to identify which specific statements made an impression. Poret Report at 10-11. Poret never asked whether

1  the participant believed Joint Juice would relieve OA symptoms.  Nor did he ask whether they

2  believed the product could provide palliative or structural benefits to those suffering from OA.

3  Based on the survey results, Poret contends the consumer survey results reveal that

4  consumers purchase Joint Juice for myriad reasons, and only 5.5% chose to buy the product

5  because of the statements on the label.  Poret Report at 5, 25.  Indeed, Poret contends, "[e]ven

6  when the idea of statements in packaging or advertising was presented to respondents in the

7  answer choices, roughly 75% of respondents answered that they were not influenced by statements

8  on the package and roughly 75% answered that they were not influenced by statements in

9  advertising."  Poret Report at 27 (emphasis in original).  These results, he claims, show that the

10  statements do not influence consumer decisionmaking, and less than half of respondents reported

11  finding the statements on packaging and in advertisements influential.  *Id.* at 27.  Instead, he

12  interprets the survey results as showing that recommendations from friends and family members

13  had the greatest impact on consumers' purchasing decisions.  *Id.* at 30.

14  Keegan also reviewed the results of Poret's survey and reached different conclusions.  He

15  concluded that, despite serious design flaws, the survey confirms that most Joint Juice users

16  purchase the product with the hope that it will provide joint health benefits or relieve joint pain.

17  Keegan Suppl. Report ¶ 13.  Keegan's principal criticism is that Poret coded respondents' answers

18  incorrectly, thereby failing to count all respondents motivated to buy the product by concern for

19  joint pain and health.  *See id.* ¶¶ 32-34.  For example, Poret did not treat as motivated by joint

20  health concerns those who tried the product to see if "it would work."  *Id.* ¶ 33.  According to

21  Keegan, proper coding reveals that 91% of those surveyed identified joint health and pain

22  concerns influenced the decision to buy Joint Juice.  *Id.* ¶¶ 26, 36-37, tbl. 2.  In addition, Keegan

23  faults Poret's question design.  Many of the offered reasons to purchase Joint Juice did not

24  mention joint pain or joint health.  *See id.* ¶¶ 39-40.  Instead, the list of options included reasons

25  why the consumer might purchase Joint Juice instead of another glucosamine or joint-health

26  product, such as the color of the package or that the product is shellfish-free.  *Id.*  In Keegan's

27  view, the failure to "present respondents with the opportunity that they purchased the product for

28

joint health/joint pain-related reasons" renders the results incomplete, and therefore a poor indicator of whether the implied or expressed messages influenced their purchasing decisions.  *Id.* ¶ 41.

### H.  The Scientific Literature About the Efficacy of Glucosamine and Chondroitin

Sonner advances three principle theories to prove the falsity of Premier's claims about the effects of drinking Joint Juice.  First, she argues that the high-quality clinical studies and meta-analyses show that glucosamine and chondroitin do not reduce pain and stiffness caused by osteoarthritis ("OA") or improve joint function.  Second, she and her expert, Dr. Jeremiah E. Silbert, contend that very little ingested glucosamine and chondroitin actually gets to the joints by the time they work their way through the digestive system and into the bloodstream.  Blood Decl. CC Ex. 46, Silbert Decl. ¶ 12.  Third, Silbert and Sonner claim that, even if some orally ingested glucosamine and chondroitin are bioavailable, the amount is too small to have any effect on joints, Silbert Decl. ¶ 13, 22, and the elevated levels of glucosamine in the bloodstream do not increase the "the total amount of chondroitin synthesized."  Silbert Decl. ¶ 19.

### 1.  The Literature Regarding the Efficacy of Glucosamine and Chondroitin

There is a wealth of scientific literature about the efficacy of glucosamine and chondroitin of varying quality.  The canon includes (1) randomized double-blind, placebo-controlled studies, (2) meta-analyses, (3) clinical treatment protocols, (4) *in vitro* studies; and pre-clinical animal studies.  Sonner has retained Dr. Lynn R. Willis, a physiologist and pharmacologist, to conduct a systematic review of the available scientific literature and to interpret the meta-analyses and clinical trials.  Premier also retained an expert witness, Dr. Daniel Grande, a cell biologist who specializes in cartilage defects, who offers his summary and impressions of the scientific literature.

#### a.  Clinical Trials

Randomized clinical trials are "the gold standard for determining the relationship of an agent to a health outcome."  Federal Judicial Center, *Reference Manual on Scientific Evidence* 555 (3d ed. 2011).  Usually such trials are placebo-controlled, meaning that trial participants receive an

United States District Court
Northern District of California

United States District Court
Northern District of California

1  inactive ingredient that appears similar to the active ingredient being studied.  Double blinding

2  ensures that neither the trial participants nor the researchers know which participants received the

3  active ingredient.  *See id.*  At the conclusion of the trial period, researchers compare the results of

4  those who received the treatment and those who took the placebo to form conclusions about the

5  effect of the treatment.  *See id.* at 555-56.

6       Of the numerous clinical trials examining the palliative and structural benefits of

7  glucosamine and chondroitin, the Glucosamine/Chondroitin Arthritis Intervention Trials ("GAIT")

8  studies are the most influential.  In 2006, 2008, and 2010 the NIH conducted three multicenter

9  clinical trials to evaluate the efficacy of glucosamine and chondroitin.  The first of these studies

10  examined whether five treatments reduced pain and stiffness in patients suffering from OA.  Trial

11  participants received one of five treatments for twenty-four weeks:  (1) glucosamine

12  hydrochloride, (2) chondroitin, (3) glucosamine and chondroitin, (4) celecoxib,[6] and (5) placebo.

13  In 2006, the authors of the GAIT I study concluded, "Glucosamine and chondroitin sulfate alone

14  or in combination did not reduce pain effectively in the overall group of patients with [OA] of the

15  knee."  Blood Decl. CC Ex. 50 at 2 (GAIT I); *see also* Willis Suppl. Decl. ¶¶ 56-57.  In other

16  words, glucosamine and chondroitin, alone or in combination, performed no better than placebo.

17  Researchers found, however, that a "subgroup of patients with moderate-to-severe pain

18  demonstrated that combination therapy significantly decreased knee pain related to [OA]."  GAIT

19  I at 13.

20       Two years later, in 2008, NIH published a follow-up study, GAIT II, which explored the

21  effects of the same five treatments on progressive loss of joint space width in patients with OA of

22  the knee over a period of twenty-four months.  Blood Decl. Ex. 52 at 2 (GAIT II); *see also* Willis

23  Supp. Decl. ¶ 57.  Researchers found "no significant differences in mean [joint space width] loss

24  over 2 years between the treatment groups and the placebo group . . . ."  GAIT II at 5.

25       Finally, in 2010, NIH released the third study designed to evaluate the efficacy and safety

26

27  [6] Celecoxib is a nonsteroidal anti-inflammatory drug.

28

United States District Court
Northern District of California

of the same five treatments over a twenty-four-month period.  Blood Decl. CC Ex. 53 at 2 (GAIT III).  In addition, this study examined the research question the GAIT I study left open:  whether people with moderate to severe joint pain benefit from taking glucosamine and chondroitin.  The authors of GAIT III concluded "no treatment achieved a clinically important difference in WOMAC Pain or Function as compared with placebo."  GAIT III at 3.  These results caused the researchers to conclude that glucosamine was "ineffective for treatment of pain."  *Id.* at 6.  Nevertheless, the GAIT III authors noted that all treatment groups, including placebo, reported improved pain and function over the twenty-four-month period.  *Id.* at 7.  In sum, the authors surmised that the benefits of taking glucosamine and chondroitin to treat OA pain, function, and stiffness are "marginal at best."  Willis Suppl. Decl. ¶ 61.

In addition to the GAIT studies, numerous double-blind randomized placebo-controlled clinical trials add to the body of scientific literature finding that glucosamine and chondroitin do not provide palliative or functional benefits.  A 2015 six-month, double-blind study concluded that glucosamine and chondroitin have "no impact on the relief of OA symptoms."  Blood Decl. Mot. to Exclude Grande Ex 16 at 9 (Hochberg, 2015).  In 2014, the Long-term Evaluation of Glucosamine Sulfate study ("the LEGS study") did "not detect significant symptomatic benefit" of glucosamine and chondroitin.  Blood Decl. Mot. to Exclude Grande Ex. 12 at 1.  Similarly, a short-term study of "glucosamine hydrochloride in beverage form"—the first of its kind—found no evidence "that glucosamine is more effective than placebo in improving joint health" when assessing cartilage damage.  Blood Decl. Mot. to Exclude Grande Ex. 13 at 2, 7 (Kwoh, 2014).

Nevertheless, some researchers performing clinical trials have found that glucosamine and chondroitin outperform placebo.  The GAIT I study, for example, noticed significant improvement for those participants with moderate to severe OA pain.  Grande Suppl. Report at 3.  The 2014 LEGS study authors observed that participants experienced statistically significant improvement in joint space narrowing.  *Id.* at 4.  In addition, the 2015 Multicenter Osteoarthritis InterVEntion trial with SYSDOA ("the MOVES study") conducted a randomized double-blind clinical trial comparing glucosamine and chondroitin with celecoxib.  These researchers found that daily

1    consumption of glucosamine and chondroitin are as effective as celecoxib in reducing pain for

2    those with moderate to severe OA.  *Id.* at 5.

3              b.  Meta-Analyses

4         Meta-analyses pool the results of clinical trials "to arrive at a single figure to represent the

5    totality of the studies reviewed."  *Reference Manual on Scientific Evidence*, *supra*, at 607.  This

6    system of methodically reviewing the literature often includes weighting the clinical studies and

7    examining the cause of heterogeneity among the pooled clinical trials.  *See id.* at 606-07, 725.

8    Among types of medical evidence, meta-analysis is considered the strongest.  *Id.* at 723.

9         There have been no fewer than ten meta-analyses of clinical studies about the effects of

10   glucosamine and chondroitin on joint pain, movement, and function.  Other meta-analyses

11   reviewed the clinical trials that examine whether glucosamine and chondroitin help reduce joint

12   space narrowing.

13        A review of the meta-analyses reveals that the effects of glucosamine and chondroitin are

14   similar to placebo, and therefore clinically insignificant.  Willis Suppl. Decl. ¶¶ 44, 48.  In 2014,

15   for example, one study examined the results of twenty-five placebo-controlled clinical studies and

16   declared, "[w]e are confident that glucosamine by and large has no clinically important effect."

17   Blood Decl. Mot. to Exclude Grande Ex. 3 at 11 (Eriksen, 2014); *see also* Decl. Blood Mot. to

18   Exclude Grande Ex. 5 at 2 (Wu, 2013) ("[Glucosamine hydrochloride] is ineffective for pain

19   reduction in patients with knee OA.").  Similarly, in 2010, another study examined ten blind

20   randomized trials and concluded "that glucosamine, chondroitin, and their combination do not

21   result in a relevant reduction of joint pain nor affect joint space narrowing[7] compared with

22   placebo."  Blood Decl. CC Ex. 55 at 9 (Wandel, 2010).  Other studies examining the effects of

23   chondroitin concluded that "[n]o robust evidence supports the use of chondroitin in [OA]," and the

24

25   ───────────────
     [7] According to Sonner, studies looking at joint space width ("JSW") measure cartilage loss.
26   Premier's expert, Kevin Stone (founder of Joint Juice) has stated that JSW is a "terrible measure
     of arthritis."  Blood Decl. MSJ Ex. 7 at 38989.  Apparently, the more effective measure is to look
27   at pain and function.  Blood Decl. Ex. 8, Stone Dep. 145:13-23.

28

1    [l]arge-scale, methodologically sound trials indicate that the symptomatic benefit is minimal to

2    non-existent."  Blood Decl. Mot. to Exclude Grande Ex. 4 at 2 (Reichenbach, 2007).

3           These meta-analyses all recognize that some clinical studies have shown glucosamine or

4    glucosamine and chondroitin reduce joint pain and stiffness; however, most meta-analysts

5    attribute these findings to industry bias.  *See, e.g.*, Blood Decl. CC Ex. 54 at 2 (Vlad, 2007)

6    ("Heterogeneity among trials of glucosamine is larger than would be expected by chance.

7    Glucosamine hydrochloride is not effective [to treat OA pain].  Among trials with industry

8    involvement, effect sizes were consistently higher.  Potential explanations include the different

9    glucosamine preparations, inadequate allocation concealment, and industry bias."); Blood Decl.

10   CC Ex. 55 at 000624 (Townheed, 2009) ("If only the best designed studies are included, the

11   benefit in pain and WOMAC[8] function is no longer present as shown . . . .").  Willis reviewed all

12   studies finding positive effects of glucosamine and chondroitin consumption and concluded that

13   these studies suffered from poor design or bias.  Willis Suppl. Decl. ¶ 49.  According to Willis,

14   Sonner's expert witness, in 2014, Eriksen "published a very definitive evaluation" of whether

15   industry bias alone accounted for findings that glucosamine and chondroitin reduced pain and

16   stiffness in arthritic joints.  Blood Decl. MSJ Ex. 16, Willis Dep. 36:19-38:7.  Eriksen concluded

17   that "publication bias was, in fact, to blame for . . . what appeared to be a therapeutic effect,

18   significant therapeutic effect of glucosamine sulfate in osteoarthritis."  Blood Decl. MSJ Ex. 16,

19   Willis Dep. 38:1-7.

20          Two meta-analyses have found a positive correlation between glucosamine and chondroitin

21   consumption and improvements in joint health.  In 2000, for example, one study noted

22   heterogeneity among clinical trials testing whether glucosamine and chondroitin improve pain and

23   reduce joint space narrowing.  Grande Report at 12; *see also* Blood Decl. Mot. to Exclude Grande

24   Ex. 9 at 2 (McAlindon, 2000).  Similarly, in 2013, another meta-analysis concluded that

26   [8] The Western Ontario and McMaster Universities Arthritis Index ("WOMAC") is a set of
27   standardized questionnaires used to evaluate knee- and hip-osteoarthritis patients' pain, stiffness,
     and physical functioning of the joints.

28

United States District Court
Northern District of California

glucosamine sulfate "may have function modifying effects," even though glucosamine hydrochloride was "ineffective for pain reduction in patients with knee OA."  Decl. Blood Mot. to Exclude Grande Ex. 5 at 2 (Wu, 2013).  Grande concludes that the heterogeneity among meta-analyses and clinical trials proves that scientists remain divided about the efficacy of glucosamine and chondroitin as treatment for OA and joint pain.  Although Willis acknowledges this heterogeneity, he attributes the positive results to publication bias or poor study design.

### c.   Clinical Treatment Protocols

To assist practicing doctors in evaluating and treating patients, medical academies, such as the American Academy of Orthopedic Surgeons ("AAOS"), American College of Rheumatology ("ACR"), and the National Institutes for Health and Care Excellence ("NIHCE"), create clinical practice guidelines.  Willis Suppl. Decl. ¶ 53; *see also Reference Manual on Scientific Evidence*, *supra*, at 726.  These medical academies develop the guidelines systematically, but provide only general guidance.  None of these academies—AAOS, ACR, and NIHCE—recommends using glucosamine and chondroitin to manage symptoms or pain associated with OA.  *See* Blood Decl. CC Ex. 61 at 7 (AAOS Guidelines); Blood Decl. CC Ex. 63 at 470 (ACR Guidelines); Blood Decl. CC Ex. 63 at 14 (NIHCE Guidelines).  Dr. Steven Graboff, plaintiff's expert, a practicing orthopedic surgeon, confirms that "[g]lucosamine and chondroitin sulfate are not part of the general hierarchy of treatment for arthritis."  Graboff Decl. ¶ 36.

### d.   In Vitro and Preclinical Animal Studies

*In vitro* studies involve tissue explants or isolated cells in a tissue culture.  Grande Decl. at 9; Willis Suppl. Decl. ¶ 26.  These *in vitro* studies help researchers identify physiological and biochemical mechanisms worthy of further study.  Willis Suppl. Decl. ¶ 27.  Similarly, pre-clinical animal studies facilitate identification of hypotheses for future testing in human subjects.  *Id.*

Grande has identified numerous *in vitro* studies which suggest that glucosamine and chondroitin are effective pain inhibitors.  One 2007 study found that glucosamine may inhibit cyclooxygenase-2, a common pain mediator.  Grande Report at 10.  Another study demonstrated that glucosamine and chondroitin inhibit inflammatory mediators and increase production of

United States District Court
Northern District of California

1    natural inflammatory inhibitors.  *Id.*  According to Grande, these *in vitro* studies offer evidence

2    that there is a mechanism for glucosamine and chondroitin to reduce joint pain and to improve

3    joint function.

4          Some preclinical animal studies suggest glucosamine and chondroitin may provide similar

5    benefits in humans.  A study of guinea pigs found a connection between glucosamine and

6    chondroitin and reduced cartilage destruction and reduced inflammatory activity.  *Id.*  Another

7    preclinical trial involving canines found that glucosamine was "highly effective" at preventing

8    cartilage breakdown.  *Id.*  Rabbits treated with glucosamine and chondroitin exhibited improved

9    cartilage repair, as well.  *Id.* at 11.  These animal studies, Grande contends, lend support to

10   Premier's claims about the benefits of drinking Joint Juice.  On the other hand, Willis rejects the

11   notion that these *in vitro* and animal studies provide any evidence of these positive effects because

12   scientists have not been able to replicate these effects in humans.  Willis Suppl. Decl. ¶¶ 80,

13   82-83.

14          *2.  The Bioavailability and Efficacy of Orally Ingested Glucosamine and Chondroitin*

15          Dr. Jerimiah Silbert has spent his entire career researching biosynthesis and cellular

16   localization of chondroitin and other glycosaminoglycans.  He and his colleagues measured and

17   studied the levels of glucosamine in blood serum after ingestion.  In the course of this research and

18   subsequent studies, Silbert formed the opinion that there are no achievable benefits to ingesting

19   glucosamine and chondroitin alone or in combination.  Silbert's research does not focus on

20   cartilage; he studies the cells, namely chondrocytes.  Koenig Decl. Ex. G, Silbert Dep. at

21   196:20-197:9.  Silbert believes that benefits of drinking glucosamine and chondroitin supplements

22   are categorically impossible to achieve.  To start, he has explained that the quantity of chondroitin

23   in Joint Juice and other dietary supplements is "less than 1% the size of the completed functional

24   cartilage chondroitin sulfate" and cannot attach to the proteins, which are part of the complex

25   structure that contributes to cartilage's water retention and elasticity.  Silber Decl. ¶ 9.  The

26   chondroitin found in blood plasma after consumption is "one four hundredth of" the amount

27   ingested, and therefore cannot be effective for the maintenance or repair of joint cartilage.  *Id.* ¶

28

11.

To reach this conclusion, Silbert measured the amount of glucosamine in blood plasma after oral ingestion and found that the quantity remaining was too small to provide any benefit to cartilage.  He discovered that as the 1,500 milligrams of ingested glucosamine works its way from the stomach, through the kidneys, to the liver, and into the blood stream, the amount of glucosamine diminishes over time.  Once the glucosamine reaches the blood stream, very little remains:  0.9 mg/liter.  *Id.* ¶ 12.  In other words, the ingested molecule does not actually get into the joint cartilage.  Silbert acknowledges that, in some instances, some orally ingested glucosamine and chondroitin make their way to the cartilage, but he contends that the amount remaining in the bloodstream is too small to provide any benefit.  Koenig Decl. Ex. G, Silbert Dep. at 159:3-9 ("What' I'm saying is, of course, there is something rapidly absorbed and bioavailable, but the amounts that are bioavailable are miniscule.").

According to Silbert, all studies of orally ingested glucosamine conducted after he published his paper have confirmed that the orally ingested glucosamine does not get into the cartilage.  Blood Decl. MSJ Ex. 15, Silbert Dep. at 108:18-22.  Sonner has introduced scientific research papers that generally confirm Silbert's position.  *See, e.g.*, Blood Decl. Mot. to Exclude Grande Ex. 24 at 10 (Henrotin, 2013) (Absorption of [glucosamine] after oral administration is limited, leading to low bioavailability (varying between animal species and human)."); *id.* Ex. 25 at 8 (Henrotin, 2012) ("[T]he weak effect of glucosamine reported by clinical trials can be attributed to the low concentrations of glucosamine available to joint tissues.  Indeed, the competition that exists between glucosamine and glucose for cellular uptake favors transport of glucosamine in the intestine, liver and kidney, leaving little glucosamine available for uptake by the joint."); *id.* Ex. 27 at 5(Block, 2010) ("We found no evidence for absorption of oral [chondroitin sulfate] into the circulation under any dosing regimen.").

## I.   Sonner's Experience with Joint Juice

In the fall of 2013, Sonner purchased a six-pack of eight-ounce "Ready-to-Drink" Joint Juice because she was experiencing shoulder pain and discomfort and hoped the product would

relieve some of her pain.  Koenig Decl. Ex. D, Sonner Dep. 41:2-25.  After drinking Joint Juice for five consecutive days, she decided that she did not experience any relief and discontinued using the product.  *Id.* at 24:16-24, 28:12-14.

### III.   LEGAL STANDARD

#### A.  Motion for Summary Judgment

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party who seeks summary judgment bears the initial responsibility of identifying an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies this initial burden, the non-moving party must present specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  "Only disputes over facts that might affect the outcome of the suit under governing law" are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue exists if the non-moving party presents evidence from which a reasonable fact-finder, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  *Id.* at 248-49.

#### B.  Motion to Exclude Expert Witnesses

To testify at trial as an expert, Rule 702 of the Federal Rules of Evidence requires that the witness be qualified by "knowledge, skill, experience, training, or education."  Fed R. Evid. 702.  Even if a witness is qualified as an expert in a particular field, any scientific, technical, or specialized testimony is admissible only if it (a) "will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "is based upon sufficient facts or data," (c) "is the product of reliable principles and methods," and (d) "the expert has reliably applied the principles and methods to the facts of the case."  *Id.*

Rule 702 does not permit irrelevant or unreliable testimony.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  Expert opinions are relevant if the knowledge underlying them has a "valid connection to the pertinent inquiry."  *United States v. Sandoval-Mendoza*, 472

United States District Court
Northern District of California

F.3d 645, 654 (9th Cir. 2006) (internal quotation marks and alteration omitted).  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 590 (citing 3 Weinstein & Berger ¶ 702[02], p. 702–18) (internal quotation marks omitted).  Expert opinion testimony is reliable if such knowledge has a "basis in the knowledge and experience of [the relevant] discipline."  *Id.* at 592.  Courts should consider the following factors when evaluating whether an expert's proposed testimony is reliable:  (1) "whether a theory or technique can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) the known or potential error rate of the particular scientific theory or technique, and (4) the degree to which the scientific technique or theory is accepted in a relevant scientific community.  *Id.* at 593–94.  This list is not exhaustive, however, and the standard is flexible.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999).  The *Daubert* inquiry "applies not only to testimony based on 'scientific' knowledge but also to testimony based on 'technical' and other 'specialized' knowledge."  *Id.* at 141.

The task is not to "decid[e] whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury."  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013).  Courts may not exclude testimony because it is impeachable.  *Id.* at 969.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.  The focus of the inquiry is thus on the principles and methodology employed, not the conclusions reached by the expert.  *See id.* at 595.  Ultimately, the purpose of the assessment is to exclude speculative or unreliable testimony to ensure accurate, unbiased decision-making by the trier of fact.  "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Kumho*, 526 U.S. at 157 (internal quotation marks omitted).

**C.  Motion to Strike Errata**

Federal Rule of Civil Procedure 30(e) permits a deponent to make changes to his

United States District Court
Northern District of California

deposition testimony "in form or substance" provided the deponent (1) requests review of the deposition to make corrections, (2) signs a statement listing the changes and the reasons for making them, and (3) submits changes within 30 days of receiving notice that the transcript is available.  Fed. R. Civ. P.  30(e)(1)-(2).  "Rule 30(e) is to be used for corrective, and not contradictory, changes."  *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1225-26 (9th Cir. 2005); *see also Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) ("[A] change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'").  The Ninth Circuit his interpreted Rule 30(e) to prevent "sham" corrections— "changes offered solely to create a material factual dispute in a tactical attempt to evade an unfavorable summary judgment."  *Hambleton Bros.*, 397 F.3d at 1225.  Thus, even though the rule allows deponents to make changes "in form or substance," it does not allow the deponent "to alter what was said under oath. . . . A deposition is not a take home examination."  *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002) (internal quotation marks omitted).

## IV.   DISCUSSION

### A.  Premier's Motion for Summary Judgment

California's UCL prohibits any "unfair, deceptive, untrue, or misleading advertising."  Cal. Bus. & Prof. Code § 17500.  Each prong is separately actionable.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009).  The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices."  Cal. Civ.Code § 1770.  The gravamen of Sonner's claims for violations of both statutes is that the statements used to sell Joint Juice—individually and collectively—are likely to deceive a reasonable consumer.  *See Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (explaining that the UCL and CLRA use the "reasonable consumer test").

*1.  What message does Premier convey to consumers about the effects of drinking Joint Juice?*

Sonner claims Joint Juice does not provide any benefit to those who drink it because the

United States District Court
Northern District of California

glucosamine and chondroitin it contains are not bioavailable in sufficiently high quantities to produce any positive effect, meaning the express messages—that Joint Juice will help keep joints flexible and lubricated—are false or misleading.  In addition, she contends Premier's packaging and advertisements send an additional implied message:   that Joint Juice can relieve joint pain and stiffness in arthritic joints.  There is no dispute that Joint Juice expressly informs buyers that daily consumption will improve joint flexibility and help lubricate the joints, but the parties disagree vehemently about whether or not Premier's packages and advertisements convey implied messages.  Specifically, Sonner contends that Premier promotes Joint Juice as a substance that can relieve joint pain and stiffness associated with OA.  Premier insists that the messages address only general health benefits and that the disclaimer on the back of the package disabuses users of any notion that Joint Juice treats or provides relief for OA.  In any event, Premier challenges Sonner's ability to prove the existence of any implied pain or stiffness message in the absence of a consumer survey.

The California statutes Sonner invokes recognize claims even where representations may not be misleading in isolation, but are deceptive when considering the package and advertisement as a whole.  *Williams*, 552 F.3d at 939 n.3 (interpreting California's UCL and CLRA); *see also Lima v. Gateway, Inc.*, 710 F. Supp. 2d 1000, 1007 (C.D. Cal. 2010) ([S]tatements . . . cannot be considered in isolation because they contribute to the deceptive context of the advertising as a whole.").  At the very minimum, Sonner must present some evidence that "a significant portion of the consuming public or of targeted consumers acting reasonably under the circumstances, could be misled" by the statements on Joint Juice packages.  *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).

a. Evidence of Implied Messaging

California courts have provided little guidance for how to evaluate whether an advertisement conveys an implied message or what that message is.  Federal courts interpreting the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), otherwise known as the Lanham Act, may provide some guidance because the UCL is often called one of the "little FTC Acts" enacted

by states in the 1930s. *Lavie*, 105 Cal. App. 4th at 505. "Because of this relationship between the UCL and the Federal Trade Commission Act, judicial interpretations of the federal act have persuasive force." *Id.* (internal alterations omitted). Like the UCL and CLRA, "the Lanham Act encompasses more than blatant falsehoods; it embraces innuendo, indirect intimations, and ambiguous suggestions." *Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272, 277 (2d Cir. 1981) (internal quotation marks omitted); *see also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir. 1997) ("Even if an advertisement is not literally false, relief is available under Lanham Act § 43(a) if it can be shown that the advertisement has misled, confused, or deceived the consuming public."). Federal courts interpreting the Lanham Act have required plaintiffs asserting implied-message claims to present "proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients." *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995). Such proof is "critical." *Id.* Occasionally, "a facial analysis of the product name or advertising" may lead to the conclusion "that the consumer will unavoidably receive a false message." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 587 (3d Cir. 2002). Some courts in this circuit have concluded, however, that they cannot evaluate whether representations are impliedly misleading without extrinsic evidence demonstrating "that the challenged advertisements tend to mislead or confuse consumers." *CKE Rest. v. Jack in the Box, Inc.*, 494 F. Supp. 2d 1139, 1143-44 (C.D. Cal. 2007) (internal quotation marks and alterations omitted).

Consumer surveys are the most common form of extrinsic evidence. *See, e.g.*, *Novartis*, 290 F.3d at 588 ("[Plaintiff] should have been required to prove through a consumer survey that the name and advertising actually misled or had a tendency to mislead consumers into believing that the product provided nighttime heartburn relief superior to any other product in the market."); *Ries v. Arizona Beverages USA LLC*, No. 10-01139 RS, 2013 WL 1287416, at *6 (N.D. Cal. Mar. 28, 2013) ("[T]o prevail, plaintiff must demonstrate by extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to mislead consumers." (internal quotation marks omitted)); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 950 (N.D. Ill.

1    2009) ("[S]ome courts have held that the success of a plaintiff's implied falsity claim usually turns

2    on the persuasiveness of a consumer survey." (internal quotation marks omitted)).

3            This is an area, however, where the California statutes break ranks with the federal

4    statutes:  California courts have expressly rejected the "view that a plaintiff must produce a

5    consumer survey or similar extrinsic evidence to prevail on a claim that the public is likely to be

6    misled by a representation."  *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th

7    1351, 1362 (2003); *see also Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 681-82

8    (2006) (holding that federal cases requiring "'extrinsic evidence,' such as expert testimony or

9    consumer surveys . . . do not accurately reflect California law." (internal quotation marks and

10   citations omitted)).  Thus, while "[s]urveys and expert testimony regarding consumer assumptions

11   and expectations may be offered," they are not required to prove consumers held a false belief

12   communicated by the advertisements.  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026

13   (9th Cir. 2008).

14           With that background in mind, there are three types of evidence present in this case:  the

15   advertisement itself, Sonner's experiences, and the results of the marketing research surveys

16   commissioned by Premier.  Premier cannot run from the fact that it sells *Joint* Juice.  The name

17   alone implies that the whole point to drinking the product is to receive joint health benefits.

18   Sonner testified that she believed Joint Juice, like ibuprofen, would provide pain relief.  While an

19   isolated anecdotal incident is likely insufficient to show that the reasonable consumer understands

20   this implied pain message, *see id.* at 1026, Sonner's account is some evidence of Premier's

21   unspoken message.

22           Sonner has offered more evidence of consumers' behavior:  Premier's market research.

23   The Schireson, Zoomerang, and MindReader surveys provide a foundation from which a

24   reasonable jury could conclude targeted customers believed Joint Juice would relieve joint pain

25   and stiffness.  Each of these studies found that the vast majority of consumers purchased Joint

26   Juice because they suffered arthritis and joint pain and stiffness.  The MindReader survey, in

27   particular, provides evidence that nearly a third of respondents tried Joint Juice because they saw

United States District Court
Northern District of California

28   ORDER GRANTING IN PART AND DENYING IN PART EVIDENTIARY MOTIONS AND DENYING SUMMARY JUDGMENT
     CASE NO.  13-cv-01271-RS

1    Premier's advertisements.  *See* Blood Decl. CC Ex. 39 at 132515.  That many of these consumers

2    cited joint pain as the principal reason they tried and continued to use Joint Juice is evidence that

3    may persuade a reasonable jury that Premier's ads subliminally encouraged people to buy the

4    product to relieve joint pain.  Sonner need not hire an expert to conduct another consumer survey

5    to survive summary judgment when there is sufficient evidence from Premier's own marketing

6    files to lend support for her claims.

7            b.  The Impact of the Disclaimer

8            There remains the additional issue of whether the disclaimer on the back of Joint Juice

9    products disabuses all reasonable consumers of the notion that the product relieves OA symptoms.

10   On this point, district courts are apparently divided.  One court has granted a motion to dismiss

11   claims based on the defendant's alleged implied message about the positive effects of taking

12   glucosamine and chondroitin to relieve OA symptoms.  The district court reasoned that because

13   the "packaging directly contradicts any supposed reference or inference to [OA] by disclaiming

14   that it treats any disease," the claims could not advance.  *McCrary v. The Elations Co., LLC*, No.

15   EDCV 13-0242 JGB OPX, 2013 WL 6402217, at *4 (C.D. Cal. Apr. 24, 2013).[9]  In contrast,

16   another district court held that "[t]he presence of a disclaimer . . . does not require dismissal of the

17   fraudulent advertising claims."  *Dorfman v. Nutramax Labs., Inc.*, No. 13CV0873 WQH RBB,

18   2013 WL 5353043, at *11 (S.D. Cal. Sept. 23, 2013); *Johns v. Bayer Corp.*, No. 09CV1935 DMS

19   _____

20   [9] Premier stretches the holdings of *Stanley* and *Eckler* when it argues that these courts concluded
     no reasonable person could believe probiotics relieve diarrhea because the packaging included the
21   FDA-mandated disclosure.  That is not a completely accurate characterization of the district
     court's holding.  Instead, the district court noted that the plaintiff had presented no evidence that a
22   reasonable consumer would be misled to believe the product provided such relief.  *Stanley v.
     Bayer Healthcare LLC*, No. 11cv862-IEG(BLM), 2012 WL 1132920, at *8 (S.D. Cal. Nov. 1,
23   2012).  Instead, the plaintiff offered only her own belief and failed to show why the product did
     not work for her.  *See id.* at *8-9.  The court mentioned the disclaimer, but did not actually make
24   any conclusions about whether the disclaimer rendered the plaintiff's belief unreasonable.  *See id.*
     Similarly, in *Eckler*, the court limited the scope of the motion to dismiss to the express claims on
25   the package because it was "less clear . . . that merely claiming a product supports joint comfort,
     rebuilds cartilage, and lubricates joints suggest it provides benefits to all persons and for all stages
26   of joint disease" when the package displays the FDA-mandated disclaimer.  *Eckler v. Wal-Mart
     Stores, Inc.*, No. 12-CV-727-LAB-MDD, 2012 WL 5382218, at *3 n.4 (S.D. Cal. Nov. 1, 2012).
27   The court did not say that the disclaimer eliminates any claims for implied misrepresentations.

28

1   (JMA), 2010 WL 2573493, at *4 (S.D. Cal. June 24, 2010) (refusing to grant a motion to dismiss

2   false advertising claims because the packaging had a disclaimer).

3        Under Ninth Circuit law, the latter group of authorities has the stronger position.  When

4   confronted with whether inclusion of an ingredient list shields manufacturers from suits for false

5   advertising, the Ninth Circuit rejected the assertion that "reasonable consumers should be expected

6   to look beyond misleading representations on the front of the box to discover the truth from the

7   ingredient list in small print on the side of the box." *Williams*, 552 F.3d at 939.  This binding

8   authority therefore strongly suggests that courts cannot hold as a matter of law that disclaimers

9   vitiate claims for misleading representations.

10        Moreover, California law generally reserves for the jury the question of whether a

11   reasonable consumer is likely to be deceived, *Asis Internet Servs. v. Subscriberbase Inc.*, No. 09-

12   3503 SC, 2010 WL 1267763, at *2 (N.D. Cal. Apr. 1, 2010) (collecting cases), and thus a jury

13   should typically review the package as a whole to evaluate the impact of the disclaimer.  In

14   addition, there is evidence in this record that the disclaimer did not alter consumers' views about

15   the efficacy of glucosamine and chondroitin for treating joint pain and stiffness associated with

16   OA.  Premier's marketing surveys show consistently that consumers purchased Joint Juice because

17   they had joint pain.  These survey results raise an inference that people believed Joint Juice would

18   provide pain relief despite the disclaimer on the back.  Accordingly, a triable issue of fact remains.

19        In sum, there are three types of representations at issue:  (1) implied claims that Joint Juice

20   relieves joint pain and stiffness associated with OA; (2) implied claims that Joint Juice provides

21   palliative effects for healthy joints; and (3) implied and express claims that Joint Juice will furnish

22   general joint health benefits.  Sonner has presented sufficient circumstantial evidence that

23   consumers understood and acted upon the implied claims.

24

25        *2.  Are Joint Juice's implied and expressed representations likely to deceive a
         reasonable consumer?*

26

27        a.  <u>Lack of Substantiation</u>

28

United States District Court
Northern District of California

Premier insists that all its claims—express and implied—are merely unsubstantiated, and therefore no reasonable jury could conclude its advertisements are false or misleading.  To curb false and misleading advertising, the California legislature empowered the Attorney General and private persons to sue to enjoin the advertising and to obtain restitution.  *See Nat'l Council Against Health Fraud, Inc. v. King Bio Pharm., Inc.*, 133 Cal. App. 4th 1336, 1344 (2003).  State prosecuting authorities have an advantage when it comes to prosecuting these claims:  they may demand advertisers substantiate their claims before pursuing an action.  *Id.*  At trial, however, the prosecuting authority, like a private plaintiff, still bears the burden of proving that the representations are false or misleading.  *See id.* at 1348.  Neither a private plaintiff nor a prosecuting authority may shift the burden to the defendant to substantiate its claims.  In other words, Sonner, like all plaintiffs (public or private) must introduce evidence and cannot prevail by arguing that the defendant's claims are unsubstantiated and therefore misleading.  *See Aloudi v. Intramedic Research Group, LLC*, 2015 WL 4148381, at *4 (N.D. Cal. July 9, 2015) (dismissing UCL and CLRA claims averring that defendant failed "to provide adequate substantiation" that its advertising claims were true); *Kwan v. SanMedica Int'l, LLC*, No. 14-CV-03287-MEJ, 2015 WL 848868, at *5 (N.D. Cal. Feb. 25, 2015) (dismissing UCL and CLRA claims where plaintiff alleged there were no studies supporting defendant's representations).  She must do more.  She bears the burden to establish that Premier's claims are false or misleading "by testing, scientific literature, or anecdotal evidence."  *King Bio*, 133 Cal. App. 4th at 1348.

Sonner has risen to the challenge.  She does not claim injury simply because Premier has made unsubstantiated claims about the joint health benefits of drinking Joint Juice.  As set forth in detail in Section II.H, Sonner has advanced expert evidence to disprove Premier's health claims.  She has marshalled clinical studies of the efficacy of exogenous glucosamine and chondroitin and oral ingestion of these molecules and insists that these studies prove that Premier's representations are false or misleading.  In addition, she has produced three experts to support her claims.  Willis reviewed clinical studies and concluded that glucosamine and chondroitin are no better than a placebo at providing relief for joint pain and stiffness.  To rebut the implied claim that doctors

United States District Court
Northern District of California

1   recommend taking glucosamine and chondroitin to treat OA, Sonner turns to Graboff, who has

2   explained that the medical community rejects the use of these products.  Finally, Silbert offers

3   evidence that Premier's general health claims are false because ingested glucosamine and

4   chondroitin are not bioavailable in joint tissue in sufficient quantity to confer any benefit.  Premier

5   answers Sonner's evidence with its own expert and points to some studies that suggest

6   glucosamine and chondroitin consumption benefits healthy and even diseased joints.  In other

7   words, Premier's offer of proof sets up a classic clash of the experts.

8         That Premier can point to some studies to support its claims does not, however, mean

9   Sonner improperly advances claims for lack of substantiation.  Rather, if the scientific record is

10   equivocal, then summary judgment is appropriate because no reasonable jury could conclude that

11   the representations are false or misleading.  Sonner would then lose the old fashioned way:  with

12   an absence of material disputes of fact for the jury to consider.  Thus, the first question is whether

13   a jury could logically conclude that the scientific evidence is unequivocal or such that Premier has

14   used it in a misleading fashion.

15         c.   Battle of the Experts

16         Premier insists a battle of the experts alone does not immunize UCL and CLRA claims

17   from summary judgment because, if the scientific community is merely divided, then the plaintiff

18   cannot establish that advertising claims are false or misleading.  Recently, the Fourth Circuit held

19   that UCL and CLRA claims fail if the plaintiffs do not aver "that *all* scientists agree that

20   glucosamine and chondroitin are ineffective at providing the promised joint health benefits."  *In re*

21   *GNC Corp.*, 789 F.3d 505, 515 (4th Cir. 2015) (emphasis in original).  Even if "the vast weight of

22   competent clinical evidence" cuts against a purported health claim, the Fourth Circuit concluded

23   no claim for false advertising may lie.  *Id.*  Thus, according to the Fourth Circuit, UCL and CLRA

24   claims for alleged *false* advertising may not advance if "a reasonable difference of scientific

25   opinion exists."  *Id.*  A "battle of the experts" will not forestall summary judgment.  *See id.*

26   ("When litigants concede that some reasonable and duly qualified scientific experts agree with a

27

28

1   scientific proposition, they cannot also argue that the proposition is 'literally false.'").[10]

2   Yet the Fourth Circuit did not address whether such evidence is sufficient to prove an

3   advertising claim is *misleading*.  *Id.* at 516 ("[W]e need not decide today whether any of the

4   representations made on the [defendants']  products are misleading, because Plaintiffs chose not to

5   include such allegations in the [complaint]").  Sonner has asserted that Premier's claims about the

6   benefits of drinking Joint Juice are false *and* misleading, and therefore tees up the question the

7   Fourth Circuit circumvented:  Do advertising claims have "the capacity, likelihood or tendency to

8   deceive or [to] confuse the public" if the vast weight of scientific evidence undermines those

9   claims?  *Williams*, 552 F.3d at 938 (citing *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002)).

10   No California court has addressed squarely this question, and therefore the analysis must

11   begin with the statutes' purpose.  The UCL and CLRA are "intentionally broad" to promote the

12   underlying purpose of consumer protection.  *Herron v. Best Buy Co., Inc.*, 924 F. Supp. 2d 1161,

13   1172 (E.D. Cal. 2013) (citing *In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006);

14   *ABC Int'l Traders, Inc. v. Matsushita Elec. Corp.*, 14 Cal. 4th 1247, 1270 (1997); *Colgan*, 135

15   Cal. App. 4th at 680).  California courts have stressed that, while a statement "may be accurate on

16   some level," it may "nonetheless tend to mislead or deceive."  *Boschma v. Home Loan Center,*

17   *Inc.*, 198 Cal. App. 4th 230, 253 (2011) (internal quotation marks omitted).  These California

18   authorities therefore apparently embrace the view that "a manufacturer may not hold out the

19

20   [10] Authority from the Fourth Circuit is not binding in this court; it is persuasive, at most.  *See e.g.*,
      *Int'l Chem. Workers Union Council v. N.L.R.B.*, 467 F.3d 742, 748 n.3 (9th Cir. 2000).  There is
21   cause to believe the Fourth Circuit's characterization of California law is flawed.  *See Zakaria v.*
      *Gerber Products Co.*, No. LACV1500200JAKEX, 2015 WL 4379743, at *2-3 (C.D. Cal. July 14,
22   2015).  *In re GNC* involved claims arising from multiple state statutes, including the UCL and
      CLRA, but the court did not analyze UCL and CLRA individually to "predict as best [it could]
23   what the California Supreme Court would do" as district courts in this circuit must.  *Pacheco v.*
      *United States*, 220 F.3d 1126, 1131 (9th Cir. 2000).  Instead, the Fourth Circuit leaned on the
24   "body of federal common law construing the Lanham Act."  *Zakaria*, 2015 WL 4379743, at *2
      (internal quotation marks and alterations omitted).  Although California courts often turn to the
25   Lanham Act when interpreting the UCL, federal courts must take care to avoid "import[ing] into
      the California UCL standards of proof derived from federal Lanham Act cases."  *Colgan*, 135 Cal.
26   App. 4th at 682.  Accordingly, this reliance on federal common law instead of California
      law undermines the persuasiveness of the Fourth Circuit's reasoning.  In any event, these flaws are
27   likely irrelevant because Sonner asserts that Premier's claims are misleading, as well.

28

opinion of a minority of scientists as if it reflected broad scientific consensus." *In re GNC*, 789 F.3d at 516. Accordingly, even if a reasonable expert testifies that the scientific literature is equivocal, a plaintiff may prevail under the UCL and CLRA if she proves that the expert is nevertheless incorrect.

Essentially, Sonner has two lines of attack. She may prove that Premier's claims are literally false if a reasonable jury concludes all *reasonable* scientists agree that drinking glucosamine and chondroitin do not relieve joint pain or stiffness associated with OA and that Joint Juice does not provide any general joint health benefits. To do so, she may show that Grande's expert opinions are unreasonable or that no expert believes glucosamine and chondroitin ingestion confers benefit. Additionally, she has the option to prove that the purported health claims of Joint Juice are *misleading* by showing that the vast weight of the competent evidence establishes that those health claims are false. *See In re GNC*, 789 F.3d at 516; *Zakaria v. Gerber Products Co.*, No. LACV1500200JAKEX, 2015 WL 4379743, *3 (C.D. Cal. July 14, 2015) ("If some reasonable experts incorrectly opined that Good Start Gentle had this [purported] health benefit, this would not necessarily bar the claim."). Under this second theory, she can concede the existence of scientific studies substantiating a representation, but argue that those studies are poorly designed, incredible, or represent the view of a minority of scientists.

Thus, whether Premier is entitled to summary judgment turns on whether or not there is a genuine dispute of fact about (1) whether its expert Dr. Grande's opinions are reasonable; and (2) whether a jury could reasonably conclude that "the totality of the evidence" supports the conclusion that Joint Juice does not relieve joint pain or stiffness in arthritic joints or improve joint health, in general. *Cf. In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 48 (1st Cir. 2013) ("We conclude that the totality of the evidence supported the district court's ultimate conclusion that Kaiser met its burden of showing that Neurontin was ineffective for the four off-label indications.").

d. Could a Reasonable Jury Conclude Dr. Grande's Opinions Are Unreasonable?

1   Sonner has mounted an attack on the reliability and credibility of Grande's expert opinions

2   about the use of glucosamine and chondroitin for pain relief in OA suffers.  She insists these

3   opinions "are at odds with the professional medical societies, unbiased researchers, the gold

4   standard clinical studies and analysis," and accepted principles of clinical research and

5   interpretation.  Mot. to Exclude Grande at 1.  As explained in Section IV.C.1, while Sonner has

6   not carried her burden to show that Grande's opinions are too unreliable to be admitted into

7   evidence, she advanced evidence on which a jury could find that Grande has made unreasonable

8   conclusions in light of the scientific evidence available.  For example, she faults Grande for his

9   alleged failure to take into consideration the hierarchy of scientific evidence, which places meta-

10  analyses and randomized clinical trials at the top.  In addition, she accuses Grande of

11  mischaracterizing the results of the numerous meta-analyses and clinical trials available or relying

12  on discredited studies or those characterized by poor design.

13  Sonner's expert, Dr. Willis has also offered principled critiques of each of the studies

14  finding beneficial effects of glucosamine and chondroitin consumption.  For instance, he insists

15  most of such studies were funded by supplement manufacturers whose stake in the outcome of the

16  study tainted the findings.  *See, e.g.*, Blood Decl. MSJ Ex. 16, Silbert Dep. 218:8-219:3 (stating

17  that the "overall evidence" does not show a positive outcome for OA patients taking glucosamine

18  and chondroitin after removing industry-funded studies).  Where studies free from industry

19  funding have found that taking glucosamine and chondroitin is beneficial, Willis criticizes the

20  study designs.  If a jury accepts these critiques, it may rationally conclude that Grande's opinion is

21  beyond the pale.

22  Even if a jury concludes Premier has not made any implied claims directed at OA suffers,

23  Sonner has offered evidence that Grande's opinions about the impact of glucosamine and

24  chondroitin on general joint health are equally unreasonable.  Sonner's expert Dr. Silbert faults

25  Grande for relying upon *in vitro* and animal studies to conclude that ingested glucosamine and

26  chondroitin reach joint tissue.  Silbert holds the view that his study demonstrated definitively that,

27  when a person consumes glucosamine and chondroitin in the amounts present in Joint Juice, the

28

quantity that makes it through the digestive process into joint tissue is too miniscule to confer any benefit.  Blood Decl. MSJ Ex. 15, Silbert Dep. 107:11-20; Blood Decl. CC Ex. 46, Silbert Decl. ¶ 22.  At least one study supports that position:  the authors conclude that animal studies are "unlikely to yield useful information about potential [glucosamine] effects in humans."  Blood Decl. Exclude Grande Ex. 26 at 7 (Block, 2010).  Premier has highlighted the limits of Silbert's study, such as the fact that he did not test whether glucosamine and chondroitin provide anti-inflammatory benefits or lubricate the joints.  Koenig Decl. Ex. G, Silbert Dep. at 190:13-25.  That a jury may conclude Silbert's study is not definitive simply means a material dispute of fact exists.

Finally, Silbert has offered principled reasons to reject, contrary to Grande's approach, the practice of drawing meaningful conclusions from *in vitro* and animal studies.  Specifically, he contends those studies involved glucosamine concentrations greater than 1,500 mg—the quantity in Joint Juice products.  Should the jury agree with Silbert, they may logically surmise that Grande's reliance on these studies is untenable.  In sum, because Sonner and her experts have offered principled, supported critiques of the studies Grande used to form his opinions, and a jury may reasonably adopt those same views, she may be able to convince a jury that Premier's claims are literally false.

e.  The Totality of the Scientific Evidence Regarding the Implied OA Claims

Sonner has also amassed enough evidence from which a jury may logically conclude that the totality of evidence shows drinking Joint Juice will not relieve OA sufferers' pain and stiffness.  Meta-analyses—the top of the hierarchy of medical evidence—have consistently found that glucosamine and chondroitin ingestion does not alleviate pain and stiffness in arthritic joints.  *Reference Manual on Scientific Evidence*, *supra*, at 723.  Numerous randomized controlled studies "ideally suited for showing causation" similarly conclude that glucosamine and chondroitin consumption do not offer clinically significant benefits to OA patients.  *In re Neurontin*, 712 F.3d at 48.  Clinical treatment protocols also add to the body of scientific literature finding that glucosamine and chondroitin consumption does not benefit OA sufferers.

Premier argues these studies are insufficient proof that its claims are false or misleading for

two reasons.  First, it contends that research into the effects of glucosamine and chondroitin on diseased joints cannot prove Joint Juice provides no benefit to healthy joints.  Because evidence suggests Premier implies Joint Juice provides palliative relief to those with OA, Sonner may properly rely upon these studies to demonstrate such implied claims are false or misleading.  She may not, however, use these studies to substantiate the falsity of Premier's general health claims.  Instead, the viability of those contentions rests on the strength of Silbert's testimony that ingested glucosamine and chondroitin are not bioavailable in sufficient quantity to provide any benefits.

Second, Premier contends Sonner cannot prevail by pointing to studies showing that glucosamine and chondroitin are not *clinically* effective because Joint Juice is a supplement, not a drug.  "Although new drugs must be pre-approved by the Food and Drug Administration, *see* [21 U.S.C.] § 331(d); *id.* § 355(a), and traditionally must be supported by randomized, placebo-controlled, double-blind clinical trials, *see* 21 C.F.R. § 314.126, dietary supplements need not." *United States v. Bayer Corp.*, No. CV 07-01(JLL), 2015 WL 5822595, at *3 (D.N.J. Sept. 24, 2015).  Supplement manufacturers need show only that their claims are "truthful and not misleading," 21 U.S.C. §343(r)(6)(B), i.e., supported by "competent and reliable scientific evidence," *Bayer*, 2015 WL 5822595, at *3.  The FTC has concluded that randomized clinical trials are not required to substantiate claims about the efficacy of dietary supplements.  *Id.* Premier thus contends that studies showing glucosamine and chondroitin are not clinically effective do not establish its claims are false or misleading.  That the FTC permits supplement manufacturers to make claims unsupported by randomized clinical trials is not a reason to reject the use of such studies to prove supplement claims are false or misleading.  One reason such clinical trials are not required to substantiate supplement claims is that they "may not always be possible, practical, or ethical."  Food and Drug Administration, *Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403(r)(6) of the Federal Food, Drug, and Cosmetic Act* (Dec. 2008), http://www.fda.gov/food/guidanceregulation/guidancedocumentsregulatoryinformation/dietarysupplements/ucm073200.htm.  Nevertheless, clinical trials are "[t]he gold standard," *id.*, and thus

United States District Court
Northern District of California

1    when such a trial has been conducted, the results of those studies may be used to prove that an

2    advertisement is misleading.

3        Against Sonner's evidence, Premier offers little.  Grande and Premier make reference to a

4    handful of studies finding that glucosamine and chondroitin help OA patients, but Sonner and her

5    experts fire back with substantive critiques of those studies.  Some suffer from poor design.

6    Others measure joint space narrowing, which Joint Juice creator Dr. Stone admits is a "terrible

7    measure of arthritis."  Blood Decl. MSJ Ex. 7 at 038989.  Or Sonner accuses Premier of cherry-

8    picking inapplicable portions of studies.  For example, Premier notes that the GAIT I researchers

9    found substantial treatment effects in a sub-group of patients with moderate-to-severe OA.

10   However, the report authors specifically noted that this sub-group was small, which "limited the

11   study's power to demonstrate significant benefits."  Koenig Decl. Ex. J, GAIT I at 010231.  These

12   are valid criticisms—criticisms that may reduce the size of Premier's supportive scientific

13   evidence.  If a jury believes those studies finding positive results pale in comparison to those

14   going the other way, then a jury may conclude that Premier's implied claims are misleading.  Of

15   course, a jury may also conclude that these studies muddy the waters enough to believe the

16   scientific literature on the subject is equivocal, in which case it must side with Premier.  That a

17   reasonable dispute exists, however, means that Sonner's claims may proceed.

18       f.   The Totality of the Scientific Evidence Regarding the Express General Health Claims

19       Even if a jury concludes Premier has not made any implied representations about the

20   benefits of drinking Joint Juice, they could reasonably conclude Joint Juice does not even benefit

21   healthy joints.  Although Sonner may not rely upon clinical studies and meta-analyses examining

22   whether glucosamine and chondroitin relieve OA symptoms to prove Premier's express claims are

23   misleading, Silbert's testimony is nevertheless sufficient to support her claim.  To his testimony,

24   Sonner adds numerous studies confirming and building upon Silbert's finding that orally ingested

25   glucosamine is not bioavailable in sufficient quantities to impact cartilage.  As discussed above,

26   the jury can and should decide whether the *in vitro* and animal studies undermine Silbert's

27   informed belief that glucosamine and chondroitin do not get to the joints and would not work if

28

they did.  The same is true with respect to Premier's criticisms about the reach of Silbert's research; a jury may decide that his limited focus on cartilage formation leaves open the possibility that Joint Juice provides general joint health benefits.

Premier's final argument centers on the testimony of Willis.  When asked whether he believes "glucosamine and chondroitin do not provide any joint health benefits," he denied having such an opinion "because no studies have been done."  Koenig Decl. Ex. E, Willis Dep. at 89:14-25.  This admission, Premier claims, is the silver bullet that kills the claim that representations about the general joint health benefits of Joint Juice are false and misleading.  Not quite.  First, this admission stands in stark contrast to the rest of Willis's testimony and his declarations, which contest the efficacy of exogenous glucosamine and chondroitin.  Second, Willis's deposition statements contradict Silbert's opinion that glucosamine and chondroitin consumption does not and cannot provide joint health benefits.  Accordingly, because a jury could logically decide that Silbert's testimony and his studies foreclose any possibility that Joint Juice drinkers will benefit from the substance, Premier's motion for summary judgment must be denied.

### b.  Restitution

Only one monetary remedy is available for those who have shown harm stemming from a UCL violation:  restitution.  *See Colgan*, 135 Cal. App. 4th at 696-97 (collecting cases).  The CLRA on the other hand offers more options:  restitution, actual damages, punitive damages, and "[a]ny other relief that the court deems proper."  Cal. Civ. Code § 1780(a)(1)-(5).  "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003).  "Where plaintiffs are 'deceived by misrepresentations into making a purchase, the economic harm is the same:  the consumer has purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay if the product had been labeled accurately.'"  *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (quoting *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 329 (emphasis in original)).

United States District Court
Northern District of California

1    While the plaintiff need not prove the restitution amount "with exact precision," *Ries*, 2013

2    WL 1287416, at *7, "substantial evidence" must support the restitution award under the UCL and

3    CLRA, *Colgan*, 135 Cal. App. 4th at 700.  Failure to provide evidence to support a prayer for

4    restitution "provides an independent and sufficient basis to grant . . . summary judgment." *Ries*,

5    2013 WL 1287416, at *8.

6    Sonner seeks a full refund for her purchase because, she insists, Joint Juice provides no

7    joint health benefits and the only reason to purchase *Joint* Juice is to obtain such benefits.  In other

8    words, the proof required is evidence of the cost of the product.  California courts have left open

9    the possibility of a full refund under the UCL "when the plaintiffs prove the product has *no* value

10   to them." *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 795 (2015) (emphasis in original); *see

11   also id.* at 802.  Courts have thus held consistently that the full-refund model is an inappropriate

12   measure of damages unless the plaintiff can prove the product conferred no benefits.  In the

13   *Tobacco Cases*, for example, the California Court of Appeal held that a class of smokers could not

14   plausibly show that they received no value from so-called "light" cigarettes even though they

15   believed those cigarettes to be less unhealthful than full-flavored cigarettes. *Id.* at 784, 802.

16   Similarly, district courts have routinely declared the full-refund model a poor fit in cases alleging

17   that juices contained less real juice than advertised or claimed to be "all natural" when they were

18   not. *See, e.g.*, *In re POM Wonderful LLC*, No. ML 10-02199 DDP RZX, 2014 WL 1225184, at *3

19   (C.D. Cal. Mar. 25, 2014) ("In other words, the Full Refund model depends upon the assumption

20   that not a single consumer received a single benefit, be it hydration, flavor, energy, or anything

21   else of value, from Defendant's juices."); *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523,

22   532 (N.D. Cal. 2012).

23   There are two key distinguishing characteristics of *In re POM*, *Ries*, and *In re Tobacco

24   Cases II*, which make these authorities poor guidance for the facts of this case.  First, in each case,

25   the plaintiffs did not claim that the product they received was, in fact, valueless.  Second, the

26   plaintiffs did not contend that consumers never would have purchased the product absent the

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  claims on the label.  How could they?  The products at issue were expressly for consumption,

2  flavor, and hydration.

3      Here, however, Sonner claims that she and other putative class members would not have

4  purchased Joint Juice absent its claim to treat joint health problems or to keep joints healthy.

5  Essentially, she argues that Joint Juice is nothing more than a liquid pill, which nobody would

6  purchase unless they were concerned about joint health.  Unlike juice, which consumers purchase

7  for hydration, or cigarettes, which smokers purchase for flavor and to assuage nicotine cravings,

8  Joint Juice is for all intents and purposes a liquid pill.  Indeed, Premier has even stated that "the

9  only reason to purchase Joint Juice® supplement is for the medicinal value of the glucosamine and

10  chondroitin it contains."  Blood Decl. CC Ex. 13 at 131440.  That assertion is backed by some

11  evidence:  many consumers cite joint pain as the reason for trying and using Joint Juice, which

12  raises the reasonable inference that they would not have bought the product absent the joint-health

13  claims.  While she may ultimately fail to prove that nobody would buy Joint Juice absent the joint

14  health claims, she has produced enough evidence to draw that conclusion.  *See Rikos v. Proctor &*

15  *Gamble Co.*, 799 F.3d 497, 524 (6th Cir. 2015) (certifying a class of people who purchased a

16  probiotic pill because the plaintiff's damages theory was that the only reason to purchase the pill

17  was to reap the purported health benefits).[11]

18      **B.  Premier's Evidentiary Motions**

19          *1.  Motion to Exclude Steven R. Graboff, M.D.*

20      Sonner's expert Steven Graboff, M.D., has been an orthopedic clinical practitioner for

21  thirty years.  Throughout his career, he has specialized in identifying and treating patients with

22  cartilage problems and arthritis by surgical or clinical means.  Graboff has offered three categories

23  of opinions about the roles glucosamine and chondroitin play in the treatment of OA.  Included in

24  the first category are descriptions of different types of arthritis, the causes and symptoms of

25  

_____

26  [11] Alternatively, Sonner suggests that she may be entitled to restitution in an amount less than the
full purchase price.  The viability of that theory and the sufficiency of such evidence need not be

27  addressed at this juncture.

28

United States District Court
Northern District of California

1   arthritis, the medically recognized treatment hierarchy, and his experience treating patients.

2   Second, Graboff rejects an implication in the report of defense expert Dr. Daniel Grande that

3   glucosamine and chondroitin are part of the clinical treatment protocols or recommended by

4   clinical doctors.  The third category is comprised of opinions about whether orally glucosamine

5   and chondroitin are bioavailable in sufficient quantities to benefit the joints or cartilage.  Premier

6   moves to exclude Graboff's testimony in its entirety, arguing that he is unqualified and that his

7   opinions are unreliable or *ipse dixit*.

8        Graboff is certainly qualified to testify about arthritis, medical guidelines and treatment

9   protocols, and his clinical practice and observations—the first two categories of opinions he

10  offers.  Despite Graboff's extensive experience treating patients suffering OA, performing joint

11  surgeries, and working with human cartilage, Premier contends that the first two categories of his

12  opinions are inadmissible *ipse dixit*.  Specifically, it focuses on Graboff's admission that he

13  formed his opinions based upon his "clinical experience," "hands-on treatment of patients over 30

14  years," "knowledge, training, [and] education as an orthopedic surgeon and not so much on the

15  scientific research."  Graboff Dep. at 180:11-16.

16       Rule 702 recognizes that witnesses gain expertise in a variety of ways, including training

17  and experience.  To be able to testify, however, expert witnesses must describe their relevant

18  background and explain how that background informed the opinions they offer.  *See, e.g.*, *Den*

19  *Norske Bank AS v. First Nat. Bank of Boston*, 75 F.3d 49, 57-58 (1st Cir. 1996) (permitting a

20  banking executive who had worked in banking for forty years to testify about the industry custom

21  to allow minority-participant vetoes); *Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 359 (D. Mass. 2008)

22  (allowing a casting director for photo shoots to testify about customs and practices in the modeling

23  industry relative to photographer rights).  Of course, there are limits to an expert's ability to testify

24  about customary practice.  For example, a proffered travel industry expert may not be in the

25  position to testify about the customs of the cruise line business specifically if he or she never

26  worked in the cruise industry.  *See Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 953 (9th

27  Cir. 2011).  Or, in the absence of a "bright-line rule" or "qualitative analysis," a veteran police

28

ORDER GRANTING IN PART AND DENYING IN PART EVIDENTIARY MOTIONS AND DENYING SUMMARY JUDGMENT
CASE NO.  13-cv-01271-RS

1  officer may not testify about how many excessive force complaints are too many.  *See Thomas v.*

2  *City of Chattanooga*, 398 F.3d 426, 431-32 (6th Cir. 2005).

3      To form his opinions, Graboff has identified "bright-line rules" in the medical field,

4  namely that recognized treatment guidelines do not recommend glucosamine and chondroitin for

5  the treatment of OA.  Graboff Report ¶ 36.  Moreover, he can offer his opinion that treating

6  orthopedic surgeons do not prescribe glucosamine and chondroitin to maintain healthy joints.  *Id.*

7  ¶ 37.  Finally, Graboff may explain that his medical and post-medical training led him to believe

8  that glucosamine and chondroitin are not effective as prophylactic or palliative treatments.  *Id.*

9      Even the most qualified expert may not offer any opinion on any subject; the expert's

10 opinion must be grounded in his or her personal "knowledge, skill, experience, training, or

11 education."  Fed. R. Evid. 702.  Unfortunately, Graboff has not limited his opinions to those

12 subjects.  To determine whether there is a possibility that ingested glucosamine and chondroitin

13 are bioavailable in sufficient quantities to be utilized requires review and understanding of the

14 available scientific literature.  Graboff has admitted, however, that he does not understand many of

15 the articles discussing the bioavailability of orally ingested glucosamine and chondroitin.  *See,*

16 *e.g.*, Garganta Decl. Mot. to Exclude Graboff Ex. A, Graboff Dep. at 146:6-147:13 (admitting that

17 he did not understand the Perisini study).  Nor does he claim to understand articles discussing

18 clinical trials.  *See, e.g.*, Graboff Dep. at 173:9-174:2 (conceding a failure to understand the LEGS

19 study).  Finally, Graboff does not claim that clinical trials are within his expertise.  Graboff Dep.

20 at 181:7-13 (stating that he does not have expertise in the area of clinical trials).  Accordingly, he

21 is not qualified to offer opinions about the bioavailability of orally ingested glucosamine and

22 chondroitin or the state of the scientific literature discussing the efficacy of these molecules.

23     Graboff's opinions about the bioavailability of glucosamine and chondroitin are not

24 admissible for the additional reason that he has not identified any reliable method that he used to

25 form these opinions.  "The reasoning between steps in a theory must be based on objective,

26 verifiable evidence and scientific methodology of the kind traditionally used by experts in the

27 field."  *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002).  When asked to

28

United States District Court
Northern District of California

1   identify how he formed these opinions he identified the AAOS clinical guidelines, his experience

2   as a practitioner, and his understanding of pathophysiology of joint disease.  Blood Decl. Opp'n to

3   Mot. to Exclude Graboff Ex. A, Graboff Dep. at 111:25-112:6, 114:19-115:20.  While these

4   experiences provide Graboff with a reliable foundation for his opinions about the treatment

5   protocols, they do not provide a sufficient basis to opine about whether glucosamine and

6   chondroitin work on a cellular level.  In sum, Premier's motion to exclude Graboff's testimony is

7   granted in part as set forth above.

8            *2.  Motion to Strike Errata to the Deposition of Lynn Willis, Ph.D.*

9           To assist Sonner with this litigation, Willis critically evaluated the available clinical and

10   scientific literature regarding glucosamine and chondroitin oral supplements.  He submitted two

11   declarations in December 2014 and January 2015 respectively.  In July 2015, Premier deposed

12   him.  Within thirty days of receiving the deposition transcript, Willis submitted an errata sheet

13   with eleven changes.  Premier does not dispute that Willis complied with the procedural dictates

14   of Rule 30(e), but instead accuses Willis of contradicting his previous answers in an effort to help

15   Sonner avoid entry of summary judgment.  So-called "sham" corrections—corrections designed to

16   create a material dispute of fact—are not permitted.  *Hambleton Bros.*, 397 F.3d at 1226.  As is

17   often the case, there is no direct evidence that Willis's changes are contrived, leaving only

18   circumstantial evidence of his (or Sonner's) intent.  The timing and number of corrections,

19   whether the corrections fundamentally change prior testimony, the impact of the original answer

20   on the case—these are the factors considered to determine whether corrections are insincere.

21   *Lewis v. The CCPOA Benefit Trust Fund*, No. C-08-03228-VRW DMR, 2010 WL 3398521, at *2

22   (N.D. Cal. Aug. 27, 2010).

23           Nothing in the record suggests these changes are part of a last-ditch effort to avoid

24   summary judgment.  In contrast to *Hambleton Bros.*, where the Ninth Circuit affirmed the district

25   court's decision to strike sham changes, Willis followed all of the procedural requirements of Rule

26   30(e)(3):  he requested the transcript, submitted changes within thirty days of receipt, and provided

27   reasons for the changes.  *See* 397 F.3d at 1224-26 (describing how the deponent failed to follow

28

United States District Court
Northern District of California

Rule 30(e)(3)'s requirements).  Nor hasWillis submitted a long list of corrections, suggesting judicious use of the right to correct the transcript.  Likewise, these admissions are not fatal to Sonner's claims.  To accept Premier's contention that Willis's answers to these three questions eviscerate the material disputes of fact created by his declarations and additional testimony requires reading Willis's answers in isolation without reference to his declarations or deposition testimony as a whole.

Finally, Willis submitted his errata sheet before Premier filed its motion for summary judgment.  While Premier contends Sonner was well aware of its intent to seek summary judgment, that fact alone does not give rise to an inference of impropriety.  If Willis had submitted these changes after Premier submitted its moving papers, in which it focuses attention on these three admissions, there might be cause to infer Willis acted with mischievous motives.  As this record stands, however, there is no reason to impugn his intentions—particularly because he has taken pains to distinguish between endogenous and exogenous glucosamine in his declaration.  In short, Premier has not demonstrated Willis's alterations are sham corrections, and therefore the errata sheet will not be stricken solely for that reason.

The five changes at issue, can be separated into two categories.  The first are changes where Willis struck his original answer in its entirety and urged the reader to consult his declaration.  The exchange and Willis's edits at issue are as follows:

> Q     I want you to tell me where in your report you address whether Joint Juice provides benefits for overall joint health as opposed to osteoarthritis.
> A     In the absence of disease?
> Q     Correct
> A     Okay.  Well, this narrative begins in paragraph 15 . . .
> Q     Oh, no.  I'm looking for an opinion that you have that says that glucosamine and chondroitin do not provide any joint health benefits.  That's what I'm looking for.
> A.    I don't have that opinion. I don't know that. [I misunderstood the question. Please see my declaration.]
> Q.    Thank you.
> A.    It's not possible for me to determine that, because no studies have been done. [I misunderstood the question.  Please see my declaration.]

United States District Court
Northern District of California

Q.      And you haven't seen any studies that have concluded that glucosamine and chondroitin do not provide any joint health benefits?

A.      ~~I haven't seen no studies in that vein at all.~~  [I misunderstood the question. Please see my declaration.]

Garganta Decl. Mot. to Strike Errata Ex. A, Willis Dep. at 89:4-25; *id.* Ex. B, Errata Sheet.

When Willis altered his responses to these questions, he did not merely fix "substantive" or "formal" errors or clarify his answers; he contradicted the response.  While Willis's changes are not the "paradigmatic examples" of contradiction, such as changing "yes" to "no" or "no" to "not correct," *see Tourgeman v. Collins Fin. Servs., Inc.*, No. 08-cv-1392 JLS (NLS), 2010 WL 48179900, at *2 (S.D. Cal. Nov. 22, 2010), these changes are contradictory nonetheless.  If these changes were accepted, the answer becomes nonresponsive to the question asked.  Moreover, if a reader cross-checks with Willis's first and second declaration, the contradiction becomes quite clear because he has opinions about the efficacy of glucosamine and chondroitin and whether there are studies addressing that subject.  Even though the views expressed in his declaration are limited to the studies about exogenous glucosamine and chondroitin, he cannot use the errata sheet to contradict his original responses.  *Cf. Teleshuttle Techs., LLC v. Microsoft Corp.*, No. C04-02927 JW (HRL), 2005 WL 3259992, at *2 (N.D. Cal. Nov. 29, 2005) (finding contradictory changes from "I don't recall" to an actual or affirmative answer).  He may, of course, clarify his response at trial.

Although Sonner did not object to the form of the question, she contends the queries posed were confusing because counsel did not distinguish between endogenous and exogenous glucosamine.  Whether Premier's counsel's questions were problematic is beside the point. Parties may object to "the form of a question or answer . . . or other matters that might have been corrected at that time."  Fed. R. Civ. P. 32(d)(3)(B).  Failure to lodge a contemporaneous objection waives the grievance, and thus Sonner cannot now complain about the clarity of the question. Likewise, Sonner had the opportunity to ask Willis follow-up questions to clarify his responses, but chose not to do so.  *See* Fed. R. Civ. P.  32(d)(3)(B)(i)-(ii).  In any event, these changes may not matter.  Willis's declaration is admissible, as is the remainder of the deposition transcript, and

1    there is no need to read rigidly his responses in isolation.  The fact finder may yet conclude that he

2    was honestly mistaken when he answered the question, but the Ninth Circuit does not permit

3    contradictory changes to stand.  Accordingly, these three changes must be stricken.

4         The second category of challenged changes includes instances where Willis inserted a few

5    words to his original answers:

6

7    Q    So, for instance you might have drugs that are on the market that
     might produce a clinical benefit or a therapeutic benefit in one population of
     patients but not another?

8    A    For a variety of reasons.

9    Q    So, for instance, people that took Joint Juice could have –
     experience benefits while another group of people might not?

10   A    ~~Correct~~.  [Correct, as a result of the placebo effect.]
                                        . . .

11

12   Q    So what the author of the 2014 LEGS study was saying is that
     glucosamine and chondroitin used in combination demonstrated the benefits

13   noted in the LEGS study?
     [Objection omitted.]

14   A     They cite for this a paper by Aghazadeh-Habashi, which is an
     evaluation of a glucosamine controversy, a pharmacokinetic issue. And

15   what that author concludes after evaluating the literature is that what's
     probably needed is a higher dose of glucosamine and chondroitin than you

16   would find in – now – in these products, including the one that they would
     have used here. . . . They also cite . . . a review by Miller and Clegg, Clegg

17   who wrote the – who did the GAIT study.

18   Q    Yes.

19   A    ~~In that review, Miller and Clegg say, unequivocally, the effects of
     glucosamine and chondroitin in the treatment of osteoarthritis are marginal~~.

20   [In that review, Miller and Clegg say, unequivocally, the effects of
     glucosamine and chondroitin in the treatment of osteoarthritis are marginal

21   at best.]

22   Willis Dep. at 173:1-9, 67:18-25, 68:1-18; Errata Sheet.

23         These changes of the second category are not actually contradictory.  The first correction is

24   permissible because it is a direct quotation from the study Willis was discussing.  Similarly, the

25   second alteration merely clarifies the answer.  Such additions that do not "stray[] substantively

26   from the original testimony" are proper.  Premier's motion to strike these two corrections is

27   therefore denied.

28

### C.  Sonner's Evidentiary Motions

#### 1.   Motion to Exclude Daniel A. Grande, Ph.D.

Dr. Grande, Premier's hired expert, opines that clinical trials and available cellular research do not disprove Premier's expressed and implied representations about the benefits of drinking Joint Juice.  In particular, he believes "there are competing views among experts as to whether glucosamine and/or [chondroitin sulfate] are effective for clinical treatment of OA patients."  Grande Report at 4; *see also id.* at 16, 19.  In addition, he interprets the clinical trials, such as the GAIT and LEGS studies differently than Willis.  Sonner moves to exclude Grande's testimony.  She accuses Grande of mischaracterizing the results of meta-analyses, relying on discredited or animal studies, omitting unfavorable studies from his analysis, and selecting passages from these studies that appear to favor Premier's position, when the study as a whole does not.  All in all, she contends, "there is simply too great an analytical gap between" what the studies say "and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Sonner has presented significant arguments to disbelieve or discredit Grande's opinions.  She has not, however, shown that his opinions are unprincipled or ungrounded in scientific methodology, and she must save those points for cross-examination and closing argument.  For example, it is perfectly valid to question the validity of industry-funded studies, but at this stage, no gap exists between those studies and Grande's conclusions.  The same is true of studies that used animal subjects or *in vitro* methods, which Grande has used to form his opinions.  While Willis, Silbert, and Sonner may disagree with Grande's decision to use these studies, his methods are not so inherently suspect to warrant excluding his testimony.  That these studies appearing in peer-reviewed journals are industry-funded or involve animal subjects are factors that determine the weight of the opinions, not their admissibility.  "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge," and thus Sonner's forceful arguments are better reserved for the jury.  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).

Sonner has, however, identified some opinions about which Grande is not qualified to

United States District Court
Northern District of California

United States District Court
Northern District of California

1   testify:  (1) opinions about clinical studies or practices and the treatment protocols for cartilage

2   degeneration; (2) his view that consumers can drink Joint Juice "daily for healthy, flexible joints";

3   and (3) his stance that the statement "originally developed for pro athletes by orthopedic surgeon

4   Kevin R. Stone" is not misleading.  Premier's failure to respond to these arguments constitutes a

5   concession on those points.  *Angeles v. U.S. Airways, Inc.*, No. C 12-05860 CRB, 2013 WL

6   622032, at *4 (N.D. Cal. Feb. 19, 2013).

7        In any event, these particular topics do not fall within the ambit of Grande's expertise.

8   Experts must base their opinions on personal "knowledge, skill, experience, training, or

9   education."  Fed. R. Evid. 702; *see also* Fed. R. Evid. 602.  Grande has never been a practitioner

10  or a veterinarian, and therefore he lacks the requisite experience to discuss treatment protocols or

11  clinical and veterinary practice.  Moreover, he has not identified any information that he reviewed

12  or any aspect of his background that would allow him to opine about whether reference to Dr.

13  Stone subliminally conveys a message about the clinical efficacy of Joint Juice.

14       Lastly, as to Premier's claim daily consumption of Joint Juice keeps joints healthy and

15  flexible, Grande relies on three inapposite studies.  First, Grande states that the 2008 study by

16  Rothenfluh "showed that 4 weeks of treatment with glucosamine resulted in improved 'Lequesne'

17  scores in patients . . . similar to changes seen with ibuprofen use."  Grande Report at 13.

18  Examination of Rothenfluh paper reveals, however, that the objective of the study aimed to

19  evaluate "the internal construct validity of the [WOMAC]" and did not test the efficacy of

20  glucosamine or chondroitin.  Blood Decl. Mot. to Exclude Grande Ex. 28 at 2 (Rothenfluh, 2008).

21  The second study involved glucosamine *injections*, and therefore does not provide a reliable basis

22  to form an opinion about glucosamine ingestion.  *See* Blood Decl. Mot. to Exclude Grande Ex. 3

23  at 1848, 1850 (Eriksen, 2014).  Third, Grande relied upon a study where researchers injected

24  glucosamine into rabbits and found "no effect of [glucosamine] on normal cartilage."  Blood Decl.

25  Mot. to Exclude Grande Ex. 29 at 10326 (Oegema, 2002).  Thus, in this particular case, the gap

26  between Grande's methods and the opinion he formed is far too great to be admissible.  In sum,

27  Sonner's motion to exclude Grande's testimony is granted in part with respect to these three

28  ORDER GRANTING IN PART AND DENYING IN PART EVIDENTIARY MOTIONS AND DENYING SUMMARY JUDGMENT
    CASE NO.  13-cv-01271-RS

opinion categories, but is otherwise denied.

### 2. Motion to Exclude Hal Poret

Sonner also moves to exclude Poret's testimony and the results of the consumer survey he created, arguing that the results of the survey are irrelevant, unduly prejudicial, and unreliable, and therefore inadmissible under Federal Rules of Evidence 401, 403, and 702.[12]  Sonner faults Poret's survey question design, claiming that Poret never asked consumers whether they purchased Joint Juice because of its purported joint health benefits (pain reduction, increased flexibility, joint lubrication, etc.).  Her second complaint is that Poret draws inappropriate conclusions from the consumers' responses to open-ended questions.  Finally, she criticizes Poret's question design because he never asked participants about their understanding of the benefits of drinking Joint Juice from the messages (implied and expressed) on Joint Juice labels and in the advertisements.

The general rule is that "as long as [the survey] is conducted according to accepted principles and is relevant," the "technical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (internal quotation marks and alterations omitted).  Of course, "there must be outer limits to this principle," such as when a survey in a patent infringement case does not adequately describe the technology at issue. *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 794328, at *18 (N.D. Cal. Feb. 25, 2014).  Effective cross-examination

_____

[12]  Premier complains that Sonner's motion to exclude Poret's testimony is untimely and urges us to decline to hear the motion.  Motions to exclude expert testimony were due on the same date as the oppositions to the motions for summary judgment and class certification. *See* Dkt. 94.  Sonner filed her motion to exclude Poret's testimony along with her reply brief to the motion for class certification.  There does appear to be a gap in the scheduling order, which omits a deadline to file motions to exclude expert reports or declarations submitted in support of opposition.  Sonner believed she could file such a motion with her reply briefs—an explanation that is reasonable given the gap in the scheduling order.  Even if the motion were untimely, there is no cause to decline to hear the motion unless any prejudiced Premier.  Although Premier asserts prejudice on the basis of its counsel's personal schedule, it never attempted to secure Sonner's agreement to extend the deadline and filed a fulsome response.  Premier has not demonstrated prejudice, and so Sonner's motion to exclude Poret's testimony will be considered.

1    will nevertheless expose the weaknesses of a survey and tenuous conclusions drawn from those

2    results.

3         Although these survey questions creep close to the general rule's outer boundaries, they do

4    not cross them.  Sonner has identified many significant issues to address during cross-

5    examination, such as whether Poret coded the results inappropriately or whether the questions

6    posed to participants illuminate whether consumers understand that Premier has made a claim that

7    Joint Juice helps relieve joint pain.  Yet she has not shown that Poret's methodology is too flawed

8    to prevent the jury from considering Poret's survey or testimony.  Indeed, Keegan has offered

9    opinions favorable to Sonner's claims based on these data—a fact that undermines her contention

10   that the survey is unreliable, irrelevant, or unduly prejudicial.  *See* Keegan Suppl. Decl. ¶ 47.

11   Accordingly, the motion to exclude Poret's testimony is denied.

12                          **V.    CONCLUSION**

13        Numerous triable issues of fact remain, and therefore Premier's motion for summary

14   judgment must be denied.  Sonner's motions to exclude experts Grande and Poret are denied.

15   Premier's motions to exclude Graboff and to strike the errata to Willis's deposition are granted in

16   part and denied in part.

17   **IT IS SO ORDERED**.

18

19   Dated:  April 15, 2016

20                                                    _____

21                                                    RICHARD SEEBORG
                                                      United States District Judge
22

23

24

25

26

27

28

United States District Court
Northern District of California