UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VINCENT D. MULLINS, et al.,

    Plaintiffs,

v.

PREMIER NUTRITION CORPORATION,

    Defendant.

Case No. 13-cv-01271-RS

**ORDER GRANTING IN PART MOTION FOR CLASS CERTIFICATION AND REQUIRING FURTHER BRIEFING**

## I.   INTRODUCTION

California-based Premier Nutrition Corporation manufactures, distributes, and promotes Joint Juice, a drinkable supplement containing glucosamine hydrochloride and chondroitin sulfate. Premier's advertisements and packages encourage consumers to drink Joint Juice to "keep cartilage lubricated and flexible" or "for healthy, flexible joints." Koening Decl. Ex. C; Blood Decl. CC Ex. 9. Plaintiff Kathie Sonner asserts Joint Juice is nothing more than worthless snake oil that does not and cannot provide any joint health benefits to anyone. The inefficacy of the product, she contends, renders Premier's advertisements false and misleading in violation of the California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, and the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770. Sonner moves to certify a nationwide class of consumers who purchased Joint Juice from March 1, 2009, to the present.

Sonner has satisfied her burden to prove that the consumer claims she advances are amenable to classwide adjudication and that common questions predominate. Accordingly, at the

very least, a class of California consumers who have purchased Joint Juice since March 1, 2009, will be certified. The remaining question is whether the class should be larger. To resolve this difficult question, the parties are requested to submit supplemental briefing not to exceed fifteen pages, addressing the questions identified below.

## II.   FACTS AND PROCEDURAL HISTORY[1]

California-based Premier manufactures Joint Juice, a liquid supplement containing glucosamine hydrochloride ("glucosamine") and chondroitin sulfate ("chondroitin"). Sonner contends that Joint Juice labels and advertisements expressly and impliedly tout Joint Juice for the purported palliative and structural benefits of glucosamine and chondroitin. Numerous studies have tested the efficacy of glucosamine and chondroitin as treatment for pain and stiffness in arthritic joints. While some studies have found positive effects, the majority has concluded glucosamine alone or with chondroitin do not help those who suffer osteoarthritis ("OA"). In addition, Jerimiah Silbert, Ph.D. and his colleagues have tracked ingested glucosamine and chondroitin and concluded that very little—if any—of the ingested molecules are bioavailable in sufficient quantity to provide any benefit at all to joint cartilage. Based on this scientific evidence, Sonner contends Premier has used false and misleading advertising that caused her and others like her to purchase Joint Juice.

Since 2009, consumers have spent approximately $156 million to buy Joint Juice. Approximately 85% of those sales took place at major retail chains, such as Walmart, Sam's Club, and Costco. Sonner was one of those Joint Juice purchasers. She bought the product believing it would relieve pain she was experiencing in her joints.

## III.   LEGAL STANDARD

Rule 23 of the Federal Rules of Civil Procedure governs class actions. To obtain class certification, plaintiffs bear the burden of demonstrating that they have satisfied Rule 23(a)'s

---

[1] A detailed account of the factual basis for Sonner's claims appears in the order denying Premier's motion for summary judgment issued contemporaneously with this order.

ORDER GRANTING CLASS CERTIFICATION
CASE NO. 13-cv-01271-RS

2

requirements. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended by* 273 F.3d 1266 (9th Cir. 2001). Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

A "court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (internal quotation marks omitted). Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 1194–95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195.

If all four prerequisites of Rule 23(a) are satisfied, a court must also find that plaintiffs "satisfy through evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). A court may certify a class under subsection (3) if the court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Even if putative class representatives have satisfied the requirements of Rule 23(a), they must also satisfy one of the three requirements of Rule 23(b). Rule 23(b)(3) permits class certification only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 133 S. Ct. at 1191 (emphasis in original).

### IV.   DISCUSSION

Sonner advances claims for violations of the CLRA and the UCL. The CLRA proscribes

"unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer," Cal. Civ. Code § 1770(a), and prohibits conduct "likely to mislead a reasonable consumer," *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 680 (2006) (internal quotation marks omitted). To prevail on her UCL and CLRA claims, Sonner must show (1) that the alleged misrepresentation is material or likely to deceive reasonable consumers, and (2) that Premier made those representations uniformly. *Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 518 (6th Cir. 2015) (summarizing the critical elements of state consumer protection statutes, including the UCL and CLRA). The proposed class consists of consumers who purchased Joint Juice from March 1, 2009, until the date notice is provided to the class.

### A. Numerosity

To qualify for class certification, plaintiffs must demonstrate that the proposed class is "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). While there is no fixed number that satisfies the numerosity requirement, as a general matter, a class greater than forty often satisfies the requirement, while one less than twenty-one does not. *See Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 346 (N.D. Cal. 2008). There is no dispute that the number of potential plaintiffs is numerous; Joint Juice sold over 12 million units of the product throughout the country. The total number of Joint Juice consumers is substantial, and thus the numerosity requirement is satisfied.

### B. Commonality

"One or more members of a class may sue or be sued as representative parties on behalf of all members only if . . . there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks omitted). To satisfy the commonality requirement, Sonner must show that this case involves common contentions and that a classwide proceeding has the capacity "to generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal quotation

marks omitted). In other words, she must demonstrate that determination of the common contention's "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Sonner identifies the following two common questions—answers to which, she contends, will resolve the litigation for everyone in the proposed class: (1) What message does Premier's packaging and advertising convey? (2) Is that message false or likely to deceive a reasonable consumer? These questions are certainly central to resolution of Sonner's claims—a point Premier does not really contest. Instead, Premier challenges the quantum and quality of Sonner's proof of uniform consumer understanding of the express and implied representations on Joint Juice packages. While the statements in Joint Juice products varied slightly, they were consistently variations on the following message: glucosamine and chondroitin help lubricate and cushion joints. The question is whether Sonner has demonstrated the ability to use common proof to substantiate her contention there are subliminal messages in Joint Juice advertisements that consumers understood uniformly.

First, Premier contends Sonner cannot prove consumers uniformly understood the subliminal messages in Joint Juice advertisements without a consumer survey. As explained below, Premier's own marketing research is sufficient evidence of the existence of an implied message in Joint Juice advertisements.

Second, Premier insists substantiating consumer reliance is not amenable to common proof because Joint Juice users cite the advice of doctors or friends as the reason they tried Joint Juice in the first place. Sonner's marketing expert, Jeremy Keegan, interprets the results of Premier's marketing research and consumer survey differently: he contends nearly 93% of all Joint Juice purchasers identified the product's purported joint health and pain benefits as the primary reason for their purchases. Keegan Rebuttal Decl. ¶ 45. How consumers first learned about Joint Juice— from a doctor, parent, Joe Montana, or the packaging—does not matter if "they nonetheless decided to purchase the product only for its purported health benefits." *Rikos*, 799 F.3d at 512. Marketing research suggests the overwhelming majority of Joint Juice users purchased the product

to obtain these benefits, and thus there is a reason to believe the represented health benefits were material. In California, a presumption of reliance arises when a representation is material. *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted); *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (2010). Sonner has therefore advanced evidence that consumers relied upon Premier's advertising message.

Finally, Premier argues that this case is not amenable to common proof because some people reported that they were satisfied with Joint Juice and some studies found benefits to taking glucosamine and chondroitin supplements. That some people *believe* Joint Juice provides benefits as advertised is beside the point. Sonner's "claims do not rise or fall on whether individual consumers experienced health benefits, due to the placebo effect or otherwise. They rise or fall on whether [Premier's] representations were deceptive." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 673 (7th Cir. 2015); *see also Rikos*, 799 F.3d at 506-07 ("The [UCL and CLRA] punish companies that sell products using advertising that misleads the reasonable consumer. Whether consumers were satisfied with the product is irrelevant." (citation omitted)). Sonner has taken an all-or-nothing approach: to prevail, she must show that what is true for one is true for all. Thus, while she may ultimately fail to substantiate this claim, the proof she intends to use will not vary from plaintiff to plaintiff. Rule 23(a)(2)'s mandate has been satisfied.

**C. Typicality**

Rule 23(a)(3) requires that putative class representatives show "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Putative class members' claims are usually typical if their claims "arise[] from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriquez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (internal quotation marks omitted). Premier argues that Sonner cannot represent all possible class members because there are four types of putative class members: (1) those who bought Joint Juice because of the statements on the packaging and in advertisements; (2) those who bought Joint Juice because of the implied message about Joint Juice's ability to relieve pain; (3) those who bought Joint Juice because of the implied message

that it helps treat OA symptoms; and (4) those who purchased Joint Juice for other reasons (taste, doctor/family/friend recommendation, cost, etc.). According to Premier, Sonner could only represent the second group because she bought the drink for pain relief.

For the most part, however, Premier rehashes its commonality argument with one exception: Sonner does not have OA, and so she may not be able to represent those who purchased Joint Juice to combat their OA symptoms. If Sonner's theory were that Joint Juice does not provide structural or palliative joint health benefits *to those with OA*, then the happy fact Sonner does not suffer from the disease would call into question her ability to represent those class members. Yet her theory is that Joint Juice does not provide *any* joint health benefits *to anyone*. There is therefore nothing about her experience with the product that would prevent her from representing a class of all Joint Juice consumers.

**D. Adequacy of Representation**

The class representatives must also show that they and their attorneys will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy this element the plaintiffs must demonstrate that (1) neither they nor their counsel have any conflicts of interest with other class members, and (2) they and their counsel will prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Premier does not challenge the appointment of Mr. Blood as class counsel. He and his firm have represented many classes competently. Nor has Premier challenged Sonner's ability fairly and adequately to protect the class's interests. Absent any indication to the contrary, Sonner and Mr. Blood and his firm have demonstrated they will represent the class adequately.

**E. Predominance: Whether Class or Individual Issues Predominate**

When evaluating whether individual issues predominate, the court should imagine "how the case will be tried." Fed. R. Civ. P. 23 advisory committee's note. To Premier's mind, the nature of Sonner's claims will necessitate numerous mini-trials about discrete issues. Premier argues that individual issues predominate for three reasons. First, it contends that consumers do not interpret statements on packaging and in advertisements uniformly. Second, Premier insists

that its actual or implied statements about the efficacy of the product were not material to some consumers. Third, it argues Sonner's theory of damages—that each consumer should receive a full refund—is not viable because it does not account for the value of the product in the absence of the purported joint health benefits.

### 1. *Consumer Understanding of Implied Messages*

Premier does not claim that consumers saw varying advertisements with different messages. The record is quite clear: Joint Juice advertisements consistently made the same general health claims. Instead, Premier faults Sonner for failing to submit her own consumer survey to show that consumers believe Joint Juice promises to relieve pain and stiffness in arthritic joints. To shore up this attack, Premier relies on *Jones v. ConAgra Foods, Inc.*, where a district court denied class certification for lack of predominance because the plaintiff had not shown that a reasonable consumer would consider material a claim that the product was 100% natural. *Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726, at *14–16 (N.D. Cal. June 13, 2014). In particular, Premier contends Sonner has failed to offer proof her belief that Joint Juice would relieve her pain was reasonable.

In *Jones*, however, the district court concluded "there is no fixed meaning for the world 'natural,'" *id.* at *14, which is quite different from the scenario here. Premier glosses over the fact it sells *Joint* Juice, but the meaning of its express messages are much clearer than those at issue in *Jones*. Premier expressly represents Joint Juice consumption will lubricate and improve the flexibility of joints. Whether an ordinary consumer reasonably believes Premier advertises Joint Juice as a way to improve joint health is amenable to common proof: reviewing the advertisements, labels, and then asking the jury how they understand the message. In addition, Premier's own marketing research provides further circumstantial evidence that a substantial majority (over 90%) of Joint Juice users believed the product would relieve their joint pain and stiffness.

### 2. *Materiality and Reliance*

According to Premier, the question of whether consumers relied upon or considered

material these implied and express representations presents an additional obstacle to class certification. To bring claims under the CLRA and UCL, plaintiffs must have actually relied upon the allegedly false or misleading advertising. "While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause." *In re Tobacco II*, 46 Cal. 4th at 326 (discussing the UCL); *In re Steroid Hormone*, 181 Cal. App. 4th at 155-56 (discussing the CLRA). A presumption "of reliance arises whenever there is a showing that a misrepresentation was material," i.e., that "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction." *In re Tobacco II*, 46 Cal. 4th at 327 (internal quotation marks omitted); *In re Steroid Hormone*, 181 Cal. App. 4th at 157 ("[I]f [plaintiff] can show that material representations were made to class members, at least an inference of reliance i.e., causation/injury would arise as to the entire class. . . . Materiality of the alleged misrepresentation generally is judged by a reasonable man standard." (citations, internal quotation marks, and alterations omitted)). Accordingly, if Sonner can prove materiality on a classwide basis, she can also demonstrate classwide reliance.

As a general rule, materiality may be established by common proof "[b]ecause materiality is judged according to an objective standard," and so "[t]he alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all investors composing the class." *Amgen*, 133 S. Ct. at 1191. California courts are in accord. *See In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009) ("Causation, on a classwide basis, may be established by *materiality*." (emphasis in original)).

Premier contends this case is different, returning to its familiar refrain: Sonner did not commission a consumer survey, and therefore she cannot prove that Premier's actual or implied messages would deceive a reasonable consumer. Yet, this position conflicts with California law. The California Court of Appeal has expressly rejected the "view that a plaintiff must produce a consumer survey or similar extrinsic evidence to prevail on a claim that the public is likely to be misled by a representation." *Colgan*, 135 Cal. App. 4th at 681-82 (internal quotation marks

omitted).  Thus, the lack of extrinsic evidence of reliance does not automatically prevent class certification.  More importantly, Sonner did not come to this battle empty handed; Premier's own marketing research and surveys tend to show that numerous consumers cite joint pain, stiffness, and function as the reasons behind their purchase.  That Sonner has decided not to forge her own consumer survey is not fatal to her contention that materiality can be assessed on a classwide basis.

Premier interprets these marketing survey results differently.  Instead, it argues, these surveys show that whether a statement is material varies from consumer to consumer.  At trial, Premier is free to offer a different interpretation of that question, but the question of materiality remains a common one if a jury decides that a reasonable man would attach importance to the existence or nonexistence of joint health benefits in Joint Juice.  *Amgen*, 133 S. Ct. at 1191; *In re Steroid Hormone*, 181 Cal. App. at 157.

### 3.  Classwide Proof of Restitution

Rule 23(b) requires that a putative class representative show that "damages are capable of measurement on a classwide basis."  *Comcast*, 133 S. Ct. at 1433.  In *Comcast*, "the Supreme Court held that courts must conduct a 'rigorous analysis' to ensure at the class-certification stage that 'any model supporting a plaintiff's damages case [is] consistent with its liability case,' i.e., that the model 'measure[s] only those damages attributable to that theory' of liability."  *Rikos*, 799 F.3d at 523 (quoting *Comcast*, 133 S. Ct. at 1433 (internal quotation marks omitted)).  Although *Comcast* requires putative class plaintiffs to show "that their damages stemmed from the defendant's actions that created the legal liability," "damages calculations alone cannot defeat certification."  *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987-88 (9th Cir. 2015) (alterations and internal quotation marks omitted).

Restitution is the only available remedy under the UCL and one of the possible remedies under the CLRA.  "Restitution under the UCL . . . 'must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes, and that measurable amount must be supported by evidence.'"  *Pulaski*, 802 F.3d at 988 (quoting *Colgan*, 135 Cal.App.4th at 698).

Thus, the proper measure for restitution is the value of the price paid minus the actual value of the product. *Id.* at 989.

Sonner has satisfied her burden because, under her liability theory, a full refund is available to every member of the class. "A full refund *may* be available in a UCL case when the plaintiffs prove the product had *no* value to them" because "the price paid minus the value actually received equals the price paid"—zero. *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 795 (2015). To prevail on this theory, Sonner must prove (1) that consumers buy Joint Juice only because of its claimed health benefits; and (2) Joint Juice does not, in fact, provide those benefits *to anyone*.

Premier argues that this restitution model does not consider the other benefits of Joint Juice—hydration, vitamins, antioxidants, taste, etc. When courts have concluded the full-refund model is inapplicable, the plaintiff could not prove the product was worthless without the challenged representations. For example, in *In re POM Wonderful LLC*, the district court rejected the full-refund method in a case involving a claim that consumers were misled to believe POM products contained 100% juice, when they did not. No. ML 10-02199 DDP RZX, 2014 WL 1225184, at *2 (C.D. Cal. Mar. 25, 2014). In *In re POM*, however, the plaintiffs' theory was that "consumers did not receive any *wanted* benefit from [POM Wonderful's] juices," which failed to take into consideration the benefits they actually received. *Id.* at *3 (emphasis in original). In *Ries*, the full-refund model of restitution was inappropriate because iced tea that was not actually "all natural," as advertised, "still had some market value that accrued to plaintiffs." *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 532 (N.D. Cal. 2012). Finally, Premier leans on *In re Tobacco Cases II*, where the Court of Appeal rejected the plaintiffs' argument that the full-refund model accurately accounted for the amount they would have paid in the absence of the tobacco companies' claim that "light" cigarettes were more healthful than "regular cigarettes." 240 Cal. App. 4th at 784. The plaintiffs did not, however, claim they would not have purchased *any* cigarettes in the absence of a "healthier way to smoke." *See id.*

In contrast, Sonner claims she and other putative class members would not have purchased Joint Juice had they known it would not benefit their joints. She argues Joint Juice is nothing

more than a liquid pill, which nobody would purchase unless they were concerned about joint health. While she may ultimately fail to prove that nobody would buy Joint Juice absent the joint health claims, she has produced some evidence to suggest that she may be able to make both showings. *See Rikos*, 799 F.3d at 523–24 (holding that, if plaintiff proves there was no other reason to purchase an Align pill, then the full-refund theory of restitution satisfies *Comcast*). Because Sonner has provided a model of damages that traces the harm (the full amount of the purchase) to Premier's allegedly improper conduct (claiming that Joint Juice will benefit joints), she has satisfied *Comcast*'s requirement.

Whether glucosamine and chondroitin work for anyone, whether Premier impliedly suggests Joint Juice relieves OA symptoms, whether Joint Juice's express and implied joint health claims are false or misleading, and whether the only reason to buy Joint Juice is to receive joint health benefits—these are all questions that do not require individualized inquiry. Because Sonner has framed her claims in such absolute terms, common questions predominate over individual ones.

### F. Ascertainability

Although Rule 23 does not explicitly require that class members be clearly ascertainable before class certification, courts have required such a showing. *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D.Cal. 2011). An ascertainable class is one that is "sufficiently definite so that it is administratively feasible to determine whether a particular person is a class member." *Id.* Here, the proposed class definition is quite clear: those who purchased Joint Juice from March 1, 2009, to the present. Nevertheless, Premier complains that the proposed class may include (1) those who bought Joint Juice because of its express joint health claims and are satisfied; (2) those who bought Joint Juice because of its implied joint health claims and are satisfied; (3) those who chose to buy Joint Juice for reasons other than joint health; and (4) those who were dissatisfied with their purchase, complained to Premier, and received a full refund.

Consumer satisfaction is not, however, an issue that undermines a court's ability to ascertain potential class members. Premier's advertising messages are the focus of the claims, not

customer satisfaction, and therefore consumer satisfaction is irrelevant. "All of the proposed class members would have purchased the product bearing the alleged misrepresentations," which means they have been harmed. *Ries*, 287 F.R.D. at 536 (internal quotation marks omitted). There is therefore no need to examine whether consumers were satisfied with the product to find an injury. *See, e.g.*, *Mullins*, 795 F.3d at 673 ("[Plaintiff's] claims . . . rise or fall on whether [defendant's] representations were deceptive."); *McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB OP, 2014 WL 1779243, at *14 (C.D. Cal. Jan. 13, 2014) (citing *Yokoyama v. Midland National Life Ins. Co.*, 594 F.3d 1087, 1089, 1094 (9th Cir. 2010) ("[T]here is no reason to look at the circumstances of each individual purchase in this case, because . . . the fact-finder need only determine whether those brochures were capable of misleading a reasonable consumer.")).

Premier contends that class members are unascertainable for the additional reason that some Joint Juice customers, dissatisfied with the product, contacted the company and received a full refund. While such customers would not be entitled to a second full refund, this fact alone is not fatal to class certification. Instead, those who received a full refund for their Joint Juice purchase will be excluded from the class. Premier kept track of those who received a full refund, *See* Blood Decl. CC Reply Ex. 2, and therefore those transactions can and will be excluded from the class.

In a footnote, Premier argues that the class is not ascertainable because many putative class members, including Sonner, do not have proof of their purchase. *See Carrera v. Bayer Corp.*, 727 F.3d 300, 308–09 (3d Cir. 2013). It urges following the approach used in *In re Consumer Clorox Litigation*, where the district court held, "where [p]laintiffs intend to rely on retailer records, [they] must produce sufficient evidence to show that such records can be used to identify class members." 301 F.R.D. 436, 440 (N.D. Cal. 2014). Standing in opposition are the Sixth and Seventh Circuits, which have rejected *Carrera*. *See Rikos*, 799 F.3d at 525 ("We see no reason to follow *Carrera,* particularly given the strong criticism it has attracted from other courts."); *Mullins*, 795 F.3d at 662 ("The Third Circuit's approach in *Carrera*, which is at this point the high-water mark of its developing ascertainability doctrine, goes much further than the established

meaning of ascertainability and in our view misreads Rule 23."); *Young v. Nationwide Mutual Ins. Co.*, 693 F.3d 532, 538–39 (6th Cir. 2012). The Ninth Circuit has not yet offered its view.

At the end of the day, however, the question of whether the heightened standard applies is merely academic; Sonner can satisfy either standard. Most Joint Juice sales took place at large retailers, like Costco, Sam's Club, Walgreens, and Kroger, which track customer purchases. Costco and Sam's Club, for example, are members-only stores, and therefore they can track members' purchases. Walgreens and Kroger, while not member-only stores, have loyalty programs, which enable them to identify which consumers purchased Joint Juice. *See* Blood Decl. CC Exs. 67-70 (declarations from representatives of Costco, Walmart (Sam's Club's parent company), Walgreens, and Kroger describing categories of consumer information collected). Sonner has therefore demonstrated that potential class members are sufficiently ascertainable to permit class certification.

### G. Superiority

Rule 23(b)(3) also requires that class resolution be "superior to other available methods for the fair and efficient adjudication of the controversy." The rule sets forth four relevant factors to guide this determination: "the class members' interests in individually controlling the prosecution or defense of separate actions"; "the extent and nature of any litigation concerning the controversy already begun by or against class members"; "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and "the likely difficulties in managing a class action." Fed. R. Civ. P. Rule 23(b)(3)(A)–(D). "[C]onsideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser*, 253 F.3d at 1190 (internal quotation marks omitted).

Sonner contends class adjudication is superior in this case because the potential recovery for each class member (between $5 and $20 for each unit sold) pales in comparison to the cost of litigating these claims. On this point, she is certainly correct, and Premier does not dispute it. Cases, such as this, "where litigation costs dwarf potential recovery" are paradigmatic examples of

those well-suited for classwide prosecution. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998). Individual suits for small recovery amounts would overwhelm the courts and prove uneconomic for potential litigants. *Id.* Thus, a class action is superior in this case.

### H. The Scope of the Class

Having satisfied Rule 23's mandate, Sonner turns to the question of how large this class of Joint Juice consumers should be. At the very least, a class of California consumers is appropriate. Sonner would like to apply California law to a larger group of consumers—all those who purchased Joint Juice in the United States.

When determining whether state law may apply to a nationwide class, a federal court sitting in diversity must follow the "forum state's choice of law rules to determine the controlling substantive law." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (internal quotation marks omitted). Thus, California's choice-of-law rules apply. Under California law, a putative class representative bears the initial burden to show that California "has 'significant contact or significant aggregation of contacts' to the claims of each class member." *Id.* (quoting *Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 921 (2001) (citations omitted)). Once the plaintiff has made that showing, the burden shifts to the defendant "to demonstrate 'that foreign law, rather than California law, should apply to class claims.'" *Id.* at 590 (quoting *Wash. Mut. Bank*, 24 Cal. 4th at 921). California may apply nationally or to plaintiffs in other states "if the interests of other states are not found to outweigh California's interest in having its law applied." *Id.* (internal quotation marks omitted).

Premier's headquarters are located in California, where it develops its marketing strategy and coordinates nationwide distribution. Nearly a quarter of potential plaintiffs purchased Joint Juice in California. Sonner has therefore adequately shown that California has had significant contacts to the claims of plaintiffs nationwide. *See id.* (holding that plaintiffs had shown significant contacts with California because the defendant's headquarters were in California and one-fifth of potential plaintiffs were located in California). Sonner has thus demonstrated that the contacts of Premier and Joint Juice purchasers with California are significant and sufficient to

satisfy due process.

The burden now falls on Premier to show that foreign law should apply. California courts conduct a three-step analysis to determine whether California's interests outweigh those of other states. First, they examine whether the laws of other states to "determine[] whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different." *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 81–82 (2010). At this stage, the foreign law proponent must show that the differences between California and foreign law are material. *Wash. Mut. Bank*, 24 Cal. 4th. at 919. Second, if there is a difference between the state laws, then the court's task is to determine "what interest, if any, each state has in having its own law applied to the case." *Id.* at 920. "Only if the trial court determines that the laws are materially different *and* that each state has an interest in having its own law applied, thus reflecting an actual conflict, must the court take the final step and select the law of the state whose interests would be 'more impaired' if its law were not applied." *Id.* The law of the state with the stronger interests applies. *McCann*, 48 Cal. App. 4th at 82.

Indisputably, California's UCL and CLRA differ from the consumer protection statutes of other states. *See Mazza*, 666 F.3d at 591 (noting that some state consumer-protection statutes deviate from California's because they require scienter, do not require proof of reliance, and offer different remedies for proven violations). In *Mazza*, a panel of the Ninth Circuit concluded these variations "are not trivial or wholly immaterial." *Id.* Proceeding to step two, the court noted California courts treat the "place of the wrong" as the place with the predominant interest, and the place of the wrong is the place of the transaction. *Id.* at 593 (citing *Hernandez v. Burger*, 102 Cal. App. 3d 795, 802 (1980); *McCann*, 48 Cal. 4th at 94. n.12). The court thus concluded the states where the transactions occurred had "a strong interest in the application of their laws to transactions between their citizens and corporations doing business within their state." *Id.* at 594. At step three, the court held those foreign states' interest in those transactions outweighed those of California—the defendant's home state. *Id.* Yet, the panel concluded its conflict-of-law discussion thus: "*Under the facts and circumstances of this case*, we hold that each class

1    member's consumer protection claim should be governed by the consumer protection laws of the

2    jurisdiction in which the transaction took place." *Id.* (emphasis added).

3    Whether there will always be material conflicts in every consumer-protection case remains

4    unclear after *Mazza*. On the one hand, the *Mazza* court spoke in general terms, suggesting the

5    mere fact that some states require proof of scienter, for example, will always doom an attempt to

6    apply California's UCL and CLRA nationwide. *See id.* at 592-93 ("Each of our states has an

7    interest in balancing the range of products and prices offered to consumers with the legal

8    protections afforded to them. Each of our states also has an interest in being able to assure

9    individuals and commercial entities operating within its territory that applicable limitations on

10   liability set forth in the jurisdiction's law will be available . . . ." (internal quotation marks

11   omitted)). Did the Ninth Circuit conclude plaintiffs are categorically barred from pursuing UCL

12   and CLRA claims on behalf of class members in all fifty states because some states include a

13   scienter element?

14   A reasonable argument exists, however, that *Mazza*'s conflict-of-law analysis is narrowly

15   applicable only to circumstances where the plaintiff will have difficulty proving class members in

16   all fifty states relied upon the message. Of particular importance is the fact plaintiffs could not

17   depend on the presumption of reliance that arises from proof that a representation is material

18   because the defendant had not engaged in a uniform, "extensive and long-term fraudulent

19   advertising campaign." *Id.* at 596 (internal quotation marks omitted).

20   Noting this distinction, some district courts in this circuit have declined to strike

21   nationwide class claims in the context of a motion to dismiss. *See, e.g.*, *Forcellati v. Hyland's,*

22   *Inc.*, 876 F. Supp. 2d 1155, 1160-61 (C.D. Cal. 2012) ("Defendants can only meet [their] burden

23   by engaging in an analytically rigorous discussion of each prong of California's 'government

24   interests' test based on the facts and circumstances of *this* case and *this* Plaintiff's allegations."

25   (emphasis in original)); *In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237 (N.D. Cal.

26   2012) ("Since the parties have yet to develop a factual record, it is unclear whether applying

27   different state consumer protection statutes could have a material impact on the viability of

Plaintiffs' claims."). At the class certification stage, other district courts have rejected blind reliance on *Mazza*, and instead require defendants to provide "case-specific analysis as to the second and third prongs of the governmental interest test." *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 658 (C.D. Cal. 2014); *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 550 (C.D. Cal. 2012) ("Defendants cannot profitably rely on the work of a different party in a different case with different facts—or on the Ninth Circuit finding error in a district court rejecting an argument Defendants did not themselves present to this Court—to correct their failure" to show "the law of other states conflicted with California law *as applied to this particular case*." (emphasis in original)).

In contrast to the defendants in *Allen* and *Bruno*, Premier has provided a detailed chart of the laws of all fifty states and identified seemingly important differences, such as the scienter requirements many states have, or the fact California requires proof of reliance. What is missing from the parties' briefs is a detailed discussion of which interpretation of *Mazza* is correct or whether these elements are seriously contested in this case. Accordingly, the Court requests the parties' address the following issues:

(1) Does California's government interest test require a categorical approach, where the existence of a scienter requirement, for example, always give rise to a material conflict between the UCL and the CLRA and the consumer-protection laws of other states? Or must Premier prove that this differing element is seriously in dispute in this case?

(2) Why do scienter and reliance elements and differing damages models[2] make a difference in this case in terms of the geographic scope of the putative class? When answering this question, the parties should examine the specific facts of this case.

### V. CONCLUSION

---

[2] Premier identified one other potential material difference: that Iowa does not provide a private right of action for violations of consumer protection laws. In fact, Iowa does provide a private right of action under the Consumer Frauds Act, Iowa Code § 714H.1. *See id.* § 714H.5; *McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 532-33 (Iowa 2015).

Sonner's motion for class certification is granted in part as set forth above. Sonner and Premier shall submit responses to this request for additional briefing, not to exceed fifteen (15) pages, by May 6, 2016. Reply briefs will not be permitted. The parties are reminded to limit their discussion to the questions presented here and not to reargue any issues previously decided by the Court.

**IT IS SO ORDERED**.

Dated: April 15, 2016

RICHARD SEEBORG
United States District Judge